## UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF MICHIGAN

In the Matter of:

**TURBO COMPONENTS, INC.**

        Debtor.

_____/

Case No. BG 23-01005
Chapter 11- Subchapter V
Hon. James W. Boyd

## COVER SHEET FOR MOTION TO USE CASH COLLATERAL

       The debtor has filed a motion to use cash collateral or to obtain post-petition financing, which is attached to this Cover Sheet. In accordance with LBR 4001-2(b), the debtor has identified below, by page and paragraph number, the location in the proposed order accompanying the motion of each of the following provisions:

| Provision | Contained in Proposed Order | Location in Proposed Order |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | _____ YES<br>__X___ NO | **Page _____**<br>¶_____ |
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | _____ YES<br>__X___ NO | **Page _____**<br>¶_____ |
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | _____ YES<br>__X___ NO | **Page _____**<br>¶_____ |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | _____ YES<br>__X___ NO | **Page _____**<br>¶_____ |
| (5) Provisions that prime any lien without that lienholder's consent. | _____ YES<br>__X___ NO | **Page _____**<br>¶_____ |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | _____ YES<br>__X___ NO | **Page _____**<br>¶_____ |

| | | |
|---|---|---|
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |
| (8) Provisions for the payment of prepetition debt. | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |
| (16) Provisions that purport to bind a subsequent trustee. | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | \_\_\_\_\_ **YES** <br> \_\_**X**\_\_\_ **NO** | **Page** _____ <br> **¶**_____ |

Date: April 28, 2023

/s/ Greg J. Ekdahl
A.  Todd Almassian (P55467)
Greg J. Ekdahl (P67768)
Keller & Almassian, PLC
230 E. Fulton Street
Grand Rapids, MI 49503
(616) 364-2100
ecf@kalawgr.com

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

In the Matter of:

**TURBO COMPONENTS, INC.**

        Debtor.

_____/

Case No. BG 23-01005
Chapter 11- Subchapter V
Hon. James W. Boyd

### DEBTOR'S MOTION FOR ENTRY OF AN INTERIM AND FINAL ORDER (A) AUTHORIZING IT TO USE CASH COLLATERAL AND (B) PROVIDING ADEQUATE PROTECTION AND OTHER RELIEF

The above-captioned debtor (the "**Debtor**") files this motion (the "**Motion**") pursuant to 11 U.S.C. §361 and 363, Fed. R. Bankr. P. 4001 and 9014, and W.D. Mich. Local Bankruptcy Rule ("LBR") 4001-2, for Entry of an Interim and Final Order (A) Authorizing It To Use Cash Collateral and (B) Providing Adequate Protection and Other Relief.  In support of the Motion, Debtor respectfully states as follows:

### JURISDICTION

1.      On April 28, 2023 (the "**Petition Date**"), Debtor filed its voluntary petition for relief under Chapter 11 Subchapter V of Title 11 of the United States Code, as amended (the "**Bankruptcy Code**").  The Debtor continues to manage and operate its business as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.      The Court has jurisdiction to consider this matter pursuant to 28 USC §§157 and 1334.  Venue is proper for this Court pursuant to 28 USC §§1408 and 1409.  This is a core proceeding pursuant to 28 USC §157(b)(2).

3.      The statutory predicates for the relief requested in this Motion are Sections 361 and 363 of the Bankruptcy Code and Fed. R. Bankr. P. 4001.

## RELIEF REQUESTED

4.     Debtor is in immediate need of an Order authorizing the use of cash collateral in order to sustain its operations and preserve its assets for the benefit of the estate and the creditors.

5.     Through this Motion, Debtor seeks entry of interim and final Orders (I) granting and affirming adequate protection to Debtor's secured creditors Comerica Bank ("**Comerica Bank**"), Grow Michigan, LLC ("**Grow Michigan**"), and BorgWarner Turbo Systems, LLC ("**BorgWarner**"), and (II) authorizing Debtor's use of cash collateral, and (III) scheduling a final hearing, substantially in the form of an Order attached hereto as **Exhibit A**.

## DEBTOR'S CASH COLLATERAL AND SECURED CREDITORS

6.     Debtor conducts business for the express purpose of producing and supplying casted and machined aluminum parts, prototypes, tooling production, sand castings, and the production of sand casting molds, primarily related to the agricultural industry.  See **Exhibit B**, First Day Declaration of Brad Fortenbacher.

7.     Debtor employs 34 full-time employees.

8.     The Debtor operates out of two facilities:

- The Machine Shop – 14680 Apple Drive, Fruitport, Michigan, 49415.  The Debtor owns this real property, subject the secured obligations described in this Motion.

- The Foundry – 16960 148th Avenue, Spring Lake, Michigan, 49456. The Debtor does not have an interest in the real estate at the Foundry location.  Debtor pays monthly rent to its landlord, TNB, L.L.C., in the amount of $3,000.00 per month for the Foundry location.  TNB, L.L.C. is a non-debtor entity that is solely owned by Brad Fortenbacher, who is the President of the Debtor.  The Debtor has never had an ownership interest in the real property on which the Foundry is located.

2

9.      Debtor has various operating expenses that are essential to its business.  These operating expenses total approximately $380,000.00 per month prior to debt service and professional fees.

10.     It is in the best interest of creditors to allow the Debtor to sell inventory and use revenue generated from the sales to purchase new inventory and pay for ongoing operational expenses because Debtor anticipates a monthly income, after replacement of inventory such that funds are available to apply to debt service, professional fees, and payment to unsecured creditors.

11.     Brad Fortenbacher is the President of the Debtor and has the primary responsibility for its day-to-day financial operations.  The Debtor is owned by Patsy J. Fortenbacher (66.67%) and Mark A. Sweany (33.33%).

12.     A 13-week cash flow projection demonstrating Debtor can generate revenue, while maintaining creditor security by replacing inventory and paying for operational expenses, secured creditor obligations, and professional fees is attached as **Exhibit C.**  Debtor's largest customer is BorgWarner.  Given BorgWarner's need for turbo components, orders fluctuate weekly.  Debtor's gross revenues may be adjusted weekly.  However, BorgWarner is committed to supporting the Debtor as is evidenced by the DIP Financing Motion and proposed Order.

**Comerica Bank**

13.     Debtor has the following relationship with its senior secured lender, Comerica Bank (Comerica Bank loan documents attached as **Exhibit D).**

      A.      **Comerica Bank – Unpaid Balances**

         i.   Line of Credit          $806,172.22

        ii.   Note Payable            $31,910.98

     iii.   Mortgage Note          $102,599.85

|  | iv. Term Note | $157,024.86 |
|--|--|--|
|  | v. Credit Card | $7,500.00 |
|  | **Total:** | **$1,105,207.91** |

14.     Debtor maintains its deposit accounts with Comerica Bank.  Debtor will continue to maintain all its deposit and checking accounts with Comerica Bank.

15.     Repayment of the Comerica Bank obligations are guaranteed by Brad Fortenbacher, Patsy Fortenbacher, Mark Sweany and TNB, L.L.C.

### Grow Michigan, LLC ("Grow Michigan")

16.     The Debtor has entered into a certain loan and security agreement with Grow Michigan, as subordinated to senior lender Comerica Bank, with a balance remaining in the amount of $863,087.22 (See Grow Michigan Loan Documents attached as **Exhibit E).**  This obligation is junior to the Comerica Bank's secured obligation and there is limited equity, if any, to which the obligation may attach.

17.     Repayment of the Grow Michigan obligations are guaranteed by Brad Fortenbacher, Patsy Fortenbacher, Mark Sweany, and TNB, L.L.C.

### BorgWarner Turbo Systems, LLC ("BorgWarner")

18.     The Debtor has entered into certain mortgage, loan, and security agreement documents with BorgWarner (See BorgWarner Loan Documents attached as **Exhibit F**).  Debtor's current obligation to BorgWarner is $593,386.66.  To secure this obligation, BorgWarner holds a second position mortgage on the Machine Shop (junior to Comerica Bank), and an all asset lien on the personal property of the Debtor. BorgWarner also has a second position mortgage on the Foundry real estate, owned by non-debtor entity TNB, L.L.C.

4

19.     Repayment of the BorgWarner obligations are guaranteed by Brad Fortenbacher and TNB, L.L.C.

20.     Debtor has granted a security interest in its real and personal property to Comerica Bank, Grow Michigan, and BorgWarner, as indicated herein.  Below is a description of the assets and a valuation of the assets that constitute the parties' collateral.  The valuation is based on Debtor's financial records, Debtor President's opinion, and recent appraisals:

A.     Real Estate $570,000.00

B.     Deposit Accounts (Payroll Account/General Account/Savings Account) at Comerica Bank: $24,013.72

C.     Prepayments $40,880.92

D.     Accounts Receivable: $134,411.23

E.     Tooling Projects: $74,902.64

F.     Raw Materials, Finished Goods, Metal and Material Inventory, and Tooling Projects: $624,363.27

G.     Furniture, Fixtures, Machinery and Equipment, and tooling: $1,018,900.00.

21.     Debtor believes that the value of the collateral held by Comerica Bank exceeds the amount of its claim.

22.     Debtor requires the use of its cash collateral to continue business. Debtor has approximately 34 employees.   The leadership and management of Debtor include:

• Brad Fortenbacher – President – anticipated salary of $72,000 per year, plus an additional $45,000 total amount to be paid over the initial 13 weeks of the bankruptcy proceeding (as described in Debtor's 13 Week Cash Flow).   The

5

additional $45,000 consists of: tax preparation costs, individual attorney fees, and business expenses on a personal credit card.

## BASIS FOR RELIEF

23.     11 U.S.C. 363(c)(2) sets the terms for a Court's approval for use of cash collateral, providing that a debtor "may not use, sell, or lease cash collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

24.     Under Section 362(e), upon request of an entity that has an interest in property to be used by the debtor, "the Court shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

25.     Adequate protection serves to protect secured creditors from a diminution in the value of its collateral during the Chapter 11 proceeding.  *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

26.     "A debtor, attempting to reorganize a business under chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to rebuild." *In re George Ruggerie Chrysler-Plymouth, Inc.* 727 F.2d 1017, 1019 (11th Cir. 1984).

## DEBTOR'S USE OF CASH COLLATERAL

27.     Debtor requires use of the cash collateral to pay its employees and ordinary expenses of operating the business such as insurance, rent, utilities, and inventory, as well as payment of post-petition professional expenses and fees as approved by this Court.

28.     The use of cash collateral is necessary to preserve the value of the estate and benefit the creditors.

29.     Debtor's use of its cash collateral is essential to the continuation of the business and to preserve the value of its estate, and to avoid immediate and irreparable harm to the Debtor.

30.     Debtor anticipates it will generate sufficient revenue over the course of this Chapter 11 Subchapter V proceeding, with the support of BorgWarner.

31.     Pursuant to the adequate protection identified below, Debtor submits it should be granted authority to use the cash collateral.

## **ADEQUATE PROTECTION**

32.     As adequate protection for the use of cash collateral described herein, Debtor offers the following under 11 U.S.C. 361 and 363 concerning any diminution in pre-petition collateral:

- Comerica Bank shall retain its security interest and liens on all assets in its current rank, order, and priority.  The Debtor grants Comerica Bank a replacement lien and security interest in all post petition assets of the Debtor of the same type, category, and priority constituting each secured creditor's pre-petition collateral.  Comerica Bank is adequately protected if it retains all of its security interests in post-petition assets.  Comerica Bank shall be further entitled to receive ongoing monthly interest payments in the amount of $11,000.00 for the month of May 2023, and continuing each month until the Subchapter V Chapter 11 Plan is confirmed.

- Grow Michigan shall retain its security interest and lien on all assets in its current rank, order, and priority. The Debtor grants Grow Michigan a replacement lien and security interest in all post petition assets of the Debtor of the same type, category, and priority constituting each secured creditor's pre-petition collateral.   Grow Michigan is adequately protected if it retains all of its security interests in post-petition assets.  Grow Michigan shall be further entitled to receive ongoing monthly

7

interest payments in the amount of $650.00 for the month of May 2023, and continuing each month until the Subchapter V Chapter 11 Plan is confirmed.

- BorgWarner shall retain its security interest and lien on all assets in its current rank, order, and priority. The Debtor grants BorgWarner a replacement lien and security interest in all post petition assets of the Debtor of the same type, category, and priority constituting each secured creditor's pre-petition collateral.    BorgWarner is adequately protected if it retains all of its security interests in post-petition assets.

- Debtor's projections reveal that by the week ending May 27, 2023, Comerica Bank, Grow Michigan, and BorgWarner's collateral positions in Accounts Receivable and cash in the Bank will be maintained and are not expected to deteriorate. BorgWarner continues to support the Debtor.


## <u>NOTICE</u>

33.    This Motion will be served electronically or by first-class mail on: (i) the Office of the United States Trustee for the Western District of Michigan; (ii) the Subchapter V Trustee (iii) identified secured creditors, or their counsel if known, (iv) Brad Fortenbacher or his Counsel, (v) the Twenty (20) largest unsecured creditors of the Debtor as disclosed on Debtor's Schedules filed pursuant to Bankruptcy Rule 1007(b), and (vi) any parties that have filed notices of appearances or requests for notice.  In light of the nature of the relief requested, the Debtor submits that no other or further notice is required.


**WHEREFORE**, Debtor requests that this Court enter an Order, substantially in the form attached as Exhibit A, and grant such other and further relief as it may deem just and equitable,

8

including but not limited to allowing the Debtor to use cash collateral in sufficient amounts to

maintain its business operations.

<div style="margin-left: 50%;">

Respectfully submitted,
KELLER & ALMASSIAN, PLC

</div>

Date: April 28, 2023

<div style="margin-left: 50%;">

/s/ Greg J. Ekdahl
A. Todd Almassian (P55467)
Greg J. Ekdahl (P67768)
230 East Fulton Street
Grand Rapids, MI 49503
(616) 364-2100
talmassian@kalawgr.com
gekdahl@kalawgr.com

</div>

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**

In the Matter of:

Case No. BG 23-01005
**TURBO COMPONENTS, INC.**                    Chapter 11- Subchapter V
                                             Hon. James W. Boyd

Debtor.

_____/

## INTERIM ORDER REGARDING FIRST DAY MOTION OF THE DEBTOR FOR INTERIM AUTHORITY TO USE CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION

This matter having come before the Court on Debtor's First Day Motion For Interim Authority to Use Cash Collateral and Provide Adequate Protection (the "Motion"). The Court having reviewed the Motion, and finding that (a) there are no objections; (b) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (c) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (d) notice of the Motion and the Hearing appear sufficient under the circumstances; and (e) just cause exists for the relief granted herein:

A.    As used herein, "Cash Collateral" means "cash collateral" as defined by Section 363(b) of the Bankruptcy Code. 11 U.S.C. §§ 101 et seq. including post-petition proceeds, products, offspring, rents, or profits of property and fees charges, accounts or other payments for the use or occupancy of rooms and other lodging properties subject to a security interest as provided in Section 552(b) and as the term "Proceeds" is described in Uniform Commercial Code Section 9-306.

B.    The Debtor has represented that the Cash Collateral described in the Motion is subject to a perfected first priority lien and security interest in favor of Comerica Bank ("Bank"); a perfected security lien and security interest in favor of Grow Michigan, LLC ("Grow"), and a

perfected security lien and security interest in favor of BorgWarner Turbo Systems, LLC ("BorgWarner") (collectively the "Secured Creditors").

C.      There is an immediate risk of immediate and irreparable harm to the Debtor's business if the relief requested in the Motion is not granted on an immediate basis, and that it is appropriate to enter this Order without a hearing, or after a Hearing on Reduced Notice under the exigent circumstances presented.

The Court, having reviewed the Motion presented, heard oral argument of Debtor, and being otherwise fully advised in the premises, **IT IS HEREBY ORDERED THAT:**

1.      **USE OF CASH COLLATERAL**. The Debtor is authorized to use, in the aggregate, not more than $330,000 of Cash Collateral through the period ending on May 28, 2023 for the purpose of purchasing necessary goods and services to continue its business and to pay payroll.

2.      **ADEQUATE PROTECTION**.  As adequate protection for the Debtor's use of Cash Collateral pending the final hearing described in Paragraph 3 below, the following Adequate Protection is provided to Bank, Grow, and BorgWarner:

a.      All cash, checks, refunds (including tax refunds), negotiable instruments, deposit accounts, securities and other cash equivalents (including payments from credit card issuers) which were in the possession, custody, or control of Debtor as of the Petition Date and all proceeds of Petition Date accounts and inventory constitute and will constitute Cash Collateral. Pending the final hearing described in Paragraph 3 below, and subject to the overall dollar limit described in Paragraph 1 above, Debtor's use of Cash Collateral will be limited to the payment of those expenses itemized in the budget/cash flow projection attached at Exhibit C to the Motion, but only to the extent of the aggregate amount stated in each line item in such budget (with no

2

ability to fund an expense in one line item category with any monies or surplus from another line item category) to pay wages owed as of the petition date and accruing thereafter and to pay all other line item expenses accruing post-petition. Bonuses and deferred compensation owed any employee or consultant are expressly excluded from this authorization to use Cash Collateral. The professional fees set forth in the attached budget remain subject to Court approval, with the Secured Creditors reserving all rights to object to such fees.

  b. Debtor shall not use, sell, or consume inventory except in the ordinary course of Debtor's business.

  c. No equipment shall be disposed of except pursuant to Court order. To the extent not already authorized by Section 552(b) of the Bankruptcy Code, as adequate protection for Debtor's continued use of Secured Creditors' collateral, including Cash Collateral actually used by Debtor, Debtor grants to Secured Creditors a replacement lien and security interest in all post-petition assets of Debtor of the same type, category, and priority as the pre-petition collateral of Secured Creditors. Debtor acknowledges that all post-petition cash and accounts receivable that are proceeds of pre-petition collateral will be regarded as proceeds of Secured Creditors' pre-petition collateral pursuant to Section 552(b), and waives any right under that Section to any court order to the contrary.

  d. Debtor acknowledges that Bank is a fully secured creditor, entitled to post-petition interest and attorneys fees under 11 USC 506(b). Pending final hearing, Debtor is authorized to make the adequate protection payments to the Secured Creditors as set forth in the accompanying Stipulation.

  e. Debtor shall provide Secured Creditors with proof of insurance on Secured Creditors' collateral within 5 days of entry of this Order.

3

f.      All new bank accounts opened as Debtor-in-Possession shall be opened by the Debtor at Bank.

3.      **CASH COLLATERAL MOTION HEARING.** After a final hearing on this Motion, which is hereby scheduled for _____, 2023, at _____ ___.m., in the Courtroom of the Honorable James W. Boyd, located at the United States Bankruptcy Court, Western District of Michigan, One Division Ave N, Grand Rapids, MI 49503, the terms of this Order may change.

4.      **OTHER RIGHTS**.  All other rights and remedies of the Debtor and Secured Creditors arising under the Code or other applicable law are retained and preserved.

5.      **NOTICE**.  Debtor shall serve a copy of this Order upon (i) the Office of the United States Trustee for the Western District of Michigan; (ii) the Subchapter V Trustee (iii) identified secured creditors, or their counsel if known, (iv) Brad Fortenbacher or his Counsel, (v) the Twenty (20) largest unsecured creditors of the Debtor as disclosed on Debtor's Schedules filed pursuant to Bankruptcy Rule 1007(b), and (vi) any parties that have filed notices of appearances or requests for notice.

## END OF ORDER

4

# EXHIBIT B

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

In the Matter of:

**TURBO COMPONENTS, INC.**

Debtor.

_____/

Case No. BG 23-01005
Chapter 11- Subchapter V
Hon. James W. Boyd

## DECLARATION OF BRAD FORTENBACHER
## IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, BRAD FORTENBACHER, declare under penalty of perjury pursuant to 28 U.S.C. §
1746 as follows:

1.     I am the President of Turbo Components, Inc. (the **"Debtor or Turbo"**), and I
submit this Declaration to assist the Court and other parties in interest in understanding the
circumstances that compelled the Debtor to commence its Chapter 11 case and in support of (i) the
Debtor's petition for relief under Chapter 11 of title 11 of the United States Code (the
**"Bankruptcy Code"**) and (ii) the relief requested by the Debtor pursuant to various motions filed
contemporaneously herewith (collectively, the **"First Day Motions"**).

2.     Except as otherwise indicated, all facts set forth in this Declaration are based upon
my personal knowledge, my discussions with other members of the Debtor's senior management,
financial advisors from Gantry Business Solutions LLC including Dave Distel and Matthew
Thiede, bankruptcy attorney A. Todd Almassian, my review of relevant documents, and my
opinion based upon my experience, knowledge, and information concerning the Debtor's
operations and financial affairs. If called upon to testify, I would testify competently to the facts
set forth in this Declaration. The Debtor has authorized me to submit this Declaration on its behalf.

3.     Further, I have reviewed generally the First Day Motions and affirm that the facts
set forth therein are true and correct to the best of my knowledge.

## BACKGROUND

### Corporate Structure.

4.      Turbo produces and supplies CNC machined aluminum parts, prototypes, tooling production, and sand castings.

5.      The Debtor is owned by Patsy Fortenbacher (two-thirds) and Mark Sweany (one-third). Brad Fortenbacher is the President.

### Business Operations.

6.      The company has approximately 34 employees.

7.      The Debtor's headquarters are 14680 Apple Avenue, Fruitport, MI 49415. The Debtor owns a machine shop at this location. Additionally, Brad Fortenbacher owns and is the Managing Member of TNB, L.L.C. which owns the real estate located at 16960 148th Avenue, Spring Lake, Michigan 49456. This location is the foundry and an integral part of the Debtor's operations.

### Business History.

8.      Turbo was founded in 2005 to produce aftermarket/performance components for US Turbo, LLC of Indianapolis, Indiana. Operations started in the current casting facility in Spring Lake, Michigan. The company focused on producing high mix, low volume compressor housings for the commercial diesel, performance, remanufacturing and direct aftermarket applications. In May 2005, TCI began casting and machining compressor housings for Borg Warner Turbo Systems in Asheville, North Carolina. In 2012, US Turbo, LLC ceased operations and TCI acquired the tooling and assets to settle open receivables and notes. In 2014, the company significantly leveraged its balance sheets to redeem two-thirds of its outstanding stock from the estate of a deceased investor. At this period of time, resources were being consumed by the main customer and attention and growth with aftermarket and performance came to a standstill. A

2

decision was made to take an additional 35,000 units for Borg Warner Turbo Systems in order to have volume to generate cash for debt service and capital replacement. The planned volume was 120,000 units after the transfer of the volume from other outsourced work. Due to economic issues and resulting market demand reduction, this volume was not realized in 2016 or after. After taking an additional lower margin volume and passing through a 4% price reduction, total volume actually remained around 90,000 units. The reaction was to reduce support staff and defer capital and maintenance costs. The labor crisis created by Covid-19 increased labor costs by 35% over 18 months. Metal prices doubled over a 12-month period while metal reimbursement (surcharge rates) lagged. PPP funding was consumed in 2020. TCI requested pricing increases in March of 2021 from Borg Warner Turbo Systems. An increase of 8% was implemented on August 1, 2021. The increase was almost immediately consumed by inflationary pressures across the board. Pricing was again increased in August 2022 by 11%. All other customers received increases of approximately 18-19%. The increase has again been consumed by increased costs. The key to viability going forward is target capital investments to drive increases in productivity.

## Events Leading To Chapter 11 Filing

9.     There were a number of major initiatives that needed to be addressed in order to operate the business. In November 2022, Turbo had accumulated approximately $4.3 million in debt which could not be serviced. Even with the recent price increases of between 18% and 19% from customers over the preceding 15 months improving cash flow, it did not make enough of a difference because for 16 years we did not have a price increase to offset inflation and cost increases. Comerica Bank is owed approximately $1.2 million (owed by Debtor and non-Debtor party). Comerica's debt is secured by an all-asset lien including first mortgages on both the machine shop real estate and the foundry real estate. The Debtor had entered into a number of

3

forbearance agreements, but after 8 quarters of breaching loan covenants consecutively, the senior lender was no longer willing to extend further flexibility.

a.   The Debtor owes Grow Michigan, LLC $863,087.22 on its second position all-asset lien. Grow Michigan, LLC does not have a mortgage on either of the business real estate locations.

b.   90% of Turbo's work is from BorgWarner Turbo Systems, LLC. They were assisting the Debtor with material advances.

c.   Payroll withholding taxes in the approximate amount of $650,000.00 have not been paid.

d.   General unsecured creditors are owed approximately $1.385 million which does not include possible secured creditor deficiency balances. The Debtor moved to Cash-On-Delivery terms with Beck and all suppliers, and have maintained that relationship for some time. Further, Turbo owes an owner's note in the amount of $549,000.00 as a result of my reinvestment over the years into the company to assist with its liquidity challenges.

e.   With the complete support of BorgWarner Turbo Systems, LLC., I decided to explore a sale process which would transition the company to a new owner while maintaining the business, paying the creditors the best I could under the circumstances, and retaining the employees.

f.   Significant efforts on behalf of the financial advisor and his team, along with the assistance of Turbo's bankruptcy counsel, we have been able to execute an APA for the sale of all assets for approximately $1.9 million (including non-debtor real estate). That is significantly higher than any other offer we have received.

g.   Despite the recent support and flexibility of Debtor's primary client, BorgWarner Turbo Systems, LLC, few buyers have been interested in the Debtor.

4

h. I believe a subchapter V bankruptcy filing along with a combined plan and disclosure statement for the private sale of all assets to a new buyer in the approximate amount of $2 million is the best possible outcome for all interested parties.

## FIRST DAY MOTIONS

10. To minimize the adverse effects of the commencement of its chapter 11 case on its business and employees, the Debtor will file several First Day Motions with this Court.

11. I have reviewed the First Day Motions and believe the facts set forth therein are true and correct to the best of my knowledge. I believe that the relief requested in each of the First Day Motions is necessary, appropriate, and is in the best interest of the Debtor's estate, creditors, and other parties in interest.

### A.   Employee Wages Motion.

12. In the ordinary course of its business, the Debtor incurs payroll obligations to its employees (the "**Employees**"). The Debtor employs approximately 34 full-time Employees. The Employees perform critical functions for day-to-day business operations. Payroll is made every Friday.

13. The Debtor's records indicate that the amount of Prepetition Compensation and Prepetition Benefits owing to or on account of any one particular Employee will not exceed the sum of $15,500.00 allowable as a priority claim under Sections 507(a)(4) and (a)(5) of the Bankruptcy Code. All employee wages are current (all payments issued).

### B.   Cash Collateral Motion.

14. Through the Cash Collateral Motion, the Debtor seeks Court approval to use cash in which the Secured Lenders (as defined in such motion) may assert a lien (the "**Cash Collateral**"). Such cash collateral consists primarily of cash on hand plus the normal income received from the Debtor's customers.

15.     The Debtor has an immediate need for the use of Cash Collateral and will suffer irreparable harm if it is not immediately allowed to use Cash Collateral for, among other things, continuing its regular business operations in an orderly manner; maintaining business relationships with vendors, suppliers, and customers, providing for the payment of employees, and satisfying other working capital, timely payment of post-petition vendors and operational needs--all of which are vital to preserving and having the opportunity to maintain the Debtor's going-concern value and, ultimately, effectuating a successful course for the benefit of all creditors and parties in interest.

16.     The Debtor intends to use cash collateral consistent with a proposed budget (the "Budget"), as attached to the Cash Collateral motion. The Budget covers the expenses necessary to meet the normal operations of the Debtor's businesses and to properly administer the Debtor's bankruptcy estate while in the protection of chapter 11.

17.     As may be set forth in more detail in the Cash Collateral Motion, Debtor is seeking the Secured Lenders' authorization to use Cash Collateral.  Utilizing cash collateral will help to consider maintaining the Debtor's business operations, to continually replenish its accounts receivable, and thereby preserve and enhance the value of the Secured Lenders' collateral.

## C.     **DIP Financing Motion.**

18.     Through the DIP Financing Motion, the Debtor seeks Court approval to receive post-petition debtor in possession financing from BorgWarner Turbo Systems, LLC, to fund the Debtor's inventory purchases and ongoing business expenses during the pendency of this proceeding.

19.     The Debtor believes the DIP Financing is essential to the success of this chapter 11 process, and that the relief sought in the Motion provides the best and only reasonable opportunity

6

to receive such funding, which in turn provides the Debtor and its creditors with the best opportunity for confirmation of a Plan.

20.     The DIP Financing is intended as bridge financing, which the Debtor is confident will enable it to meet required expenses in contemplation of the sale of the Debtor through a Chapter 11 Plan. If the Debtor is unable to obtain financing, it will not be able to meet its various expenses, timely furnish its customers, which includes BorgWarner, with parts, or continue operations. The inability to ship to customers would have a material adverse effect on the value of the Debtor's customer base, future business, and positive cash flow associated with those customers, and the ability of the Debtor to maintain operations in contemplation of the sale anticipated through the Subchapter V Chapter 11 process. It is in the best interests of all parties that the Debtor continues to pay expenses, maintain its customer base, and continue operations.

### C.     Utilities Motion.

21.     Any interruption of utility service would severely disrupt and diminish the Debtor's chance for a successful reorganization. Accordingly, the Debtor requests the Court enter an order (a) prohibiting the Utility Companies from altering or discontinuing utility services based upon the chapter 11 filing, and (b) establishing procedures as described in the Utilities Motion for determining requests for assurance of payment.

### D.     Claims Deadline Motion.

22.     The Debtor requires the ability to timely evaluate, and where necessary, to object to proofs of claim in the bankruptcy estate in conjunction with proposing a confirmable plan in this case. In order for the Debtor to reasonably assess all claims and propose a confirmable plan, it is necessary that the universe of claims be identified. Further, due to the shortened deadlines in this Subchapter V case, it is important that the Debtor and its counsel be able to evaluate all claims

7

sufficiently before the deadline for filing a chapter 11 plan. The Debtor requests the Court enter an order to establish the dates by which claims must be filed.

23. Debtor further requests the claims bar deadline for governmental units be accelerated to match the general claims bar deadline.

**Conclusion.**

24. I believe the relief sought in the First Day Motions is necessary for the Debtor to effectuate a smooth transition into chapter 11 bankruptcy, to avoid irreparable harm to its business and estate, and is in the best interest of the Debtor's creditors, estates, and other stakeholders.

25. Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in their entirety, together with such further relief as the Court deems just and proper.

Dated: April 28, 2023

/s/ Brad Fortenbacher
Brad Fortenbacher
President
Turbo Components, Inc.

8

EXHIBIT C

Turbo Components INC
Weekly Cash Flow Financial Forecast
(Dollars in Rounded to Nearest $1)
Chapter 11 Dated    4/28/23

| | | | | | Cash Flow Forecast Week Starting 5/1 through 7/24 | | | | |
| Week Beginning (Monday) | 5/1/23 | 5/8/23 | 5/15/23 | 5/22/23 | 5/29/23 | 6/5/23 | 6/12/23 | 6/19/23 | 6/26/23 |
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| **CASH RECEIPTS** | | | | | | | | | |
| Borg Warner | 38,713 | 38,713 | 52,621 | 52,621 | 52,621 | 52,621 | 54,571 | 54,571 | 54,571 |
| All Other Turbo+Remanufacturing Sales | 5,713 | - | - | 33,387 | 13,514 | 28,589 | 27,438 | 38,438 | 27,438 |
| Tooling/Prototype Sales | - | - | - | - | 5 | - | - | - | - |
| Scrap Sales | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 |
| Borg Warner - Advance Borrowing | 25,872 | 53,553 | 12,503 | - | 36,557 | 13,838 | - | - | 1,869 |
| **TOTAL CASH RECEIPTS** | 71,598 | 93,566 | 66,423 | 87,318 | 103,991 | 96,348 | 83,309 | 94,309 | 85,178 |
| **CASH DISBURSEMENTS** | | | | | | | | | |
| *Cost of Goods Sold* | | | | | | | | | |
| Metal | (12,683) | (18,871) | (12,683) | (11,975) | (25,844) | (10,582) | (13,959) | (10,969) | (25,844) |
| Purchased Components | (5,760) | (4,803) | (6,468) | (5,251) | (5,251) | (5,973) | (5,251) | (3,580) | (3,580) |
| Labor | (22,684) | (22,684) | (22,684) | (22,684) | (22,684) | (22,684) | (22,684) | (22,684) | (22,684) |
| Temp Staffing | - | - | - | - | - | - | - | - | - |
| Benefits | (12,261) | (744) | - | - | (16,250) | (1,000) | - | - | (17,250) |
| Payroll Taxes-Federal | (6,402) | (6,402) | (6,402) | (6,402) | (6,402) | (6,402) | (6,402) | (6,402) | (6,402) |
| Payroll Taxes-State | - | - | - | - | (5,149) | - | - | - | (4,983) |
| Payroll Taxes-Unemployment | - | - | - | - | (2,000) | - | - | - | (2,200) |
| Garnishments | - | - | - | - | (2,000) | - | - | - | (2,000) |
| Repairs & Maintenance | (2,036) | (1,579) | (2,375) | (2,510) | (2,510) | (2,379) | (2,092) | (1,426) | (1,426) |
| Consumables/Supplies | (3,149) | (2,592) | (3,561) | (3,726) | (3,726) | (4,146) | (3,726) | (2,753) | (2,753) |
| Freight | (200) | (1,200) | (200) | (200) | (200) | (1,200) | (200) | (200) | (200) |
| Truck Lease | (8,750) | - | - | - | - | (8,750) | - | - | - |
| Refuse | - | - | - | - | (2,500) | - | - | - | (2,500) |
| Utilities-Natural Gas | (13,500) | - | - | - | - | (13,500) | - | - | - |
| Utilities-Electric | - | (12,500) | - | - | (5,200) | - | (12,500) | - | (5,200) |
| Utilities-Water/Sewer | - | - | - | - | - | - | - | - | - |
| Equipment Rental | (771) | (654) | - | - | - | (771) | (654) | - | - |
| Property Taxes-PP | - | - | - | - | - | - | - | - | - |
| Property Taxes-RE | (898) | - | - | - | (898) | - | - | - | (898) |
| Rent | - | - | - | - | (3,000) | - | - | - | (3,000) |
| Property & Casualty, Workers Comp and Liability Insurance | - | (2,728) | - | - | (3,974) | (2,728) | - | - | (3,974) |
| Keyman Insurance | (724) | - | - | - | (724) | - | - | - | (724) |
| Phone Internet | - | (400) | - | - | - | - | (400) | - | - |
| Professional Services - IT/Benefits Consulting/Calibration/Accoun | - | - | - | - | (2,500) | (234) | - | - | (2,500) |
| Bank Fees | - | - | (1,000) | - | - | - | (1,000) | - | - |
| **TOTAL CASH BASED OPERATING EXPENSES** | (89,817) | (75,156) | (55,373) | (52,748) | (110,811) | (80,348) | (66,868) | (48,013) | (108,116) |
| **NET CASH FLOW/(USAGE) from OPERATIONS** | (18,219) | 18,410 | 11,050 | 34,570 | (6,820) | 16,000 | 14,441 | 46,296 | (22,937) |
| Cash Disbursements for Capital Expenditures | - | - | - | - | - | - | - | - | - |

Turbo Components INC
Weekly Cash Flow Financial Forecast
(Dollars in Rounded to Nearest $1)
Chapter 11 Dated               | 4/28/23 |

| | | | | | | | | Cash Flow Forecast Week Starting 5/1 through 7/24 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning (Monday) | | 5/1/23 | | 5/8/23 | | 5/15/23 | | 5/22/23 | | 5/29/23 | | 6/5/23 | | 6/12/23 | | 6/19/23 | | 6/26/23 |
| Week Number | | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | | 7 | | 8 | | 9 |
| FREE CASH FLOW BEFORE DEBT SERVICE | $ | (18,219) | $ | 18,410 | $ | 11,050 | $ | 34,670 | $ | (6,820) | $ | 16,000 | $ | 14,441 | $ | 46,296 | $ | (22,937) |
| | | | | | | | | | | | | | | | | | | |
| **DEBT SERVICE** | | | | | | | | | | | | | | | | | | |
| Secured Debt - Interest Payments + Credit Card Payments | | | | | | | | | | | | | | | | | | |
| L.O.C-Fundbox | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Credit Card-Comerica | $ | - | $ | (7,500) | $ | - | $ | - | $ | - | $ | (7,500) | $ | - | $ | - | $ | - |
| L.O.C-Comerica | $ | (8,500) | $ | - | $ | - | $ | - | $ | (8,500) | $ | - | $ | - | $ | - | $ | (8,500) |
| Term Loan(s)-Comerica | $ | (1,000) | $ | - | $ | - | $ | - | $ | (1,000) | $ | - | $ | - | $ | - | $ | (1,000) |
| Mortgage-Comerica | $ | - | $ | - | $ | (1,000) | $ | - | $ | - | $ | - | $ | (1,000) | $ | - | $ | - |
| Note Payable-Comerica | $ | (500) | $ | - | $ | - | $ | - | $ | (500) | $ | - | $ | - | $ | - | $ | (500) |
| Equipment Lease Furnace-Huntington | $ | (100) | $ | - | $ | - | $ | - | $ | (100) | $ | - | $ | - | $ | - | $ | (100) |
| Equipment Lease Green Sand-Huntington | $ | - | $ | - | $ | (50) | $ | - | $ | - | $ | - | $ | (50) | $ | - | $ | - |
| Grow Michigan | $ | (650) | $ | - | $ | - | $ | - | $ | (650) | $ | - | $ | - | $ | - | $ | (650) |
| | | | | | | | | | | | | | | | | | | |
| TOTAL - Secured Debt Service | $ | (10,750) | $ | (7,500) | $ | (1,050) | $ | - | $ | (10,750) | $ | (7,500) | $ | (1,050) | $ | - | $ | (10,750) |
| Priority Debt | | | | | | | | | | | | | | | | | | |
| Federal Withholding & FICA | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Michigan Withholding | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Michigan Unemployment | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Federal/State Income Tax+OSHA Penalty | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Administrative Debt | | | | | | | | | | | | | | | | | | |
| Professional Fees - Legal & Financial Advisor | $ | - | $ | (11,000) | $ | (10,000) | $ | (8,500) | $ | (8,500) | $ | (8,500) | $ | (9,000) | $ | (8,500) | $ | (8,500) |
| TOTAL  DEBT SERVICE | $ | (10,750) | $ | (18,500) | $ | (11,050) | $ | (8,500) | $ | (19,250) | $ | (16,000) | $ | (10,050) | $ | (8,500) | $ | (19,250) |
| FREE CASH FLOW AFTER DEBT SERVICE | $ | (28,969) | $ | (90) | $ | 0 | $ | 26,070 | $ | (26,070) | $ | 0 | $ | 4,391 | $ | 37,796 | $ | (42,187) |
| Beginning Cash Balance | $ | 39,059 | $ | 10,090 | $ | 10,000 | $ | 10,000 | $ | 36,070 | $ | 10,000 | $ | 10,000 | $ | 14,391 | $ | 52,187 |
| Ending Cash Balance | $ | 10,090 | $ | 10,000 | $ | 10,000 | $ | 36,070 | $ | 10,000 | $ | 10,000 | $ | 14,391 | $ | 52,187 | $ | 10,000 |

Turbo Components INC
Weekly Cash Flow Financial Forecast
*(Dollars in Rounded to Nearest $1)*
Chapter 11 Dated

| 4/28/23 |
|---|

| Week Beginning (Monday) | 7/3/23 | | 7/10/23 | | 7/17/23 | | 7/24/23 | | 13 Week Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Week Number | 10 | | 11 | | 12 | | 13 | | | |
| **CASH RECEIPTS** | | | | | | | | | | |
| Borg Warner | $ | 54,571 | $ | 54,571 | $ | 82,329 | $ | 82,329 | $ | 725,421 |
| All Other Turbo+Remanufacturing Sales | $ | - | $ | - | $ | 26,813 | $ | 5,375 | $ | 206,715 |
| Tooling/Prototype Sales | $ | - | $ | - | $ | - | $ | - | $ | - |
| Scrap Sales | $ | 1,300 | $ | 1,300 | $ | 2,750 | $ | 2,750 | $ | 19,800 |
| Borg Warner - Advance Borrowing | $ | 45,734 | $ | 33,368 | $ | (37,776) | $ | - | $ | 185,518 |
| **TOTAL CASH RECEIPTS** | $ | 101,605 | $ | 89,239 | $ | 74,115 | $ | 90,454 | $ | 1,137,453 |
| | | | | | | | | | | |
| **CASH DISBURSEMENTS** | | | | | | | | | | |
| *Cost of Goods Sold* | | | | | | | | | | |
| Metal | $ | (17,712) | $ | (18,053) | $ | (20,160) | $ | (17,712) | $ | (217,049) |
| Purchased Components | $ | (5,338) | $ | (3,932) | $ | (3,580) | $ | (5,400) | $ | (64,167) |
| Labor | $ | (25,144) | $ | (25,144) | $ | (25,144) | $ | (25,144) | $ | (304,735) |
| Temp Staffing | $ | - | $ | - | $ | - | $ | - | $ | - |
| Benefits | $ | - | $ | - | $ | - | $ | - | $ | (47,505) |
| Payroll Taxes-Federal | $ | (7,053) | $ | (7,053) | $ | (7,053) | $ | (7,053) | $ | (85,824) |
| Payroll Taxes-State | $ | - | $ | - | $ | - | $ | - | $ | (16,832) |
| Payroll Taxes-Unemployment | $ | - | $ | - | $ | - | $ | (2,200) | $ | (6,400) |
| Garnishments | $ | - | $ | - | $ | - | $ | (3,500) | $ | (7,600) |
| Repairs & Maintenance | $ | (2,126) | $ | (1,566) | $ | (1,426) | $ | (2,151) | $ | (25,603) |
| Consumables/Supplies | $ | (3,776) | $ | (2,958) | $ | (2,753) | $ | (3,812) | $ | (43,429) |
| Freight | $ | (1,200) | $ | (200) | $ | - | $ | - | $ | (5,200) |
| Truck Lease | $ | (8,750) | $ | - | $ | - | $ | - | $ | (26,250) |
| Refuse | $ | - | $ | - | $ | - | $ | (2,500) | $ | (7,500) |
| Utilities-Natural Gas | $ | (13,500) | $ | - | $ | - | $ | - | $ | (40,500) |
| Utilities-Electric | $ | - | $ | (12,500) | $ | - | $ | - | $ | (47,900) |
| Utilities-Water/Sewer | $ | - | $ | (1,500) | $ | - | $ | - | $ | (1,500) |
| Equipment Rental | $ | (771) | $ | (654) | $ | - | $ | - | $ | (4,275) |
| Property Taxes-PP | $ | - | $ | - | $ | - | $ | - | $ | - |
| Property Taxes-RE | $ | - | $ | - | $ | - | $ | - | $ | (2,693) |
| Rent | $ | - | $ | - | $ | - | $ | - | $ | (6,000) |
| Property & Casualty, Workers Comp and Liability Insurance | $ | - | $ | (2,728) | $ | - | $ | - | $ | (16,133) |
| Keyman Insurance | $ | - | $ | - | $ | - | $ | - | $ | (2,171) |
| Phone Internet | $ | - | $ | (400) | $ | - | $ | - | $ | (1,200) |
| Professional Services - IT/Benefits Consulting/Calibration/Accoun | $ | (234) | $ | - | $ | - | $ | - | $ | (5,468) |
| Bank Fees | $ | - | $ | (1,000) | $ | - | $ | - | $ | (3,000) |
| **TOTAL CASH BASED OPERATING EXPENSES** | $ | (85,605) | $ | (77,689) | $ | (60,115) | $ | (76,274) | $ | (988,932) |
| **NET CASH FLOW/(USAGE) from OPERATIONS** | $ | 16,000 | $ | 11,550 | $ | 14,000 | $ | 14,180 | $ | 148,521 |
| Cash Disbursements for Capital Expenditures | $ | - | $ | - | $ | - | $ | - | $ | - |

Turbo Components INC
Weekly Cash Flow Financial Forecast
(Dollars in Rounded to Nearest $1)
Chapter 11 Dated          4/28/23

| | | | | | | | | | | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning (Monday) | | 7/3/23 | | 7/10/23 | | 7/17/23 | | 7/24/23 | | |
| Week Number | | 10 | | 11 | | 12 | | 13 | | |
| FREE CASH FLOW BEFORE DEBT SERVICE | $ | 16,000 | $ | 11,550 | $ | 14,000 | $ | 14,180 | $ | 148,521 |
| | | | | | | | | | | |
| **DEBT SERVICE** | | | | | | | | | | |
| Secured Debt - Interest Payments + Credit Card Payments | | | | | | | | | | |
| L.O.C.-Fundbox | $ | - | $ | - | $ | - | $ | - | $ | - |
| Credit Card-Comerica | $ | (7,500) | $ | - | $ | - | $ | - | $ | (22,500) |
| L.O.C-Comerica | $ | - | $ | - | $ | - | $ | - | $ | (26,500) |
| Term Loan(s)-Comerica | $ | - | $ | - | $ | - | $ | - | $ | (3,000) |
| Mortgage-Comerica | $ | - | $ | (1,000) | $ | - | $ | - | $ | (3,000) |
| Note Payable-Comerica | $ | - | $ | - | $ | - | $ | - | $ | (1,500) |
| Equipment Lease Furnace-Huntington | $ | - | $ | - | $ | - | $ | - | $ | (300) |
| Equipment Lease Green Sand-Huntington | $ | - | $ | (50) | $ | - | $ | - | $ | (150) |
| Grow Michigan | $ | - | $ | - | $ | - | $ | - | $ | (1,950) |
| | | | | | | | | | | |
| TOTAL - Secured Debt Service | $ | (7,500) | $ | (1,050) | $ | - | $ | - | $ | (57,900) |
| Priority Debt: | | | | | | | | | | |
| Federal Withholding & FICA | $ | - | $ | - | $ | - | $ | - | $ | - |
| Michigan Withholding | $ | - | $ | - | $ | - | $ | - | $ | - |
| Michigan Unemployment | $ | - | $ | - | $ | - | $ | - | $ | - |
| Federal/State Income Tax+OSHA Penalty | $ | - | $ | - | $ | - | $ | - | $ | - |
| Administrative Debt: | | | | | | | | | | |
| Professional Fees - Legal & Financial Advisor | $ | (8,500) | $ | (10,500) | $ | (14,000) | $ | (14,000) | $ | (119,500) |
| | | | | | | | | | | |
| TOTAL  DEBT SERVICE | $ | (16,000) | $ | (11,550) | $ | (14,000) | $ | (14,000) | $ | (177,400) |
| | | | | | | | | | | |
| FREE CASH FLOW AFTER DEBT SERVICE | $ | - | $ | - | $ | - | $ | 180 | $ | (28,879) |
| Beginning Cash Balance | $ | 0 | $ | (0) | $ | (0) | $ | 180 | $ | 39,059 |
| Ending Cash Balance | $ | 10,000 | $ | 10,000 | $ | 10,000 | $ | 10,000 | $ | 10,180 |
| | $ | 10,000 | $ | 10,000 | $ | 10,000 | $ | 10,180 | $ | 10,180 |

# EXHIBIT D

Michigan Department of State - Uniform Commercial Code

Document Number:

**2012062531-6**

Filing Date and Time:

4/27/2012 2:11:15 PM

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Corporation Service Company

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Corporation Service Company

801 Adlai Stevenson Drive

Springfield            IL      62703

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME
TURBO COMPONENTS, INC.

| OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 16960 148th AVENUE | SPRING LAKE | MI | 49456 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corp. | 1f. JURISDICTION OF ORGANIZATION MI | 1g. ORGANIZATIONAL ID #, if any 42934D | NONE |
|---|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME
COMERICA BANK

| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 39200 SIX MILE RD., MC 7578 | LIVONIA | MI | 48152 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All of the following property now owned or later acquired by Debtor, wherever located: all accounts (including without limit health care insurance receivables), chattel paper (including without limit tangible and electronic chattel paper), commercial tort claims, contract rights, deposit accounts, documents (including negotiable documents), equipment, fixtures, general intangibles (including without limit payment intangibles and software), instruments (including without limit promissory notes) and rights to payment evidenced by chattel paper, documents or instruments, inventory (including, without limit, returns and repossessions), investment property (including securities, securities entitlements and financial assets), securities accounts and all investment property and other property and assets at any time contained therein, letters of credit, letter of credit rights, money, supporting obligations, rights to payment for money or funds advanced or sold, and all additions, attachments, accessions, parts, replacements, substitutions, renewals, interest, dividends, distributions, rights of any kind, software, all general intangibles (including, without limit, software) acquired or used in connection with any of the foregoing, and all of Debtor's books and records with respect to any of the foregoing (including without limit computer software and the computers and equipment containing said books and records), and all products and proceeds of any of the foregoing (whether cash or non-cash proceeds), including without limit insurance and condemnation proceeds. A reference to a type of collateral shall not be limited by a separate reference to a more specific or narrower type of that collateral. All terms herein have the meanings assigned to them in the Uniform Commercial Code, as those meanings may be amended, revised or replaced from time to time. "Uniform Commercial Code" means Act

| 5. ALTERNATIVE DESIGNATION (if applicable): | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA
91163 - TURBO COMPONENTS, INC.    [66107702]

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# UCC FINANCING STATEMENT **ADDENDUM**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |
| OR | TURBO COMPONENTS, INC. |

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|
| | | |

**10. MISCELLANEOUS:**

Michigan Department of State - Uniform Commercial Code

**Document Number:**

**2012062531-6**

**Filing Date and Time:**

**4/27/2012 2:11:15 PM**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (11a or 11b) - do not abbreviate or combine names

| | 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|
| | | | | | |

**12.** ☐ **ADDITIONAL SECURED PARTY'S** or ☐ **ASSIGNOR S/P'S NAME** - insert only one name (12a or 12b)

| | 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14.** Description of real estate:

**16.** Additional collateral description:

No. 174 of the Michigan Public Acts of 1962, as amended, revised or replaced from time to time, including without limit as amended by Act No. 348 of the Michigan Public Acts of 2000. The terms used herein which are defined in the Uniform Commercial Code shall have, at all times, the broadest and most inclusive meanings possible.

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**17.** Check only if applicable and check only one box.
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18.** Check only if applicable and check only one box.
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction
☐ Filed in connection with a Public-Finance Transaction

International Association of Commercial Administrators (IACA)

**FILING OFFICE COPY** — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/21/09)

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

Michigan Department of State - Uniform Commercial Code

**Filing Number:** 20160914000256-6

Filing Date and Time: 09/06/2016 05:00 PM

Total Number of Pages: 1

A. NAME & PHONE OF CONTACT AT FILER (optional)
Corporation Service Company    1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscinfo.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

1199 50763 - 9/2/2016

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Michigan
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
2012062531-6 04/27/2012

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

This Change affects ☑ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☑ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME Turbo Components, Inc.

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME Turbo Components, Inc.

OR

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                                    SUFFIX

| 7c. MAILING ADDRESS 14680 Apple Drive | CITY Fruitport | STATE MI | POSTAL CODE 49415 | COUNTRY USA |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME COMERICA BANK

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA 91163 - TURBO COMPONENTS, INC. Debtor:TURBO COMPONENTS, INC.

1199 50763

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd., Ste. 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT **AMENDMENT**
FOLLOW INSTRUCTIONS

Michigan Department of State - Uniform Commercial Code

**Filing Number: 20161215000462-8**

Filing Date and Time: 11/30/2016 05:00 PM

Total Number of Pages: 1

A. NAME & PHONE OF CONTACT AT FILER (optional)
Corporation Service Company    1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscinfo.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

1242 26158 - 11/29/2016
Prepared By:
Corporation Service Company
801 Adlai Stevenson Drive                    Filed In: Michigan
Springfield, IL 62703-4261                        (S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
2012062531-6 4/27/2012

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:  AND  Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| TURBO COMPONENTS, INC. | | | |
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| COMERICA BANK | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA: 91163 - TURBO COMPONENTS, INC.

1242 26158

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd. Ste. 400
Wilmington, DE 19808

**UCC FINANCING STATEMENT AMENDMENT**

FOLLOW INSTRUCTIONS

Michigan Department of State - Uniform Commercial Code

Filing Number: 20211128000040-7

Filing Date and Time: 11/28/2021 11:11 PM

Total Number of Pages: 1

*(This document was filed electronically)*

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Corporation Service Company  800-858-5294**

B. E-MAIL CONTACT AT FILER (optional)
**FilingDept@cscinfo.com**

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)
**Corporation Service Company**
**801 Adlai Stevenson Dr**
**Springfield, IL 62703 USA**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**2012062531-6**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:

Check one of these two boxes:

AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c

☐ ADD name: Complete item 7a or 7b, and item 7c

☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| | | | |
|---|---|---|---|
| 6a. ORGANIZATION'S NAME | | | |
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | |
|---|---|---|---|
| 7a. ORGANIZATION'S NAME | | | |
| 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | | | |
|---|---|---|---|
| 9a. ORGANIZATION'S NAME **COMERICA BANK** | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**91163 - TURBO COMPONENTS, INC. [222397107]**

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)



## FIXED RATE-INSTALLMENT NOTE

| AMOUNT | NOTE DATE | MATURITY DATE |
|---|---|---|
| $764,145.00 | December 13, 2018 | December 15, 2023 |

FOR VALUE RECEIVED, the undersigned promise(s) to pay to the order of Comerica Bank (herein called "Bank"), at any office of the Bank in the State of Michigan, the principal sum of Seven Hundred Sixty Four Thousand One Hundred Forty Five and 00/100 Dollars ($764,145.00) (U.S.), in installments of $15,200.00 each, inclusive of interest on the unpaid principal balance from the date of this Note at the rate of 7% per annum, until the maturity date set forth above (the "Maturity Date"), whether by acceleration or otherwise. Interest shall be calculated for the actual number of days the principal is outstanding on the basis of a 360-day year if this Note evidences a business or commercial loan or a 365/366-day year if a consumer loan.

Installments of principal and accrued interest due under this Note shall be payable monthly on the first day of each month, commencing January 1, 2019. The entire remaining unpaid balance of principal and accrued interest shall be payable on the Maturity Date set forth above. If the frequency of principal and interest installments is not otherwise specified, installments of principal and interest due under this Note shall be payable monthly on the first day of each month. If this Note or any payment of principal or interest under this Note shall be payable on a day other than a day on which the Bank is open for business, this payment shall be extended to the next succeeding Business Day and interest shall be payable at the rate specified in this Note during this extension.

From and after the occurrence of any Default hereunder, and so long as any such Default remains unremedied or uncured thereafter, the Indebtedness outstanding under this Note shall bear interest at a per annum rate of three percent (3%) above the otherwise applicable interest rate, which interest shall be payable upon demand. In addition to the foregoing, a late payment charge equal to five percent (5%) of each late payment hereunder may be charged on any payment not received by Bank within ten (10) calendar days after the payment due date therefor, but acceptance of payment of any such charge shall not constitute a waiver of any Default hereunder.

In no event shall the interest payable under this Note at any time exceed the maximum rate permitted by law.

THE MAXIMUM INTEREST RATE SHALL NOT EXCEED 25% PER ANNUM OR THE HIGHEST APPLICABLE USURY CEILING, WHICHEVER IS LESS.

The amount from time to time outstanding under this Note, the applicable interest rate and the amount and date of any repayment shall be noted on Bank's records, which records shall be conclusive evidence thereof, absent manifest error; provided, however, any failure by Bank to make any such notation, or any error in any such notation, shall not relieve the undersigned of its/their obligations to repay Bank all amounts payable by the undersigned to Bank under or pursuant to this Note, when due in accordance with the terms hereof.

The Bank does not have to accept any prepayment of principal under this Note except as described below or as required under applicable law. The undersigned may prepay principal of this Note in increments of Five Hundred and 00/100 Dollars ($500.00) at any time so long as the Bank is provided written notice of the prepayment at least five (5) Business Days prior to the date of prepayment. The notice of prepayment shall contain the following information: (a) the date of prepayment (the "Prepayment Date"), and (b) the amount of principal to be prepaid. On the Prepayment Date, the undersigned will pay to the Bank, in addition to the other amounts then due on this Note, the Prepayment Amount (as defined below). The Bank, in its sole discretion, may accept any prepayment of principal even if not required to do so under this Note and may deduct from the amount to be applied against principal the other amounts required as part of the Prepayment Amount.

Subject to the terms of this Note, if the Bank exercises its right to accelerate the payment of this Note prior to the Maturity Date, the undersigned will pay to the Bank, in addition to the other amounts then due on this Note, on the date specified by the Bank as the Prepayment Date, the Prepayment Amount.

The Bank's determination of the Prepayment Amount will be conclusive in the absence of obvious error or fraud. If requested in writing by the undersigned, the Bank will provide the undersigned a written statement specifying the Prepayment Amount.

The "Prepayment Amount" shall be due and payable in full on the Prepayment Date and shall be equal to the sum of the following: (a) the amount of principal which the undersigned has elected to prepay or the amount of principal which the Bank has required the undersigned to prepay because of acceleration, as the case may be (the "Prepaid Principal Amount"), (b) interest accruing on the Prepaid Principal Amount up to, but not including, the Prepayment Date, plus (c) an amount equal to one percent (1%) of the Prepaid Principal Amount multiplied by the number of calendar years remaining until the Maturity Date of this Note. For purposes of this computation in clause (c), any portion of a calendar year remaining until the Maturity Date of this Note shall be deemed to be a full calendar year.

Any prepayment hereunder shall also be accompanied by the payment of all accrued and unpaid interest on the amount so prepaid. The Prepaid Principal Amount shall be applied to this Note in the inverse order of which the principal payments would have been due

-1-

under this Note's principal amortization schedule. In other words, if this Note requires multiple principal payments, then as opposed to prepaying the next principal payment due, the Prepaid Principal Amount will be applied beginning with the final principal payment due on this Note.

If any Change in Law shall: (a) subject Bank to any tax, duty or other charge with respect to this Note or any Indebtedness hereunder, or shall change the basis of taxation of payments to Bank of the principal of or interest under this Note or any other amounts due under this Note in respect thereof (except for changes in the rate of tax on the overall net income of Bank imposed by the jurisdiction in which Bank's principal executive office is located); or (b) impose, modify or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the Federal Reserve System), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by Bank, or shall impose on Bank or the foreign exchange and interbank markets any other condition affecting this Note or the Indebtedness hereunder; and the result of any of the foregoing is to increase the cost to Bank of maintaining any part of the Indebtedness hereunder or to reduce the amount of any sum received or receivable by Bank under this Note by an amount deemed by the Bank to be material, then the undersigned shall pay to Bank, within fifteen (15) days of the undersigned's receipt of written notice from Bank demanding such compensation, such additional amount or amounts as will compensate Bank for such increased cost or reduction. A certificate of Bank, prepared in good faith and in reasonable detail by Bank and submitted by Bank to the undersigned, setting forth the basis for determining such additional amount or amounts necessary to compensate Bank shall be conclusive and binding for all purposes, absent manifest error.

In the event that any Change in Law affects or would affect the amount of capital or liquidity required or expected to be maintained by Bank (or any corporation controlling Bank), and Bank determines that the amount of such capital or liquidity is increased by or based upon the existence of any obligations of Bank hereunder or the maintaining of any Indebtedness hereunder, and such increase has the effect of reducing the rate of return on Bank's (or such controlling corporation's) capital as a consequence of such obligations or the maintaining of such Indebtedness hereunder to a level below that which Bank (or such controlling corporation) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy and liquidity), then the undersigned shall pay to Bank, within fifteen (15) days of the undersigned's receipt of written notice from Bank demanding such compensation, additional amounts as are sufficient to compensate Bank (or such controlling corporation) for any increase in the amount of capital and/or liquidity and reduced rate of return which Bank reasonably determines to be allocable to the existence of any obligations of the Bank hereunder or to maintaining any Indebtedness hereunder.  A certificate of Bank as to the amount of such compensation, prepared in good faith and in reasonable detail by the Bank and submitted by Bank to the undersigned, shall be conclusive and binding for all purposes absent manifest error.

This Note and any other indebtedness and liabilities of any kind of the undersigned (or any of them) to the Bank, and any and all modifications, renewals or extensions of it, whether joint or several, contingent or absolute, now existing or later arising, and however evidenced and whether incurred voluntarily or involuntarily, known or unknown, or originally payable to the Bank or to a third party and subsequently acquired by Bank including, without limitation, any late charges; loan fees or charges; overdraft indebtedness; costs incurred by Bank in establishing, determining, continuing or defending the validity or priority of any security interest, pledge or other lien or in pursuing any of its rights or remedies under any loan document (or otherwise) or in connection with any proceeding involving the Bank as a result of any financial accommodation to the undersigned (or any of them); and reasonable costs and expenses of attorneys and paralegals, whether inside or outside counsel is used, and whether any suit or other action is instituted, and to court costs if suit or action is instituted, and whether any such fees, costs or expenses are incurred at the trial court level or on appeal, in bankruptcy, in administrative proceedings, in probate proceedings or otherwise (collectively "Indebtedness") are secured by and the Bank is granted a security interest in and lien upon all items deposited in any account of any of the undersigned with the Bank and by all proceeds of these items (cash or otherwise), all account balances of any of the undersigned from time to time with the Bank, by all property of any of the undersigned from time to time in the possession of the Bank and by any other collateral, rights and properties described in each and every deed of trust, mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been, or will at any time(s) later be, executed by any (or all) of the undersigned or any other person to or for the benefit of the Bank (collectively "Collateral"). Notwithstanding the above, (a) to the extent that any portion of the Indebtedness is a consumer loan, that portion shall not be secured by any deed of trust or mortgage on or other security interest in any of the undersigned's principal dwelling or in any of the undersigned's real property which is not a purchase money security interest as to that portion, unless expressly provided to the contrary in another place, or (b) if the undersigned (or any of them) has (have) given or give(s) Bank a deed of trust or mortgage covering California real property, that deed of trust or mortgage shall not secure this Note or any other indebtedness of the undersigned (or any of them), unless expressly provided to the contrary in another place, or (c) if the undersigned (or any of them) has (have) given or give(s) the Bank a deed of trust or mortgage covering real property which, under Texas law, constitutes the homestead of such person, that deed of trust or mortgage shall not secure this Note or any other indebtedness of the undersigned (or any of them) unless expressly provided to the contrary in another place.

If (a) the undersigned (or any of them) or any guarantor under a guaranty of all or part of the Indebtedness ("guarantor") (i) fail(s) to pay this Note or any of the Indebtedness when due, by maturity, acceleration or otherwise, or fail(s) to pay any Indebtedness owing on a demand basis upon demand; or (ii) fail(s) to comply with any of the terms or provisions of any agreement between the undersigned (or any of them) or any guarantor and the Bank, and any such failure continues beyond any applicable grace or cure period, if any, expressly provided with respect thereto; or (iii) become(s) insolvent or the subject of a voluntary or involuntary proceeding in bankruptcy, or a reorganization, arrangement or creditor composition proceeding, (if a business entity) cease(s) doing business as a going concern, (if a natural person) die(s) or become(s) incompetent, (if a partnership) dissolve(s) or any general partner of it dies, becomes incompetent or becomes the subject of a bankruptcy proceeding, or (if a corporation or a limited liability company) is the subject of a dissolution, merger or consolidation; or (b) any warranty or representation made by any of the undersigned or any guarantor in connection with this Note or any of the Indebtedness shall be discovered to be untrue or incomplete; or (c) there is any

-2-

termination, notice of termination, or breach of any guaranty, pledge, collateral assignment or subordination agreement relating to all or any part of the Indebtedness; or (d) there is any failure by any of the undersigned or any guarantor to pay when due any of its indebtedness (other than to the Bank) or in the observance or performance of any term, covenant or condition in any document evidencing, securing or relating to such indebtedness; or (e) the Bank deems itself insecure, believing that the prospect of payment or performance of this Note or any of the Indebtedness is impaired or shall fear deterioration, removal or waste of any of the Collateral; or (f) there is filed or issued a levy or writ of attachment or garnishment or other like judicial process upon the undersigned (or any of them) or any guarantor or any of the Collateral, including, without limit, any accounts of the undersigned (or any of them) or any guarantor with the Bank; then the Bank, upon the occurrence and at any time during the continuance or existence of any of these events (each a "Default"), may, at its option and without prior notice to the undersigned (or any of them), cease advancing money or extending credit to or for the benefit of the undersigned under this Note or any other agreement between the undersigned and Bank, terminate this Note as to any future liability or obligation of Bank, but without affecting Bank's rights and security interests in any Collateral and the Indebtedness of the undersigned to Bank, declare any or all of the Indebtedness to be immediately due and payable (notwithstanding any provisions contained in the evidence of it to the contrary), sell or liquidate all or any portion of the Collateral, set off against the Indebtedness any amounts owing by the Bank to the undersigned (or any of them), charge interest at the default rate provided in the document evidencing the relevant Indebtedness and exercise any one or more of the rights and remedies granted to the Bank by any agreement with the undersigned (or any of them) or given to it under applicable law. In addition, if this Note is secured by a deed of trust or mortgage covering real property, then the trustor or mortgagor shall not mortgage or pledge the mortgaged premises as security for any other indebtedness or obligations. This Note, together with all other indebtedness secured by said deed of trust or mortgage, shall become due and payable immediately, without notice, at the option of the Bank, (i) if said trustor or mortgagor shall mortgage or pledge the mortgaged premises for any other indebtedness or obligations or shall convey, assign or transfer the mortgaged premises by deed, installment sale contract or other instrument, or (ii) if the title to the mortgaged premises shall become vested in any other person or party in any manner whatsoever, or (iii) if there is any disposition (through one or more transactions) of legal or beneficial title to a controlling interest of said trustor or mortgagor.

All payments to be made by the undersigned to Bank under or pursuant to this Note shall be in immediately available United States funds, without setoff or counterclaim, and in the event that any payments submitted hereunder are in funds not available until collected, said payments shall continue to bear interest until collected.

The undersigned authorize(s) the Bank to charge any account(s) of the undersigned (or any of them) with the Bank for any and all sums due hereunder when due; provided, however, that such authorization shall not affect any of the undersigned's obligation to pay to the Bank all amounts when due, whether or not any such account balances that are maintained by the undersigned with the Bank are insufficient to pay to the Bank any amounts when due, and to the extent that such accounts are insufficient to pay to the Bank all such amounts, the undersigned shall remain liable for any deficiencies until paid in full.

If this Note is signed by two or more parties (whether by all as makers or by one or more as an accommodation party or otherwise), the obligations and undertakings under this Note shall be that of all and any two or more jointly and also of each severally. This Note shall bind the undersigned, and the undersigned's respective heirs, personal representatives, successors and assigns.

The undersigned waive(s) presentment, demand, protest, notice of dishonor, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices, and agree(s) that no extension or indulgence to the undersigned (or any of them) or release, substitution or nonenforcement of any security, or release or substitution of any of the undersigned, any guarantor or any other party, whether with or without notice, shall affect the obligations of any of the undersigned. The undersigned waive(s) all defenses or right to discharge available under Section 3-605 of the Uniform Commercial Code and waive(s) all other suretyship defenses or right to discharge. The undersigned agree(s) that the Bank has the right to sell, assign, or grant participations or any interest in, any or all of the Indebtedness, and that, in connection with this right, but without limiting its ability to make other disclosures to the full extent allowable, the Bank may disclose all documents and information which the Bank now or later has relating to the undersigned or the Indebtedness. The undersigned agree(s) that the Bank may provide information relating to this Note or relating to the undersigned to the Bank's parent, affiliates, subsidiaries and service providers.

The undersigned agree(s) to pay or reimburse to Bank, or any other holder or owner of this Note, on demand, any and all costs and expenses of Bank (including, without limit, court costs, legal expenses and reasonable attorneys' fees, whether inside or outside counsel is used, whether or not suit is instituted, and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy, probate or administrative proceeding or otherwise) incurred in connection with the preparation, execution, delivery, amendment, administration, and performance of this Note and the related documents, or incurred in collecting or attempting to collect this Note or the Indebtedness or incurred in any other matter or proceeding relating to this Note or the Indebtedness.

The undersigned acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note and agree(s) that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note. As used in this Note, the word "undersigned" means, individually and collectively, each maker, accommodation party, endorser and other party signing this Note in a similar capacity. If any provision of this Note is unenforceable in whole or part for any reason, the remaining provisions shall continue to be effective. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

For the purposes of this Note, the following terms have the following meanings:

-3-

Detroit_15756975_3

"Business Day" means any day, other than a Saturday, Sunday or any other day designated as a holiday under Federal or applicable State statute or regulation, on which Bank is open for all or substantially all of its domestic and international business (including dealings in foreign exchange) in Detroit, Michigan.

"Change in Law" means the occurrence, after the date hereof, of any of the following: (i) the adoption or introduction of, or any change in any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect and whether or not applicable to Bank on such date, or (ii) any change in interpretation, administration or implementation thereof of any such law, treaty, rule or regulation by any Governmental Authority, or (iii) the issuance, making or implementation by any Governmental Authority of any interpretation, administration, request, regulation, guideline, or directive (whether or not having the force of law), including, without limitation, any risk-based capital guidelines or any interpretation, administration, request, regulation, guideline, or directive relating to liquidity.  For purposes of this definition, (x) a change in law, treaty, rule, regulation, interpretation, administration or implementation shall include, without limitation, any change made or which becomes effective on the basis of a law, treaty, rule, regulation, interpretation administration or implementation then in force, the effective date of which change is delayed by the terms of such law, treaty, rule, regulation, interpretation, administration or implementation, and (y) the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111-203, H.R. 4173) and all requests, rules, regulations, guidelines, interpretations or directives promulgated thereunder or issued in connection therewith shall be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or promulgated, whether before or after the date hereof, and (z) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall each be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including, without limitation, any supranational bodies such as the European Union or the European Central Bank).

"Loan Amount" means the face amount of this Note as set forth at the top of Page 1 hereof.

No delay or failure of Bank in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise thereof preclude any further exercise thereof, or the exercise of any other power, right or privilege.  The rights of Bank under this Note are cumulative and not exclusive of any right or remedies which Bank would otherwise have, whether by other instruments or by law.

THE UNDERSIGNED AND BANK, BY ACCEPTANCE OF THIS NOTE, ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS.

[Remainder of page intentionally left blank]

This Note amends, restates, supersedes and replaces that certain Fixed Rate – Installment Note dated as of August 26, 2016, made in the principal amount of $750,000 by the undersigned payable to the Bank as may be amended (the "Prior Term Note") and a portion of the proceeds of this Note will be used to refinance a portion of the indebtedness outstanding under the Master Revolving Note dated August 26, 2016, made in the principal amount of $1,000,000 by the undersigned payable to Bank (the "Prior Revolving Note", and together with the Prior Term Note, the "Prior Notes"); provided, however, (i) the execution and delivery by the undersigned of this Note shall not, in any manner or circumstance, be deemed to be a payment of, a novation of or to have terminated, extinguished or discharged any of the undersigned's indebtedness evidenced by the Prior Notes, and (ii) all Collateral and guaranties securing or supporting the Prior Notes shall continue to secure and support this Note.

This Note is dated and shall be effective as of the date set forth above.

BORROWER:

**TURBO COMPONENTS, INC.**, a Michigan corporation

By: _____
   Bradley Fortenbacher

Its:    President

| 14680 Apple Drive, | Spring Lake, | MI | | 49415 |
|---|---|---|---|---|
| Street Address | City | State | Country | Zip Code |

| For Bank Use Only | | | CCAR # | |
|---|---|---|---|---|
| LOAN OFFICER INITIALS | LOAN GROUP NAME | BASE RATE INDEX Not Applicable | OBLIGOR NAME Turbo Components, Inc. | |
| LOAN OFFICER I.D. NO. | LOAN GROUP NO. | OBLIGOR NO. | NOTE NO. | AMOUNT $764,145.00 |



**Converting Installment Note (Advancing/Term Loan)**
Prime Referenced Rate
(Optional Advances)

| AMOUNT | NOTE DATE | MATURITY DATE |
|--------|-----------|---------------|
| $100,000 | December 13, 2018 | December 15, 2024 |

FOR VALUE RECEIVED, the undersigned promise(s) to pay to the order of COMERICA BANK (herein called "Bank"), at any office of the Bank in the State of Michigan, the principal sum of ONE HUNDRED THOUSAND DOLLARS ($100,000), or, if less, that portion of it advanced by the Bank and not repaid as later provided, together with interest in accordance with the terms and conditions contained herein.

Subject to the terms and conditions of this Note and subject to the undersigned's right to elect a fixed rate for the indebtedness outstanding under this Note commencing the day after the Conversion Date, as more fully set forth in the Letter Agreement, the unpaid principal balance of all Indebtedness outstanding under this Note from time to time shall bear interest at the Prime Referenced Rate plus the Applicable Margin. No interest shall accrue under this Note until the date of the first Advance made by the Bank; after that, interest on all Advances shall accrue and be computed on the principal balance outstanding from time to time under this Note in accordance with the terms hereof until the same is paid in full.

This Note is a note under which Advances in an aggregate principal amount not to exceed the Loan Amount may be made from time to time commencing on the date hereof and ending on the Conversion Date (as defined below), subject to the terms of this Note. After the Conversion Date, no further Advances shall be permitted under this Note. The principal amount under this Note shall be the sum of all Advances made by the Bank to or at the request of the undersigned, less principal payments actually received in cash by the Bank.

When the aggregate principal amount of all Advances made at any time under this Note equals the Loan Amount, no further Advances shall be available under this Note. Amounts advanced under this Note cannot be reborrowed, regardless of any repayments, whether voluntarily, by required payment or otherwise.

AT NO TIME SHALL THE BANK BE UNDER ANY OBLIGATION TO MAKE ANY ADVANCES TO THE UNDERSIGNED PURSUANT TO THIS NOTE (NOTWITHSTANDING ANYTHING EXPRESSED OR IMPLIED IN THIS NOTE OR ELSEWHERE TO THE CONTRARY, INCLUDING, WITHOUT LIMITATION, IF BANK SUPPLIES THE UNDERSIGNED WITH A BORROWING FORMULA) AND THE BANK, AT ANY TIME AND FROM TIME TO TIME, WITHOUT NOTICE, AND IN ITS SOLE DISCRETION, MAY REFUSE TO MAKE ADVANCES TO THE UNDERSIGNED WITHOUT INCURRING ANY LIABILITY DUE TO THIS REFUSAL AND WITHOUT AFFECTING THE UNDERSIGNED'S LIABILITY UNDER THIS NOTE FOR ANY AND ALL AMOUNTS ADVANCED.

Interest accruing hereunder shall be computed on the basis of a 360-day year if this Note evidences a business or commercial loan or a 365/366-day year if a consumer loan, and shall be assessed for the actual number of days elapsed, and in such computation, effect shall be given to any change in the interest rate as a result of any change in the Prime Referenced Rate on the date of each such change.

Commencing on January 1, 2019 and continuing on the first day of each succeeding calendar month of each calendar year thereafter through and including the Conversion Date, accrued and unpaid interest on this Note shall be due and payable in arrears, on such date.

Commencing on the September 1, 2019, and continuing on each successive Installment Payment Date thereafter through and including the Maturity Date, principal installments each equal to 1/60th of the principal amount outstanding under this Note at the close of business on the Conversion Date, plus accrued unpaid interest on the unpaid principal balance of this Note, shall be due and payable. The entire remaining unpaid balance of principal and accrued interest on this Note shall be payable on the Maturity Date set forth above.

Payments under this Note shall be first applied to accrued and unpaid interest hereunder and the balance, if any, to principal.

In the event the periodic installments set forth above are inclusive of interest, the undersigned hereby acknowledge(s) and agree(s) that such installments are based upon the original principal amount of Indebtedness outstanding under this Note, an assumed fixed rate of interest, and an assumed amortization term, notwithstanding the fact that the applicable interest rate may change from time to time during the term of this Note. Therefore, in the event that the applicable interest rate change(s) at any time as a result of any change(s) in the Prime Referenced Rate, Bank may, in its sole discretion, recalculate the installments of principal and interest required to be made by the undersigned under and pursuant to the terms of this Note, and the undersigned agree(s) to pay such installments as they may be recalculated by Bank, and the undersigned acknowledge(s) and agree(s) that any such recalculation shall not affect the Maturity Date of this Note or any other terms or provisions herein set forth.

From and after the occurrence of any Default hereunder, and so long as any such Default remains unremedied or uncured thereafter, the Indebtedness outstanding under this Note shall bear interest at a per annum rate of three percent (3%) above the otherwise applicable interest rate, which interest shall be payable upon demand. In addition to the foregoing, a late payment charge equal to five percent (5%) of each late payment hereunder may be charged on any payment not received by Bank within ten (10) calendar days after the payment due date therefor, but acceptance of payment of any such charge shall not constitute a waiver of any Default hereunder.

In no event shall the interest payable under this Note at any time exceed the maximum rate permitted by law.

**THE MAXIMUM INTEREST RATE SHALL NOT EXCEED 25% PER ANNUM OR THE HIGHEST APPLICABLE USURY CEILING, WHICHEVER IS LESS.**

The amount from time to time outstanding under this Note and the date of each Advance, the applicable interest rate and the amount and date of any repayment shall be noted on Bank's records, which records shall be conclusive evidence thereof, absent manifest error; provided, however, any failure by Bank to make any such notation, or any error in any such notation, shall not relieve the undersigned of its/their obligations to repay Bank all amounts payable by the undersigned to Bank under or pursuant to this Note, when due in accordance with the terms hereof.

Prior to the Conversion Date, the undersigned may request an Advance hereunder either (i) upon the delivery to Bank of a written Request for Advance duly completed and executed by the undersigned (as herein provided) or, (ii) to the extent applicable, pursuant to a request submitted through Bank's Loan Management System (each a "Request"), in each case, subject to the following: (a) no Default, or any condition or event which, with the giving of notice or the running of time, or both, would constitute a Default, shall have occurred and be continuing or exist under this Note; (b) each such Request shall be delivered to Bank by 11:00 a.m. Detroit, Michigan time) on the proposed date of the requested Advance; (c) after giving effect to such Advance, the aggregate principal amount of Advances made under this Note shall not exceed the Loan Amount; and (d) a Request, once delivered or submitted  to Bank, shall not be revocable by the undersigned; provided, however, as aforesaid, Bank shall not be obligated to make any Advance under this Note.  As aforesaid, any amount(s) repaid under this Note may not be reborrowed.

Prior to the Conversion Date, in the event that the undersigned is unable to request Advances hereunder through the Bank's Loan Management System, Advances hereunder may be requested by delivery or submission to Bank by hand delivery, first class mail, overnight courier, facsimile, email or other means of delivery acceptable to Bank, of a written Request for Advance duly completed and executed by the undersigned. Advances hereunder may be requested in the undersigned's discretion by telephonic notice to Bank. Any Advance requested by telephonic notice shall be confirmed by the undersigned that same day by submission to Bank of a written Request for Advance, as provided herein. The undersigned acknowledge(s) that if Bank makes an Advance based on a request made by telephone, facsimile, email or other means of delivery (other than by hand delivery, first class mail or overnight courier), it shall be for the undersigned's convenience and all risks involved in the use of any such procedure shall be borne by the undersigned, and the undersigned expressly agree(s) to indemnify and hold Bank harmless therefor.  Bank shall have no duty to confirm the authority of anyone requesting an Advance by telephone, facsimile, email or any such other means of delivery. In the event that the undersigned elect(s) to request Advances by telephonic notice, facsimile, email or other means of delivery acceptable to Bank, the undersigned acknowledge(s) and agree(s) that Bank may impose or require such verification, authentication and other procedures as Bank may require from time to time.

In the event that any payment under this Note becomes due and payable on any day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day, and, to the extent applicable, interest shall continue to accrue and be payable thereon during such extension at the rate set forth in this Note.

2

All payments to be made by the undersigned to Bank under or pursuant to this Note shall be in immediately available United States funds, without setoff or counterclaim, and in the event that any payments submitted hereunder are in funds not available until collected, said payments shall continue to bear interest until collected.

The undersigned may prepay all or any part of the outstanding balance of any Indebtedness hereunder at any time without premium or penalty. Any prepayment hereunder shall also be accompanied by the payment of all accrued and unpaid interest on the amount so prepaid. Partial prepayments hereunder shall be applied to the installments hereunder in the inverse order of their maturities.

If any Change in Law shall (a) subject Bank to any tax, duty or other charge with respect to this Note or any Indebtedness hereunder, or shall change the basis of taxation of payments to Bank of the principal of or interest under this Note or any other amounts due under this Note in respect thereof (except for changes in the rate of tax on the overall net income of Bank imposed by the jurisdiction in which Bank's principal executive office is located); or (b) impose, modify or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the Federal Reserve System), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by Bank, or shall impose on Bank or the foreign exchange and interbank markets any other condition affecting this Note or the Indebtedness hereunder; and the result of any of the foregoing is to increase the cost to Bank of maintaining any part of the Indebtedness hereunder or to reduce the amount of any sum received or receivable by Bank under this Note by an amount deemed by the Bank to be material, then the undersigned shall pay to Bank, within fifteen (15) days of the undersigned's receipt of written notice from Bank demanding such compensation, such additional amount or amounts as will compensate Bank for such increased cost or reduction. A certificate of Bank, prepared in good faith and in reasonable detail by Bank and submitted by Bank to the undersigned, setting forth the basis for determining such additional amount or amounts necessary to compensate Bank shall be conclusive and binding for all purposes, absent manifest error.

In the event that any Change in Law affects or would affect the amount of capital or liquidity required or expected to be maintained by Bank (or any corporation controlling Bank), and Bank determines that the amount of such capital or liquidity is increased by or based upon the existence of any obligations of Bank hereunder or the maintaining of any Indebtedness hereunder, and such increase has the effect of reducing the rate of return on Bank's (or such controlling corporation's) capital as a consequence of such obligations or the maintaining of such Indebtedness hereunder to a level below that which Bank (or such controlling corporation) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy and liquidity), then the undersigned shall pay to Bank, within fifteen (15) days of the undersigned's receipt of written notice from Bank demanding such compensation, additional amounts as are sufficient to compensate Bank (or such controlling corporation) for any increase in the amount of capital and/or liquidity and reduced rate of return which Bank reasonably determines to be allocable to the existence of any obligations of the Bank hereunder or to maintaining any Indebtedness hereunder. A certificate of Bank as to the amount of such compensation, prepared in good faith and in reasonable detail by the Bank and submitted by Bank to the undersigned, shall be conclusive and binding for all purposes absent manifest error.

This Note and any other indebtedness and liabilities of any kind of the undersigned (or any of them) to the Bank, and any and all modifications, renewals or extensions of it, whether joint or several, contingent or absolute, now existing or later arising, and however evidenced and whether incurred voluntarily or involuntarily, known or unknown, or originally payable to the Bank or to a third party and subsequently acquired by Bank including, without limitation, any late charges; loan fees or charges; overdraft indebtedness; costs incurred by Bank in establishing, determining, continuing or defending the validity or priority of any security interest, pledge or other lien or in pursuing any of its rights or remedies under any loan document (or otherwise) or in connection with any proceeding involving the Bank as a result of any financial accommodation to the undersigned (or any of them); and reasonable costs and expenses of attorneys and paralegals, whether inside or outside counsel is used, and whether any suit or other action is instituted, and to court costs if suit or action is instituted, and whether any such fees, costs or expenses are incurred at the trial court level or on appeal, in bankruptcy, in administrative proceedings, in probate proceedings or otherwise (collectively "Indebtedness") are secured by and the Bank is granted a security interest in and lien upon all items deposited in any account of any of the undersigned with the Bank and by all proceeds of these items (cash or otherwise), all account balances of any of the undersigned from time to time with the Bank, by all property of any of the undersigned from time to time in the possession of the Bank and by any other collateral, rights and properties described in each and every deed of trust, mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been, or will at any time(s) later be, executed by any (or all) of the undersigned to or for the benefit of the Bank (collectively "Collateral"). Notwithstanding the above, (i) to the extent that any portion of the Indebtedness is a consumer loan, that portion shall not be secured by any deed of trust or mortgage on or other security interest in any of the undersigned's principal dwelling or in any of the undersigned's real property which is not a purchase money security interest as to that portion, unless expressly provided to the contrary in another place, or (ii) if the undersigned (or any of them) has (have) given or give(s)

3

Detroit_15757030_4

Bank a deed of trust or mortgage covering California real property, that deed of trust or mortgage shall not secure this Note or any other indebtedness of the undersigned (or any of them), unless expressly provided to the contrary in another place, or (iii) if the undersigned (or any of them) has (have) given or give(s) the Bank a deed of trust or mortgage covering real property which, under Texas law, constitutes the homestead of such person, that deed of trust or mortgage shall not secure this Note or any other indebtedness of the undersigned (or any of them) unless expressly provided to the contrary in another place.

If (a) the undersigned (or any of them) or any guarantor under a guaranty of all or part of the Indebtedness ("guarantor") (i) fail(s) to pay this Note or any of the Indebtedness when due, by maturity, acceleration or otherwise, or fail(s) to pay any Indebtedness owing on a demand basis upon demand; or (ii) fail(s) to comply with any of the terms or provisions of any agreement between the undersigned (or any of them) or any guarantor and the Bank, and any such failure continues beyond any applicable grace or cure period, if any, expressly provided with respect thereto; or (iii) become(s) insolvent or the subject of a voluntary or involuntary proceeding in bankruptcy, or a reorganization, arrangement or creditor composition proceeding, (if a business entity) cease(s) doing business as a going concern, (if a natural person) die(s) or become(s) incompetent, (if a partnership) dissolve(s) or any general partner of it dies, becomes incompetent or becomes the subject of a bankruptcy proceeding, or (if a corporation or a limited liability company) is the subject of a dissolution, merger or consolidation; or (b) any warranty or representation made by any of the undersigned or any guarantor in connection with this Note or any of the Indebtedness shall be discovered to be untrue or incomplete; or (c) there is any termination, notice of termination, or breach of any guaranty, pledge, collateral assignment or subordination agreement relating to all or any part of the Indebtedness; or (d) there is any failure by any of the undersigned or any guarantor to pay when due any of its indebtedness (other than to the Bank) or in the observance or performance of any term, covenant or condition in any document evidencing, securing or relating to such indebtedness; or (e) the Bank deems itself insecure, believing that the prospect of payment or performance of this Note or any of the Indebtedness is impaired or shall fear deterioration, removal or waste of any of the Collateral; or (f) there is filed or issued a levy or writ of attachment or garnishment or other like judicial process upon the undersigned (or any of them) or any guarantor or any of the Collateral, including, without limit, any accounts of the undersigned (or any of them) or any guarantor with the Bank; then the Bank, upon the occurrence and at any time during the continuance or existence of any of these events (each a "Default"), may, at its option and without prior notice to the undersigned (or any of them), cease advancing money or extending credit to or for the benefit of the undersigned under this Note or any other agreement between the undersigned and Bank, terminate this Note as to any future liability or obligation of Bank, but without affecting Bank's rights and security interests in any Collateral and the Indebtedness of the undersigned to Bank, declare any or all of the Indebtedness to be immediately due and payable (notwithstanding any provisions contained in the evidence of it to the contrary), sell or liquidate all or any portion of the Collateral, set off against the Indebtedness any amounts owing by the Bank to the undersigned (or any of them), charge interest at the default rate provided in the document evidencing the relevant Indebtedness and exercise any one or more of the rights and remedies granted to the Bank by any agreement with the undersigned (or any of them) or given to it under applicable law. In addition, if this Note is secured by a deed of trust or mortgage covering real property, then the trustor or mortgagor shall not mortgage or pledge the mortgaged premises as security for any other indebtedness or obligations. This Note, together with all other indebtedness secured by said deed of trust or mortgage, shall become due and payable immediately, without notice, at the option of the Bank, (i) if said trustor or mortgagor shall mortgage or pledge the mortgaged premises for any other indebtedness or obligations or shall convey, assign or transfer the mortgaged premises by deed, installment sale contract or other instrument, or (ii) if the title to the mortgaged premises shall become vested in any other person or party in any manner whatsoever, or (iii) if there is any disposition (through one or more transactions) of legal or beneficial title to a controlling interest of said trustor or mortgagor.

The undersigned authorize(s) the Bank to charge any account(s) of the undersigned (or any of them) with the Bank for any and all sums due hereunder when due; provided, however, that such authorization shall not affect any of the undersigned's obligation to pay to the Bank all amounts when due, whether or not any such account balances that are maintained by the undersigned with the Bank are insufficient to pay to the Bank any amounts when due, and to the extent that such accounts are insufficient to pay to the Bank all such amounts, the undersigned shall remain liable for any deficiencies until paid in full.

If this Note is signed by two or more parties (whether by all as makers or by one or more as an accommodation party or otherwise), the obligations and undertakings under this Note shall be that of all and any two or more jointly and also of each severally. This Note shall bind the undersigned, and the undersigned's respective heirs, personal representatives, successors and assigns.

The undersigned waive(s) presentment, demand, protest, notice of dishonor, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices, and agree(s) that no extension or indulgence to the undersigned (or any of them) or release, substitution or nonenforcement of any security, or release or substitution of any of the undersigned, any guarantor or any other party, whether with or without notice, shall affect the obligations of any of

4

the undersigned. The undersigned waive(s) all defenses or right to discharge available under Section 3-605 of the Uniform Commercial Code and waive(s) all other suretyship defenses or right to discharge. The undersigned agree(s) that the Bank has the right to sell, assign, or grant participations or any interest in, any or all of the Indebtedness, and that, in connection with this right, but without limiting its ability to make other disclosures to the full extent allowable, the Bank may disclose all documents and information which the Bank now or later has relating to the undersigned or the Indebtedness. The undersigned agree(s) that the Bank may provide information relating to this Note or relating to the undersigned to the Bank's parent, affiliates, subsidiaries and service providers.

The undersigned agree(s) to pay or reimburse to Bank, or any other holder or owner of this Note, on demand, any and all costs and expenses of Bank (including, without limit, court costs, legal expenses and reasonable attorneys' fees, whether inside or outside counsel is used, whether or not suit is instituted, and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy, probate or administrative proceeding or otherwise) incurred in connection with the preparation, execution, delivery, amendment, administration, and performance of this Note and the related documents, or incurred in collecting or attempting to collect this Note or the Indebtedness, or incurred in any other matter or proceeding relating to this Note or the Indebtedness.

The undersigned acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note and agree(s) that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note. As used in this Note, the word "undersigned" means, individually and collectively, each maker, accommodation party, endorser and other party signing this Note in a similar capacity. If any provision of this Note is unenforceable in whole or part for any reason, the remaining provisions shall continue to be effective. **THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.**

For the purposes of this Note, the following terms have the following meanings:

"Advance" means a borrowing requested by the undersigned and made by Bank under this Note.

"Applicable Margin" means three and 00/100 percent (3.00%) per annum.

"Business Day" means any day, other than a Saturday, Sunday or any other day designated as a holiday under Federal or applicable State statute or regulation, on which Bank is open for all or substantially all of its domestic and international business (including dealings in foreign exchange) in Detroit, Michigan, and, in respect of notices and determinations relating to the Daily Adjusting LIBOR Rate, also a day on which dealings in dollar deposits are also carried on in the London interbank market and on which banks are open for business in London, England.

"Change in Law" means the occurrence, after the date hereof, of any of the following: (i) the adoption or introduction of, or any change in any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect and whether or not applicable to Bank on such date, or (ii) any change in interpretation, administration or implementation thereof of any such law, treaty, rule or regulation by any Governmental Authority, or (iii) the issuance, making or implementation by any Governmental Authority of any interpretation, administration, request, regulation, guideline, or directive (whether or not having the force of law), including, without limitation, any risk-based capital guidelines or any interpretation, administration, request, regulation, guideline, or directive relating to liquidity. For purposes of this definition, (x) a change in law, treaty, rule, regulation, interpretation, administration or implementation shall include, without limitation, any change made or which becomes effective on the basis of a law, treaty, rule, regulation, interpretation administration or implementation then in force, the effective date of which change is delayed by the terms of such law, treaty, rule, regulation, interpretation, administration or implementation, and (y) the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111-203, H.R. 4173) and all requests, rules, regulations, guidelines, interpretations or directives promulgated thereunder or issued in connection therewith shall be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or promulgated, whether before or after the date hereof, and (z) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall each be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Conversion Date" means August 1, 2019.

"Daily Adjusting LIBOR Rate" means, for any day, a per annum interest rate which is equal to the quotient of the following:

(a)     for any day, the per annum rate of interest determined on the basis of the rate for deposits in United States Dollars for a period equal to one (1) month appearing on Page BBAM of the Bloomberg Financial Markets Information Service as of 11:00 a.m. (London, England time) (or as soon thereafter as practical) on such day, or if such day is not a Business Day, on the immediately preceding Business Day. In the event that such rate does not appear on Page BBAM of the Bloomberg Financial Markets Information Service (or otherwise on such Service) on any day, the "Daily Adjusting LIBOR Rate" for such day shall be determined by reference to such other publicly available service for displaying eurodollar rates as may be reasonably selected by Bank, or, in the absence of such other service, the "Daily Adjusting LIBOR Rate" for such day shall, instead, be determined based upon the average of the rates at which Bank is offered dollar deposits at or about 11:00 a.m. (Detroit, Michigan time) (or as soon thereafter as practical), on such day, or if such day is not a Business Day, on the immediately preceding Business Day, in the interbank eurodollar market in an amount comparable to the principal amount of the Indebtedness outstanding hereunder and for a period equal to one (1) month;

divided by

(b)     1.00 minus the maximum rate (expressed as a decimal) on such day at which Bank is required to maintain reserves on "Euro-currency Liabilities" as defined in and pursuant to Regulation D of the Board of Governors of the Federal Reserve System or, if such regulation or definition is modified, and as long as Bank is required to maintain reserves against a category of liabilities which includes eurodollar deposits or includes a category of assets which includes eurodollar loans, the rate at which such reserves are required to be maintained on such category;

provided, however, and notwithstanding anything to the contrary set forth in this Note, if at any time the Daily Adjusting LIBOR Rate determined as provided above would be less than zero percent (0%), then the Daily Adjusting LIBOR Rate shall be deemed to be zero percent (0%) per annum for all purposes of this Note. Each calculation by Bank of the Daily Adjusting LIBOR Rate shall be conclusive and binding for all purposes, absent manifest error.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including, without limitation, any supranational bodies such as the European Union or the European Central Bank).

"Installment Payment Date" means September 1, 2019, and the first (1st) day of each succeeding month thereafter, until (and including) the Maturity Date.

"Loan Amount" means the face amount of this Note as set forth at the top of Page 1 hereof.

"Prime Rate" means the per annum interest rate established by Bank as its prime rate for its borrowers, as such rate may vary from time to time, which rate is not necessarily the lowest rate on loans made by Bank at any such time.

"Prime Referenced Rate" means, for any day, a per annum interest rate which is equal to the Prime Rate in effect on such day, but in no event and at no time shall the Prime Referenced Rate be less than the sum of the Daily Adjusting LIBOR Rate for such day plus two and one half percent (2.50%) per annum. If, at any time, Bank determines that it is unable to determine or ascertain the Daily Adjusting LIBOR Rate for any day, the Prime Referenced Rate for each such day shall be the Prime Rate in effect at such time, but not less than two and one half percent (2.50%) per annum.

"Request for Advance" means a Request for Advance issued by the undersigned under this Note in the form annexed to this Note as Exhibit "A".

No delay or failure of Bank in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise thereof preclude any further exercise thereof, or the exercise of any other power, right or privilege.  The rights of Bank under this Note are cumulative and not exclusive of any right or remedies which Bank would otherwise have, whether by other instruments or by law.

**THE UNDERSIGNED AND BANK, BY ACCEPTANCE OF THIS NOTE, ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL**

BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS.

[remainder of page intentionally left blank]

7

Detroit_15757030_4

This Note is dated and shall be effective as of the date set forth above.

**TURBO COMPONENTS, INC.**, a Michigan corporation

By:_____
     SIGNATURE OF BRADLEY FORTENBACHER

Its:    President

| 14680 Apple Drive, | Spring Lake, | MI | 49415 |
|---|---|---|---|
| STREET ADDRESS | CITY | STATE | ZIP CODE |

| For Bank Use Only | | | | | |
|---|---|---|---|---|---|
| OFFICER INITIALS | LOAN GROUP NAME | OBLIGOR NAME  Turbo Components, Inc. | | | |
| OFFICER ID. NO. | LOAN GROUP NO. | OBLIGOR NO. | NOTE NO. | AMOUNT  $100,000 | |

[Signature Page to Converting Installment Note (15757030)]

**EXHIBIT "A"**

**REQUEST FOR ADVANCE**

The undersigned hereby request(s) COMERICA BANK ("Bank") to make an Advance to the undersigned on _____ _____, in the amount of _____ _____ _____ Dollars ($_____ _____) under the Converting Installment Note dated as of December ___, 2018, issued by the undersigned to said Bank in the face amount of $100,000 (the "Note").

The undersigned represent(s), warrant(s) and certify(ies) that no Default, or any condition or event which, with the giving of notice or the running of time, or both, would constitute a Default, has occurred and is continuing under the Note, and none will exist upon the making of the Advance requested hereunder. The undersigned further certify(ies) that upon advancing the sum requested hereunder, the aggregate principal amount outstanding under the Note will not exceed the face amount thereof. If the amount advanced to the undersigned under the Note shall at any time exceed the face amount thereof, the undersigned will immediately pay such excess amount, without any necessity of notice or demand.

The undersigned hereby authorize(s) Bank to disburse the proceeds of the Advance being requested by this Request for Advance by crediting the account of the undersigned with Bank separately designated by the undersigned.

Capitalized terms used but not otherwise defined herein shall have the respective meanings given to them in the Note.

Dated this _____ day of _____.

**TURBO COMPONENTS, INC.**, a Michigan corporation

By:_____
　　　Bradley Fortenbacher

Its:　　President

[Exhibit A]



## Master Revolving Note
### Prime Referenced Rate
Demand-Optional Advances (Business and Commercial Loans Only)

| AMOUNT | NOTE DATE | MATURITY DATE |
|--------|-----------|---------------|
| $75,000.00 | March 23, 2020 | ON DEMAND |

ON DEMAND (or as otherwise provided in this Note), FOR VALUE RECEIVED, the undersigned promise(s) to pay to the order of COMERICA BANK (herein called "Bank"), at any office of the Bank in the State of Michigan, the principal sum of Seventy Five Thousand and 00/100 DOLLARS ($75,000.00), or so much of said sum as has been advanced and is then outstanding under this Note, together with interest thereon as hereinafter set forth.

This Note is a note under which Advances, repayments and re-Advances may be made from time to time, subject to the terms and conditions of this Note.

AT NO TIME SHALL THE BANK BE UNDER ANY OBLIGATION TO MAKE ANY ADVANCES TO THE UNDERSIGNED PURSUANT TO THIS NOTE (NOTWITHSTANDING ANYTHING EXPRESSED OR IMPLIED IN THIS NOTE OR ELSEWHERE TO THE CONTRARY, INCLUDING, WITHOUT LIMITATION, IF BANK SUPPLIES THE UNDERSIGNED WITH A BORROWING FORMULA) AND THE BANK, AT ANY TIME AND FROM TIME TO TIME, WITHOUT NOTICE, AND IN ITS SOLE DISCRETION, MAY REFUSE TO MAKE ADVANCES TO THE UNDERSIGNED WITHOUT INCURRING ANY LIABILITY DUE TO THIS REFUSAL AND WITHOUT AFFECTING THE UNDERSIGNED'S LIABILITY UNDER THIS NOTE FOR ANY AND ALL AMOUNTS ADVANCED

Subject to the terms and conditions of this Note, each of the Advances made hereunder shall bear interest at the Prime Referenced Rate plus the Applicable Margin.

Unless sooner demanded, accrued and unpaid interest on the unpaid principal balance of each outstanding Advance hereunder shall be payable monthly, in arrears, on the first Business Day of each month, from the date made until the same is paid in full (whether in accordance with the terms hereof, by acceleration, or otherwise). Interest accruing hereunder shall be computed on the basis of a year of 360 days, and shall be assessed for the actual number of days elapsed, and in such computation, effect shall be given to any change in the interest rate as a result of any change in the Prime Referenced Rate on the date of each such change.

Upon demand and from and after the occurrence of any Default hereunder, and so long as any such Default remains unremedied or uncured thereafter, the indebtedness outstanding under this Note shall bear interest at a per annum rate of three percent (3%) above the otherwise applicable interest rate, which interest shall be payable upon demand. In addition to the foregoing, a late payment charge equal to five percent (5%) of each late payment hereunder may be charged on any payment not received by Bank within ten (10) calendar days after the payment due date therefor, but acceptance of payment of any such charge shall not constitute a waiver of any Default hereunder.

In no event shall the interest payable under this Note at any time exceed the maximum rate permitted by law.

THE MAXIMUM INTEREST RATE SHALL NOT EXCEED 25% PER ANNUM OR THE HIGHEST APPLICABLE USURY CEILING, WHICHEVER IS LESS

The amount and date of each Advance, the applicable interest rate and the amount and date of any repayment shall be noted on Bank's records, which records shall be conclusive evidence thereof, absent manifest error; provided, however, any failure by Bank to make any such notation, or any error in any such notation, shall not relieve the undersigned of its/their obligations to repay Bank all amounts payable by the undersigned to Bank under or pursuant to this Note, when due in accordance with the terms hereof.

The undersigned may request an Advance hereunder either (i) upon the delivery to Bank of a written Request for Advance duly completed and executed by the undersigned (as herein provided) or, (ii) to the extent applicable, pursuant to a request submitted through Bank's Loan Management System (each a "Request"), in each case, subject to the following: (a) no Default, or any condition or event which, with the giving of notice or the running of time, or both, would constitute a Default, shall have occurred and be continuing or exist under this Note; (b) each such Request shall be delivered to Bank by 11:00 a.m. (Detroit, Michigan time) on the proposed date of the requested Advance; (c) after giving effect to such Advance, the aggregate principal amount of Advances made under this Note (excluding refundings and conversions of outstanding Advances) shall not exceed the Loan Amount; and (d) a Request, once delivered or submitted to Bank, shall not be revocable by the undersigned; provides, however, as aforesaid, Bank shall not be obligated to make any Advance under this Note.

In the event that the undersigned is unable to request Advances hereunder through the Bank's Loan Management System, Advances hereunder may be requested by delivery or submission to Bank, of a written Request for Advance duly completed and executed by the undersigned. Advances hereunder may be requested in the undersigned's discretion by telephonic notice to Bank. Any Advance requested by telephonic notice shall be confirmed by the undersigned that same day by submission to Bank of a written Request for Advance, as provided herein. The undersigned acknowledge(s) that if Bank makes an Advance based on a request made by telephone, facsimile, email or other means of delivery (other than by hand delivery, first class mail or overnight courier), it shall be for the undersigned's convenience and all risks involved in the use of any such procedure shall be borne by the undersigned, and the undersigned expressly agree(s) to indemnify and hold Bank harmless therefor. Bank shall have no duty to confirm the authority of anyone requesting an Advance by telephone, facsimile, email or any such other means of delivery. In the event that the undersigned elect(s) to request Advances by telephonic notice, facsimile, email or other means of delivery acceptable to Bank, the undersigned acknowledge(s) and agree(s) that Bank may impose or require such verification, authentication and other procedures as Bank may require from time to time.

In the event that any payment under this Note becomes due and payable on any day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day, and, to the extent applicable, interest shall continue to accrue and be payable thereon during such extension at the rate set forth in this Note.

All payments to be made by the undersigned to Bank under or pursuant to this Note shall be in immediately available United States funds, without setoff or counterclaim, and in the event that any payments submitted hereunder are in funds not available until collected, said payments shall continue to bear interest until collected.

The undersigned may prepay all or part of the outstanding balance of any Indebtedness hereunder at any time without premium or penalty. Any prepayment hereunder shall also be accompanied by the payment of all accrued and unpaid interest on the amount so prepaid.

If any Change in Law shall (a) subject Bank to any tax, duty or other charge with respect to this Note or any Indebtedness hereunder, or

PRR Master Revolver Demand Note - Nat'l (09/01/16) v. 1.01          -1-                                                       111532

shall change the basis of taxation of payments to Bank of the principal of or interest under this Note or any other amounts due under this Note in respect thereof (except for changes in the rate of tax on the overall net income of Bank imposed by the jurisdiction in which Bank's principal executive office is located); or (b) impose, modify or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the Federal Reserve System), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by Bank, or shall impose on Bank or the foreign exchange and interbank markets any other condition affecting this Note or the indebtedness hereunder; and the result of any of the foregoing is to increase the cost to Bank of maintaining any part of the indebtedness hereunder or to reduce the amount of any sum received or receivable by Bank under this Note by an amount deemed by the Bank to be material, then the undersigned shall pay to Bank, within fifteen (15) days of the undersigned's receipt of written notice from Bank demanding such compensation, such additional amount or amounts as will compensate Bank for such increased cost or reduction.  A certificate of Bank, prepared in good faith and in reasonable detail by Bank and submitted by Bank to the undersigned, setting forth the basis for determining such additional amount or amounts necessary to compensate Bank shall be conclusive and binding for all purposes, absent manifest error.

In the event that any Change in Law affects or would affect the amount of capital or liquidity required or expected to be maintained by Bank (or any corporation controlling Bank), and Bank determines that the amount of such capital or liquidity is increased by or based upon the existence of any obligations of Bank hereunder or the maintaining of any indebtedness hereunder, and such increase has the effect of reducing the rate of return on Bank's (or such controlling corporation's) capital as a consequence of such obligations or the maintaining of such indebtedness hereunder to a level below that which Bank (or such controlling corporation) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy and liquidity), then the undersigned shall pay to Bank, within fifteen (15) days of the undersigned's receipt of written notice from Bank demanding such compensation, additional amounts as are sufficient to compensate Bank (or such controlling corporation) for any increase in the amount of capital and/or liquidity and reduced rate of return which Bank reasonably determines to be allocable to the existence of any obligations of the Bank hereunder or to maintaining any indebtedness hereunder.  A certificate of Bank as to the amount of such compensation, prepared in good faith and in reasonable detail by the Bank and submitted by Bank to the undersigned, shall be conclusive and binding for all purposes absent manifest error.

This Note and any other indebtedness and liabilities of any kind of the undersigned (or any of them) to the Bank, and any and all modifications, renewals or extensions of it, whether joint or several, contingent or absolute, now existing or later arising, and however evidenced and whether incurred voluntarily or involuntarily, known or unknown, or originally payable to the Bank or to a third party and subsequently acquired by Bank including, without limitation, any late charges; loan fees or charges; overdraft indebtedness; costs incurred by Bank in establishing, determining, continuing or defending the validity or priority of any security interest, pledge or other lien or in pursuing any of its rights or remedies under any loan document (or otherwise) or in connection with any proceeding involving the Bank as a result of any financial accommodation to the undersigned (or any of them); and reasonable costs and expenses of attorneys and paralegals, whether inside or outside counsel is used, and whether any suit or other action is instituted, and to court costs if suit or action is instituted, and whether any such fees, costs or expenses are incurred at the trial court level or on appeal, in bankruptcy, in administrative proceedings, in probate proceedings or otherwise (collectively "Indebtedness"), are secured by and the Bank is granted a security interest in and lien upon all items deposited in any account of any of the undersigned with the Bank and by all proceeds of these items (cash or otherwise), all account balances of any of the undersigned from time to time with the Bank, by all property of any of the undersigned from time to time in the possession of the Bank and by any other collateral, rights and properties described in each and every deed of trust, mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been, or will at any time(s) later be, executed by any (or all) of the undersigned to or for the benefit of the Bank (collectively "Collateral").  Notwithstanding the above, (i) to the extent that any portion of the Indebtedness is a consumer loan, that portion shall not be secured by any deed of trust or mortgage on or other security interest in any of the undersigned's principal dwelling or in any of the undersigned's real property which is not a purchase money security interest as to that portion, unless expressly provided to the contrary in another place, or (ii) if the undersigned (or any of them) has (have) given or give(s) Bank a deed of trust or mortgage covering California real property, that deed of trust or mortgage shall not secure this Note or any other indebtedness of the undersigned (or any of them), unless expressly provided to the contrary in another place, or (iii) if the undersigned (or any of them) has (have) given or give(s) the Bank a deed of trust or mortgage covering real property which, under Texas law, constitutes the homestead of such person, that deed of trust or mortgage shall not secure this Note or any other indebtedness of the undersigned (or any of them) unless expressly provided to the contrary in another place.

If (a) the undersigned (or any of them) or any guarantor under a guaranty of all or part of the Indebtedness ("guarantor") (i) fail(s) to pay this Note or any of the Indebtedness when due, by maturity, acceleration or otherwise, or fail(s) to pay any indebtedness owing on a demand basis upon demand; or (ii) fail(s) to comply with any of the terms or provisions of any agreement between the undersigned (or any of them) or any guarantor and the Bank, and any such failure continues beyond any applicable grace or cure period, if any, expressly provided with respect thereto; or (iii) become(s) insolvent or the subject of a voluntary or involuntary proceeding in bankruptcy, or a reorganization, arrangement or creditor composition proceeding, (if a business entity) cease(s) doing business as a going concern, (if a natural person) die(s) or become(s) incompetent, (if a partnership) dissolve(s) or any general partner of it dies, becomes incompetent or becomes the subject of a bankruptcy proceeding, or (if a corporation or a limited liability company) is the subject of a dissolution, merger or consolidation; or (b) any warranty or representation made by any of the undersigned or any guarantor in connection with this Note or any of the Indebtedness shall be discovered to be untrue or incomplete; or (c) there is any termination, notice of termination, or breach of any guaranty, pledge, collateral assignment or subordination agreement relating to all or any part of the Indebtedness; or (d) there is any failure by any of the undersigned or any guarantor to pay when due any of its Indebtedness (other than to the Bank) or in the observance or performance of any term, covenant or condition in any document evidencing, securing or relating to such Indebtedness; or (e) the Bank deems itself insecure, believing that the prospect of payment or performance of this Note or any of the Indebtedness is impaired or shall fear deterioration, removal or waste of any of the Collateral; or (f) there is filed or issued a levy or writ of attachment or garnishment or other like judicial process upon the undersigned (or any of them) or any guarantor or any of the Collateral, including, without limit, any accounts of the undersigned (or any of them) or any guarantor with the Bank; then the Bank, upon the occurrence and at any time during the continuance or existence of any of these events (each a "Default"), may, at its option and without prior notice to the undersigned (or any of them), cease advancing money or extending credit to or for the benefit of the undersigned under this Note or any other agreement between the undersigned and Bank, terminate this Note as to any future liability or obligation of Bank, but without affecting Bank's rights and security interests in any Collateral and the Indebtedness of the undersigned to Bank, declare any or all of the Indebtedness to be immediately due and payable (notwithstanding any provisions contained in the evidence of it to the contrary), sell or liquidate all or any portion of the Collateral, set off against the Indebtedness any amounts owing by the Bank to the undersigned (or any of them), charge interest at the default rate provided in the document evidencing the relevant Indebtedness and exercise any one or more of the rights and remedies granted to the Bank by any agreement with the undersigned (or any of them) or given to it under applicable law.  In addition, if this Note is secured by a deed of trust or mortgage covering real property, then the trustor or mortgagor shall not mortgage or pledge the mortgaged premises as security for any other indebtedness or obligations.  This Note, together with all other indebtedness secured by said deed of trust or mortgage, shall become due and payable immediately, without notice, at the option of the Bank, (i) if said trustor or mortgagor shall mortgage or pledge the mortgaged premises for any other indebtedness or obligations or shall convey, assign or transfer the mortgaged premises by deed, installment sale contract or other instrument, or (ii) if the title to the mortgaged premises shall become vested in any other person or party in any manner whatsoever, or (iii) if there is any disposition (through one or more transactions) of legal or beneficial title of said trustor or mortgagor.

The undersigned hereby expressly acknowledge(s) and agree(s) that this Note is a demand note and matures upon issuance, and that the Indebtedness hereunder shall be payable upon demand (unless earlier payment is required in accordance with the terms and conditions of this Note), and that Bank may, at any time in its sole and absolute discretion, without notice and without reason and whether or not any Default shall have occurred and/or exist under this Note, without notice, demand that this Note

PRR Master Revolver Demand Note - Nat'l (09/01/16) v. 1.01          -2-          111532

and the Indebtedness hereunder be immediately paid in full. The Bank may from time to time make demand for partial payments under this Note and these demands shall not preclude the Bank from demanding at any time that this Note be immediately paid in full. Further, the demand nature of this Note shall not be deemed to be modified, limited or otherwise affected by any reference to any Default in this Note, and to the extent that there are any references to any Default(s) hereunder, such references are for the purpose of permitting Bank to accelerate any Indebtedness not on a demand basis and to receive interest at the applicable default rate provided in the document evidencing the relevant Indebtedness.

The undersigned authorize(s) the Bank to charge any account(s) of the undersigned (or any of them) with the Bank for any and all sums due hereunder when due; provided, however, that such authorization shall not affect any of the undersigned's obligation to pay to the Bank all amounts when due, whether or not any such account balances that are maintained by the undersigned with the Bank are insufficient to pay to the Bank any amounts when due, and to the extent that such accounts are insufficient to pay to the Bank all such amounts, the undersigned shall remain liable for any deficiencies until paid in full.

If this Note is signed by two or more parties (whether by all as makers or by one or more as an accommodation party or otherwise), the obligations and undertakings under this Note shall be that of all and any two or more jointly and also of each severally. This Note shall bind the undersigned, and the undersigned's respective heirs, personal representatives, successors and assigns.

The undersigned waive(s) presentment, demand, protest, notice of dishonor, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices, and agree(s) that no extension or indulgence to the undersigned (or any of them) or release, substitution or nonenforcement of any security, or release or substitution of any of the undersigned, any guarantor or any other party, whether with or without notice, shall affect the obligations of any of the undersigned. The undersigned waive(s) all defenses or right to discharge available under Section 3-605 of the Uniform Commercial Code and waive(s) all other suretyship defenses or right to discharge. The undersigned agree(s) that the Bank has the right to sell, assign, or grant participations or any interest in, any or all of the Indebtedness, and that, in connection with this right, but without limiting its ability to make other disclosures to the full extent allowable, the Bank may disclose all documents and information which the Bank now or later has relating to the undersigned or the Indebtedness. The undersigned agree(s) that the Bank may provide information relating to this Note or relating to the undersigned to the Bank's parent, affiliates, subsidiaries and service providers.

The undersigned agree(s) to pay or reimburse to Bank, or any other holder or owner of this Note, on demand, any and all costs and expenses of Bank (including, without limit, court costs, legal expenses and reasonable attorneys' fees, whether inside or outside counsel is used, whether or not suit is instituted, and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy, probate or administrative proceeding or otherwise) incurred in connection with the preparation, execution, delivery, amendment, administration, and performance of this Note and the related documents, or incurred in collecting or attempting to collect this Note or the Indebtedness, or incurred in any other matter or proceeding relating to this Note or the Indebtedness.

The undersigned acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note and agree(s) that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note. As used in this Note, the word "undersigned" means, individually and collectively, each maker, accommodation party, endorser and other party signing this Note in a similar capacity. If any provision of this Note is unenforceable in whole or part for any reason, the remaining provisions shall continue to be effective. **THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.**

For the purposes of this Note, the following terms have the following meanings:

"Advance" means a borrowing requested by the undersigned and made by Bank under this Note.

"Applicable Margin" means three percent (3.00%) per annum.

"Business Day" means any day, other than a Saturday, Sunday or any other day designated as a holiday under Federal or applicable State statute or regulation, on which Bank is open for all or substantially all of its domestic and international business (including dealings in foreign exchange) in Detroit, Michigan, and, in respect of notices and determinations relating to the Daily Adjusting LIBOR Rate, also a day on which dealings in dollar deposits are also carried on in the London interbank market and on which banks are open for business in London, England.

"Change in Law" means the occurrence, after the date hereof, of any of the following: (i) the adoption or introduction of, or any change in any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect and whether or not applicable to Bank on such date, or (ii) any change in interpretation, administration or implementation thereof of any such law, treaty, rule or regulation by any Governmental Authority, or (iii) the issuance, making or implementation by any Governmental Authority of any interpretation, administration, request, regulation, guideline, or directive (whether or not having the force of law), including, without limitation, any risk-based capital guidelines or any interpretation, administration, request, regulation, guideline, or directive relating to liquidity. For purposes of this definition, (x) a change in law, treaty, rule, regulation, interpretation, administration or implementation shall include, without limitation, any change made or which becomes effective on the basis of a law, treaty, rule, regulation, interpretation administration or implementation then in force, the effective date of which change is delayed by the terms of such law, treaty, rule, regulation, interpretation, administration or implementation, and (y) the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111-203, H.R. 4173) and all requests, rules, regulations, guidelines, interpretations or directives promulgated thereunder or issued in connection therewith shall be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or promulgated, whether before or after the date hereof, and (z) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall each be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Daily Adjusting LIBOR Rate" means, for any day, a per annum interest rate which is equal to the quotient of the following:

(a)      for any day, the per annum rate of interest determined on the basis of the rate for deposits in United States Dollars for a period equal to one (1) month appearing on Page BBAM of the Bloomberg Financial Markets Information Service at or about 11:00 a.m. (London, England time) (or as soon thereafter as practical) on such day, or if such day is not a Business Day, on the immediately preceding Business Day.  In the event that such rate does not appear on Page BBAM of the Bloomberg Financial Markets Information Service (or otherwise on such Service) on any day, the "Daily Adjusting LIBOR Rate" for such day shall be determined by reference to such other publicly available service for displaying eurodollar rates as may be reasonably selected by Bank, or, in the absence of such other service, the "Daily Adjusting LIBOR Rate" for such day shall, instead, be determined based upon the average of the rates at which Bank is offered dollar deposits at or about 11:00 a.m. (Detroit, Michigan time) (or as soon thereafter as practical), on such day, or if such day is not a Business Day, on the immediately preceding Business Day, in the interbank eurodollar market in an amount comparable to the principal amount of the Indebtedness outstanding hereunder and for a period equal to one (1) month;

        divided by

PRR Master Revolver Demand Note - Nat'l (09/01/16) v. 1.01        -3-        111532

(b)   1.00 minus the maximum rate (expressed as a decimal) on such day at which Bank is required to maintain reserves on "Euro-currency Liabilities" as defined in and pursuant to Regulation D of the Board of Governors of the Federal Reserve System or, if such regulation or definition is modified, and as long as Bank is required to maintain reserves against a category of liabilities which includes eurodollar deposits or includes a category of assets which includes eurodollar loans, the rate at which such reserves are required to be maintained on such category;

provided, however, and notwithstanding anything to the contrary set forth in this Note, if at any time the Daily Adjusting LIBOR Rate determined as provided above would be less than zero percent (0%), then the Daily Adjusting LIBOR Rate shall be deemed to be zero percent (0%) per annum for all purposes of this Note. Each calculation by Bank of the Daily Adjusting LIBOR Rate shall be conclusive and binding for all purposes, absent manifest error.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including, without limitation, any supranational bodies such as the European Union or the European Central Bank).

"Loan Amount" means the face amount of this Note as set forth at the top of Page 1 hereof.

"Prime Rate" means the per annum interest rate established by Bank as its prime rate for its borrowers, as such rate may vary from time to time, which rate is not necessarily the lowest rate on loans made by Bank at any such time.

"Prime Referenced Rate" means, for any day, a per annum interest rate which is equal to the Prime Rate in effect on such day, but in no event and at no time shall the Prime Referenced Rate be less than the sum of the Daily Adjusting LIBOR Rate for such day plus two and one-half percent (2.50%) per annum. If, at any time, Bank determines that it is unable to determine or ascertain the Daily Adjusting LIBOR Rate for any day, the Prime Referenced Rate for each such day shall be the Prime Rate in effect at such time, but not less than two and one-half percent (2.50%) per annum.

"Request for Advance" means a Request for Advance issued by the undersigned under this Note in the form annexed to this Note as Exhibit "A".

No delay or failure of Bank in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise thereof preclude any further exercise thereof, or the exercise of any other power, right or privilege.  The rights of Bank under this Note are cumulative and not exclusive of any right or remedies which Bank would otherwise have, whether by other instruments or by law.

THE UNDERSIGNED AND BANK, BY ACCEPTANCE OF THIS NOTE, ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS.

This Note is dated and shall be effective as of the date set forth above.

BORROWER:

Turbo Components, Inc., a Michigan Corporation

By: _____

Title: Bradley Fortenbacher
       President

| 14680 Apple Drive | Fruitport | MI | United States | 49415 |
|---|---|---|---|---|
| Street Address | City | State | Country | Zip Code |

| For Bank Use Only | | | | |
|---|---|---|---|---|
| LOAN OFFICER INITIALS GRB | LOAN GROUP NAME BB Muskegon | OBLIGOR NAME Turbo Components, Inc., a Michigan Corporation | | |
| LOAN OFFICER I.D. NO. 02134 | LOAN GROUP NO. 81183 | OBLIGOR NO. 9896310109 | NOTE NO. | AMOUNT $75,000.00 |

EXHIBIT "A"

REQUEST FOR ADVANCE

The undersigned hereby request(s) COMERICA BANK ("Bank") to make an Advance to the undersigned on _____, in the amount of _____ Dollars ($_____) under the Master Revolving Note dated as of _____, issued by the undersigned to said Bank in the face amount of Seventy Five Thousand and 00/100 Dollars ($75,000.00) (the "Note").

The undersigned represent(s), warrant(s) and certify(ies) that no Default, or any condition or event which, with the giving of notice or the running of time, or both, would constitute a Default, has occurred and is continuing under the Note, and none will exist upon the making of the Advance requested hereunder. The undersigned further certify(ies) that upon advancing the sum requested hereunder, the aggregate principal amount outstanding under the Note will not exceed the face amount thereof. If the amount advanced to the undersigned under the Note shall at any time exceed the face amount thereof, the undersigned will immediately pay such excess amount, without any necessity of notice or demand.

The undersigned hereby authorize(s) Bank to disburse the proceeds of the Advance being requested by this Request for Advance by crediting the account of the undersigned with Bank separately designated by the undersigned.

Capitalized terms used but not otherwise defined herein shall have the respective meanings given to them in the Note.

Dated this _____ day of _____.

Turbo Components, Inc., a Michigan Corporation

By: _____

Title: _____

By: _____

Title: _____

**Comerica Bank**

**Fixed Rate-Installment Note**

| AMOUNT | NOTE DATE | MATURITY DATE | TAX IDENTIFICATION NUMBER |
|---|---|---|---|
| $260,000.00 | August 17, 2012 | August 1, 2027 | |

For Value Received, the undersigned promise(s) to pay to the order of Comerica Bank ("Bank"), at any office of the Bank in the State of Michigan,  Two Hundred Sixty Thousand and 00/100  Dollars (U.S.) in installments of $2,121.65  each inclusive of interest on the unpaid principal balance from the date of this Note at the rate of  5.40%  per annum until maturity, whether by acceleration or otherwise, or until Default, as later defined, and after that at a default rate equal to the rate of interest otherwise prevailing under this Note plus 3% per annum (but in no event in excess of the maximum rate permitted by law). Interest shall be calculated for the actual number of days the principal is outstanding on the basis of a 360-day year if this Note evidences a business or commercial loan or a 365-day year if a consumer loan. Installments of principal and accrued interest due under this Note shall be payable on the  1st  day of each  month, commencing  September 1, 2012, and the entire remaining unpaid balance of principal and accrued interest shall be payable on the Maturity Date set forth above.  If the frequency of principal and interest installments is not otherwise specified, installments of principal and interest due under this Note shall be payable monthly on the first day of each month. If this Note or any installment of principal or interest under this Note shall become payable on a day other than a day on which the Bank is open for business, this payment shall be extended to the next succeeding business day and interest shall be payable at the rate specified in this Note during this extension. A late installment charge equal to 5% of each late installment may be charged on any installment payment not received by the Bank within 10 calendar days after the installment due date, but acceptance of payment of this charge shall not waive any Default under this Note.

The Bank does not have to accept any prepayment of principal under this Note except as described below or as required under applicable law. The undersigned may prepay principal of this Note in increments of $500.00 at any time as long as the Bank is provided written notice of the prepayment at least five business days prior to the date of prepayment. The notice of prepayment shall contain the following information: (a) the date of prepayment (the "Prepayment Date") and (b) the amount of principal to be prepaid. On the Prepayment Date, the undersigned will pay to the Bank, in addition to the other amounts then due on this Note, the Prepayment Amount described below. The Bank, in its sole discretion, may accept any prepayment of principal even if not required to do so under this Note and may deduct from the amount to be applied against principal the other amounts required as part of the Prepayment Amount.

The Prepaid Principal Amount (as defined below) will be applied to this Note in the reverse order of which the principal payments would have been due under this Note's principal amortization schedule. In other words, if this Note requires multiple principal payments, then as opposed to prepaying the next principal payment due, the Prepaid Principal Amount will be applied beginning with the final principal payment due on this Note.

If the Bank exercises its right to accelerate the payment of this Note prior to the Maturity Date, the undersigned will pay to the Bank, in addition to the other amounts then due on this Note, on the date specified by the Bank as the Prepayment Date, the Prepayment Amount.

The Bank's determination of the Prepayment Amount will be conclusive in the absence of obvious error or fraud. If requested in writing by the undersigned, the Bank will provide the undersigned a written statement specifying the Prepayment Amount.

The following, (the "Prepayment Amount") shall be due and payable in full on the Prepayment Date:  the sum of (i) the amount of principal which the undersigned has elected to prepay or the amount of principal which Bank has required the undersigned to prepay because of acceleration, as the case may be (the "Prepaid Principal Amount"), plus (ii) interest accruing on the Prepaid Principal Amount up to, but not including, the Prepayment Date, plus (iii) Five Hundred Dollars ($500), plus (iv) the Prepayment Percentage Amount (as defined below).

The term "Prepayment Percentage Amount" shall mean as follows:

i.      For the first year of this Note (i.e., the first 365-day period), an amount equal to five percent (5%) of the Prepaid Principal Amount;

ii.     For the second year of this Note (i.e., the second 365-day period), an amount equal to four percent (4%) of the Prepaid Principal Amount;

iii.    For the third year of this Note (i.e., the third 365-day period), an amount equal to three percent (3%) of the Prepaid Principal Amount;

iv.     For the fourth year of this Note (i.e., the fourth 365-day period), an amount equal to two percent (2%) of the Prepaid Principal Amount;

v.      For the fifth year of this Note (i.e., the fifth 365-day period), an amount equal to one percent (1%) of the Prepaid Principal Amount; and

vi.     For every year thereafter (i.e., the sixth 365-day period through the Maturity Date), there will be no Prepayment Percentage Amount.

Notwithstanding anything contained in this Note to the contrary, the Prepayment Percentage Amount shall only be included in the calculation of the Prepayment Amount if the undersigned refinances this Note (or any portion of this Note) with a financial institution other than Bank or if Bank exercises its rights to accelerate the payment of this Note prior to the Maturity Date.

This Note and any other indebtedness and liabilities of any kind of the undersigned (or any of them) to the Bank, and any and all modifications, renewals or extensions of it, whether joint or several, contingent or absolute, now existing or later arising, and however evidenced (collectively "Indebtedness") are secured by and the Bank is granted a security interest in all items deposited in any account of any of the undersigned with the Bank and by all proceeds of these items (cash or otherwise), all account balances of any of the undersigned from time to time with the Bank, by all property of any of the undersigned in the possession of the Bank and by any other collateral, rights and properties described in each and every deed of trust, mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been, or will at any time(s) later be, executed by any (or all) of the undersigned to or for the benefit of the Bank (collectively "Collateral"). Notwithstanding the above, (i) to the extent that any portion of the Indebtedness is a consumer loan, that portion shall not be secured by any deed of trust or mortgage on or other security interest in any of the undersigned's principal dwelling or in any of the undersigned's real property which is not a purchase money security interest as to that portion, unless expressly provided to the contrary in another place, or (ii) if the undersigned (or any of them) has(have) given

or give(s) Bank a deed of trust or mortgage covering California real property, that deed of trust or mortgage shall not secure this Note or any other indebtedness of the undersigned (or any of them), unless expressly provided to the contrary in another place.

If the undersigned (or any of them) or any guarantor under a guaranty of all or part of the indebtedness ("guarantor") (i) fail(s) to pay this Note or any of the indebtedness when due, by maturity, acceleration or otherwise, or fail(s) to pay any indebtedness owing on a demand basis upon demand; or (ii) fail(s) to comply with any of the terms or provisions of any agreement between the undersigned (or any of them) or any guarantor and the Bank; or (iii) become(s) insolvent or the subject of a voluntary or involuntary proceeding in bankruptcy, or a reorganization, arrangement or creditor composition proceeding, (if a business entity) cease(s) doing business as a going concern, (if a natural person) die(s) or become(s) incompetent, (if a partnership) dissolve(s) or any general partner of it dies, becomes incompetent or becomes the subject of a bankruptcy proceeding or (if a corporation or a limited liability company) is the subject of a dissolution, merger or consolidation; or (a) if any warranty or representation made by any of the undersigned or any guarantor in connection with this Note or any of the indebtedness shall be discovered to be untrue or incomplete; (b) or if there is any termination, notice of termination, or breach of any guaranty, pledge, collateral assignment or subordination agreement relating to all or any part of the indebtedness; or (c) if there is any failure by any of the undersigned or any guarantor to pay when due any of its indebtedness (other than to the Bank) or in the observance or performance of any term, covenant or condition in any document evidencing, securing or relating to such indebtedness; or (d) if the Bank deems itself insecure believing that the prospect of payment of this Note or any of the indebtedness is impaired or shall fear deterioration, removal or waste of any of the Collateral; or (e) if there is filed or issued a levy or writ of attachment or garnishment or other like judicial process upon the undersigned (or any of them) or any guarantor or any of the Collateral, including without limit, any accounts of the undersigned (or any of them) or any guarantor with the Bank, then the Bank, upon the occurrence of any of these events (each a "Default"), may at its option and without prior notice to the undersigned (or any of them), declare any or all of the indebtedness to be immediately due and payable (notwithstanding any provisions contained in the evidence of it to the contrary), sell or liquidate all or any portion of the Collateral, set off against the indebtedness any amounts owing by the Bank to the undersigned (or any of them), charge interest at the default rate provided in the document evidencing the relevant indebtedness and exercise any one or more of the rights and remedies granted to the Bank by any agreement with the undersigned (or any of them) or given to it under applicable law. All payments under this Note shall be in immediately available United States funds, without setoff or counterclaim.

If this Note is signed by two or more parties (whether by all as makers or by one or more as an accommodation party or otherwise), the obligations and undertakings under this Note shall be that of all and any two or more jointly and also of each severally. This Note shall bind the undersigned, and the undersigned's respective heirs, personal representatives, successors and assigns.

The undersigned waive(s) presentment, demand, protest, notice of dishonor, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices, and agree(s) that no extension or indulgence to the undersigned (or any of them) or release, substitution or nonenforcement of any security, or release or substitution of any of the undersigned, any guarantor or any other party, whether with or without notice, shall affect the obligations of any of the undersigned. The undersigned waive(s) all defenses or right to discharge available under Section 3-605 of the Michigan Uniform Commercial Code and waive(s) all other suretyship defenses or right to discharge. The undersigned agree(s) that the Bank has the right to sell, assign, or grant participations or any interest in, any or all of the indebtedness, and that, in connection with this right, but without limiting its ability to make other disclosures to the full extent allowable, the Bank may disclose all documents and information which the Bank now or later has relating to the undersigned or the indebtedness. The undersigned agree(s) that the Bank may provide information relating to this Note or relating to the undersigned to the Bank's parent, affiliates, subsidiaries and service providers.

The undersigned agree(s) to pay or reimburse to Bank, or any other holder or owner of this Note, on demand, any and all costs and expenses of Bank (including, without limit, court costs, legal expenses and reasonable attorneys' fees, whether inside or outside counsel is used, whether or not suit is instituted, and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy, probate or administrative proceeding or otherwise) incurred in connection with the preparation, execution, delivery, amendment, administration, and performance of this Note and the related documents, or incurred in collecting or attempting to collect this Note or the indebtedness or incurred in any other matter or proceeding relating to this Note or the indebtedness.

The undersigned acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note and agree(s) that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note. As used in this Note, the word "undersigned" means, individually and collectively, each maker, accommodation party, indorser and other party signing this Note in a similar capacity. If any provision of this Note is unenforceable in whole or part for any reason, the remaining provisions shall continue to be effective. THIS NOTE IS MADE IN THE STATE OF MICHIGAN AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

THE MAXIMUM INTEREST RATE SHALL NOT EXCEED 25% PER ANNUM, OR THE HIGHEST APPLICABLE USURY CEILING, WHICHEVER IS LESS.

THE UNDERSIGNED AND THE BANK ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS.

The undersigned covenants and agrees that, from and after the date hereof, as a condition to the loan evidenced by this Note, the undersigned shall maintain a non-interest bearing DDA account (the "Account") with Bank during the term of this Note with a minimum average daily balance during each calendar quarter of not less than $25,000.00 (the "Required Balance"). It shall be a Default hereunder if, during any calendar quarter, the balance of the Account does not exceed the Required Balance.

Remainder of Page Intentionally Left Blank.

This Note is dated and shall be effective as of the date set forth above.

Turbo Components, Inc., a Michigan Corporation
OBLIGOR NAME TYPED/PRINTED

By: _Harold Balkema_____
      SIGNATURE OF Harold Balkema

Its: _President_____
      TITLE

By: _____
      SIGNATURE OF Brad Fortenbacher

Its: _Treasurer____
      TITLE

| 16960 148th Avenue PO Box 94 | Spring Lake | MI | USA | 49456 |
|---|---|---|---|---|
| Street Address | City | State | Country | Zip Code |

| For Bank Use Only | | CCAR # | | |
|---|---|---|---|---|
| LOAN OFFICER INITIALS<br>KA | LOAN GROUP NAME<br>Business Banking Muskegon | OBLIGOR NAME<br>Turbo Components, Inc., a Michigan Corporation | | |
| LOAN OFFICER I.D. NO.<br>02122 | LOAN GROUP NO.<br>91153 | OBLIGOR NO.<br>9895310109 | NOTE NO. | AMOUNT<br>$250,000.00 |



8 3 2 4 5 5 8
TX:4130227
9/12/2012 10:18:00 AM

**2012-0038213**
**FILED/SEALED FOR RECORD IN**
**OTTAWA COUNTY, MI**
**GARY SCHOLTEN R.O.D.**
**09/12/2012 AT 4:43 PM**
**MORTGAGE 41.00**



 Comerica Bank

## CONTINUING COLLATERAL MORTGAGE
## (THIS IS A FUTURE ADVANCE MORTGAGE)

This Continuing Collateral Mortgage ("Mortgage") is made as of _August 17_, 20_12_, by Turbo Components, Inc., a Michigan Corporation (individually and collectively if more than one party "Mortgagor"), located at 16960 148th Avenue, PO Box 94, Spring Lake, Michigan 49456, to Comerica Bank ("Mortgagee"), located at 39200 Six Mile Road, Livonia, Michigan 48152, Attention: National Documentation Services, Mail Code 7578. As security for the purposes stated in this Mortgage, Mortgagor mortgages, warrants, and assigns to Mortgagee, its successors and assigns, the real property in the County of Ottawa, State of Michigan, legally described as:

That part of the following description lying West of Old US-16 beginning at a point 249.25 feet North of the Southeast corner of the Northwest 1/4 of the Northeast 1/4 of Section 1, Town 8 North, Range 16 West and running thence North on the East 1/8 line of said Section 747.75 feet, thence West to a point on the North and South 1/4 line of said Section, 988.0 feet North of the North 1/8 line, thence South on said North and South 1/4 line 741 feet, thence Easterly to the place of beginning, Excepting the South141 feet of the East 205 feet of the West 238 feet thereof.

Parcel Identification No. 70-03-01-200-026

Commonly Known As: 14680 Apple Dr., ~~Fruitport, Michigan 49415~~ _Spring Lake, Michigan 49456_

together with: (a) all related easements, hereditaments, appurtenances, rights, licenses and privileges; (b) all buildings and improvements now or later situated under, upon or over any of the above described land; (c) all the rents, issues, profits, revenues, accounts and general intangibles arising from the above described land, or relating to any business conducted by Mortgagor on it, under present or future leases, licenses or otherwise, including, without limit, all rights conferred by Act No. 210 of the Michigan Public Acts of 1953, as amended; (d) all machinery, equipment, goods, fixtures, and articles of personal property of every kind and nature (other than Household Goods, as defined by 12 CFR 227.12, as amended from time to time, and other than consumer goods, as defined in the Uniform Commercial Code, unless such goods were purchased with the proceeds of any loan specifically referenced as being secured by this Mortgage), now or later located upon the above described land and useable in connection with any present or future operation on the land (individually and collectively the "equipment") including, without limit, all lighting, heating, cooling, ventilating, air-conditioning, incinerating, refrigerating, plumbing, sprinkling, communicating and electrical systems, and all general intangibles, including without limit software, acquired or used in connection therewith. It is agreed that all equipment shall for the purposes of this Mortgage, unless Mortgagee shall otherwise elect, be deemed conclusively to be real estate and mortgaged under this Mortgage; (e) all "as-extracted collateral"; and (f) all awards or payments, and interest on them, made with respect to the Premises as a result of (i) any eminent domain proceeding, (ii) any street grade alteration, (iii) any loss of or damage to any building or other improvement, (iv) any other injury to or decrease in the value of the Premises, (v) any refund due on account of the payment of real estate taxes, assessments or other charges levied against the Premises or (vi) any refund of utility deposits or right to any tenant deposit (all of the above individually and collectively the "Premises"). Unless otherwise indicated, a reference to the "Premises" means all and/or any part of the Premises.

This Mortgage is made to secure when due, whether by stated maturity, demand, acceleration or otherwise, all existing and future Indebtedness (as hereinafter defined) of Mortgagor to Mortgagee, including, without limit, payment of **Two Hundred Sixty Thousand and 00/100 Dollars ($260,000.00)** according to certain evidence(s) of indebtedness. This reference to a dollar amount does not limit the dollar amount secured by this Mortgage. "Indebtedness" shall mean any and all indebtedness, obligations or liabilities of Mortgagor to Mortgagee, howsoever arising, evidenced or incurred, whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, and whether known or unknown, and whether originally payable to Mortgagee or to a third party and subsequently acquired by Mortgagee, including, without limitation, (a) any and all direct indebtedness of Mortgagor to Mortgagee, including indebtedness evidenced by any and all promissory notes; (b) any and all obligations or liabilities of Mortgagor to Mortgagee arising under any guaranty where Mortgagor has guaranteed the payment of indebtedness owing to Mortgagee from a third party; (c) any and all obligations or liabilities of Mortgagor to Mortgagee arising from applications or agreements for the issuance of letters of credit; (d) late charges, loan fees or charges and overdraft indebtedness; (e) any agreement to indemnify Mortgagee for environmental liability or to clean up hazardous waste; (f) any and all indebtedness, obligations or liabilities for which Mortgagor would otherwise be liable to Mortgagee were it not for the invalidity, irregularity or unenforceability of them by reason of any bankruptcy, insolvency or other law or order of any kind, or for any other

reason; (g) any and all amendments, modifications, renewals and/or extensions of any of the above, including, without limit, amendments, modifications, renewals and/or extensions which are evidenced by new or additional instruments, documents or agreements; (h) all costs incurred by Mortgagee in establishing, determining, continuing, or defending the validity or priority of its lien or security interest, or to protect the value of the Premises, or for any appraisal, environmental audit, title examination or title insurance policy relating to the Premises, or in pursuing its rights and remedies under this Mortgage or under any other agreement between Mortgagee and Mortgagor or in connection with any proceeding involving Mortgagee as a result of any financial accommodation to Mortgagor; all costs incurred by Mortgagee in connection with any suit or claim involving or against Mortgagee in any way related to the Premises, the Indebtedness or this Mortgage; and (i) all costs of collecting Indebtedness, including, without limit, attorneys' fees and costs. Any reference in this Mortgage to attorneys' fees shall be deemed a reference to reasonable fees, charges, costs and expenses of counsel and paralegals, whether inside or outside counsel is used, and whether or not a suit or action is instituted, and to court costs if a suit or action is instituted, and whether attorneys' fees or court costs are incurred at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding or otherwise.  All costs and expenses shall be payable immediately by the Mortgagor when incurred by Mortgagee, immediately upon demand, and until paid shall bear interest at the highest per annum rate applicable to any of the Indebtedness, but not in excess of the maximum rate permitted by law. Notwithstanding the foregoing, this Mortgage shall not secure that part of the Indebtedness, if any, which constitutes a consumer loan, other than a consumer loan specifically referenced as being secured by this Mortgage (and all extensions, renewals, modifications or replacements thereof).

Mortgagor, on a continuing basis, warrants, covenants and agrees to and with Mortgagee, which covenants, warranties and agreements, to the extent permitted by law, shall be deemed to run with the land, as follows:

1.     Mortgagor will pay to Mortgagee all Indebtedness according to the terms of the relevant instruments evidencing it, and Mortgagor agrees that this Mortgage is a continuing mortgage securing the payment of the Indebtedness.

2.     Mortgagor has good and indefeasible title to the entire Premises in fee simple and with full power to sell, mortgage and convey it; the Premises are free of all easements, restrictions, liens, leases and encumbrances whether now existing or later created, except those matters listed on attached Schedule A (if any) to which this Mortgage is expressly subject, and Mortgagor will warrant and defend the Premises against all other claims. Mortgagee shall have the right, at its option and at such times as it, in its sole discretion deems necessary, to take whatever action it may deem necessary to defend or uphold the lien of this Mortgage or otherwise enforce any of its rights under this Mortgage or any obligation secured by this Mortgage including, without limit, the right to institute appropriate legal proceedings for these purposes. With respect to the right, title, or lien of any person or entity which is superior to the lien of this Mortgage, Mortgagee has the right, but not the obligation, to acquire and/or pay off the holder of such right, title, or lien and add the amount so paid to the Indebtedness.

3.     Mortgagor shall not mortgage or pledge the Premises as security for any other indebtedness or obligations.  Mortgagor shall pay when due, and before any interest, collection fees or penalties accrue or default occurs, all payments required under any mortgages on the Premises, and all taxes, assessments, and other charges and impositions levied, assessed or existing with respect to (i) the Premises or (ii) the execution, delivery or recordation of this Mortgage or any note or other instrument evidencing or securing repayment of the Indebtedness or the interest of Mortgagee in the Premises, and will deliver to Mortgagee without demand official receipts showing these payments. If Mortgagor fails to pay these mortgage payments, taxes, assessments, other charges or impositions when due, or if Mortgagor fails to pay all interest, collection fees and penalties accrued on them, Mortgagee, at its sole option, may (but is not obligated to) pay them and the monies paid shall be added to the Indebtedness.  Mortgagor shall pay (before the same become liens or encumbrances against the Premises) any and all obligations or liabilities for repairs or improvements to the Premises or for any other goods, services, or utilities furnished to the Premises.  At the sole option of Mortgagee, Mortgagor shall pay to Mortgagee on the first day of each month a pro rata portion of all taxes, assessments, liens, mortgages, and other charges levied, assessed or existing on the Premises in an amount  sufficient to pay them when due, plus payments (based on single item or aggregate analysis, as determined by Mortgagee under applicable law) sufficient to maintain an additional balance of not more than one-sixth of that amount, all as estimated by Mortgagee. In the event that sufficient funds have been deposited with Mortgagee to cover the amount of these taxes, assessments, liens, mortgages, and other charges when they become due and payable, Mortgagee shall pay them. In the event that sufficient funds have not been deposited to cover the amount of these taxes, assessments, liens, mortgages and other charges at least fifteen (15) days prior to the time when they become due and payable, Mortgagor shall immediately upon request by Mortgagee pay the amount of the deficiency to Mortgagee. Mortgagee shall not be required to keep in a separate account or to pay Mortgagor any interest or earnings whatever on the funds held by Mortgagee for the payment of taxes, assessments, liens, mortgages, or other charges pursuant to this paragraph or for the payment of insurance premiums under paragraph (4) below, or on any other funds deposited with Mortgagee in connection with this Mortgage. If an Event of Default occurs under this Mortgage, any funds then remaining on deposit with Mortgagee may be applied against the Indebtedness immediately upon or at any time after the Event of Default occurs, and without notice to Mortgagor.  No lienholder junior to this Mortgage may exercise any rights with respect to the Premises, and all rents and other proceeds from the Premises shall be held in trust by the junior lienholder as the property of Mortgagee, until satisfaction in full of the Indebtedness. Nothing in this paragraph shall be considered a consent by Mortgagee to any lien, mortgage or encumbrance on the Premises unless set forth on attached Schedule A, if any.

4.      Mortgagor shall keep the buildings and all other improvements now or later existing on the Premises constantly insured for the benefit of Mortgagee against fire and other hazards and risks, including, without limit, vandalism and malicious mischief, as Mortgagee may require and shall further provide flood insurance (if the Premises are situated in a special flood hazard area as determined by the Director of the Federal Emergency Management Agency or other governing agency), loss of rents insurance, public liability and product liability insurance and any other insurance as Mortgagee may require from time to time, all in amounts and in forms and with companies as are satisfactory to Mortgagee. Mortgagor shall deliver to Mortgagee the policies evidencing the required insurance with premiums fully paid for one year in advance and with standard mortgagee clauses satisfactory to Mortgagee. Renewals of the required insurance (together with evidence of premium prepayment for one year in advance) shall be delivered to Mortgagee at least thirty (30) days before the expiration of any existing policies. All policies and renewals shall provide that they may not be canceled or amended without giving Mortgagee thirty (30) days' prior written notice of cancellation or amendment. All policies and renewals shall be held by, and are pledged to, Mortgagee, along with all insurance premium rebates, as additional security for the Indebtedness. Should Mortgagor fail to insure or fail to pay the premiums on any required insurance or fail to deliver the policies or renewals of them as provided above, Mortgagee may (but is not obligated to) have the insurance issued or renewed (and pay the premiums on it for the account of Mortgagor) in amounts and with companies and at premiums as Mortgagee deems appropriate. If Mortgagee elects to have insurance issued or renewed to insure Mortgagee's interest, Mortgagee shall have no obligation to also insure Mortgagor's interest or to notify Mortgagor of Mortgagee's actions. Any sums paid by Mortgagee for insurance as provided above shall be added to the Indebtedness. In the event of loss or damage, the proceeds of all required insurance shall be paid to Mortgagee alone. No loss or damage shall itself reduce the Indebtedness. Mortgagee and any of Mortgagee's employees is each irrevocably appointed attorney-in-fact for Mortgagor and is authorized to adjust and compromise each loss without the consent of Mortgagor, to collect, receive and receipt for the insurance proceeds in the name of Mortgagee and Mortgagor and to endorse Mortgagor's name upon any check in payment of the loss. The proceeds shall be applied first toward reimbursement of all costs and expenses of Mortgagee in collecting the proceeds (including, without limit, attorneys' fees), and then toward payment of the Indebtedness or any portion of it, whether or not then due or payable and in whatever order of maturity as Mortgagee may elect, or Mortgagee, at its option, may apply any or all the insurance proceeds to the repair or rebuilding of the Premises. Application of proceeds by Mortgagee toward later maturing installments of the Indebtedness shall not excuse Mortgagor from making the regularly scheduled installment payments nor shall such application extend the due date or reduce the amount of any of these payments. Application of proceeds by Mortgagee toward payment of the Indebtedness shall constitute an acceleration and prepayment and shall subject Mortgagor to any applicable prepayment premium or formula. In the event of a foreclosure of this Mortgage, or the giving of a deed in lieu of foreclosure, the purchaser or grantee of the Premises shall succeed to all of the rights of Mortgagor under said insurance policies. At the sole option of Mortgagee, Mortgagor shall pay to Mortgagee on the first day of each month a pro rata portion of the annual premiums (as estimated by Mortgagee) for the required insurance in an amount sufficient to pay them when due, plus payments (based on single item or aggregate analysis, as determined by Mortgagee under applicable law) sufficient to maintain an additional balance of not more than one-sixth of that amount. In the event that sufficient funds have been deposited with Mortgagee to cover the amount of the insurance premiums for required insurance when the premiums become due and payable, Mortgagee shall pay the premiums. In the event that sufficient funds have not been deposited with Mortgagee to pay the insurance premiums at least fifteen (15) days prior to the time when they become due and payable, Mortgagor shall immediately upon request pay the amount of this deficiency to Mortgagee. Mortgagor shall promptly repair, replace or rebuild each part of the Premises which may be damaged or destroyed by fire or other casualty or which may be affected by any eminent domain proceedings, notwithstanding application by Mortgagee of the insurance proceeds or eminent domain award to payment of the Indebtedness.

5.      Mortgagor shall abstain from commission of waste upon the Premises, keep the Premises in good repair, and promptly comply with all laws, regulations and requirements of all governmental bodies affecting the Premises. If Mortgagee determines that the Premises requires inspection, testing, appraisal, repair, care, alteration or attention of any kind, Mortgagee or its representatives may (but is not obligated to) enter upon the Premises, and inspect, test, appraise, repair, alter or maintain the Premises as Mortgagee may deem necessary, and Mortgagor shall reimburse Mortgagee upon demand for all resulting costs and expenses incurred by Mortgagee. Any inspection, audit, appraisal or examination by Mortgagee or its representatives of the Premises or of information or documents pertaining to the Premises is for the sole purpose of protecting Mortgagee's interests under this Mortgage and is not for the benefit or protection of Mortgagor or any third party. Mortgagee has no obligation to provide Mortgagor or any third party with information concerning, or results of, any inspection, audit, appraisal or examination by Mortgagee or its representatives. If Mortgagee, in its sole discretion, discloses information to Mortgagor this disclosure is for the sole protection of Mortgagee, does not constitute an agreement to further disclosure and does not create a warranty by Mortgagee as to the accuracy, sufficiency or any other aspect of the disclosure. Mortgagee may spend money as Mortgagee deems essential to protect the value of the Premises. Mortgagor shall not make or permit any other party to make any material alterations, additions or improvements of any type to the Premises (individually and collectively the "Improvements"), regardless of whether the Improvements would increase the value of the Premises, without Mortgagee's prior written consent. This consent may be withheld by Mortgagee in its sole discretion. If Mortgagee consents to the making of any Improvements and the Improvements are not completed with due diligence in accordance with the plans and specifications approved in writing by Mortgagee, or if construction of the Improvements should cease before completion for a period of thirty (30) days, then and in either event it shall be an Event of Default under this Mortgage and Mortgagee shall have all the rights and remedies provided in this Mortgage, including, without limitation, the right (but not the obligation) to enter or cause entry to be made upon the Premises and complete the Improvements and

its costs shall be added to the Indebtedness. If any action is threatened or commenced which affects Mortgagee's interest in the Premises, including, without limit, building, environmental or zoning proceedings, Mortgagee may take such action as it deems necessary to protect its interest and its costs shall be added to the Indebtedness.

6.     In the event the Premises is taken under power of eminent domain, or by condemnation, the entire proceeds of the award shall be paid directly to Mortgagee and applied toward reimbursement of all Mortgagee's costs and expenses incurred in connection with collecting the award (including, without limit, attorney fees), and the balance applied upon the Indebtedness whether or not then due or payable in whatever manner Mortgagee deems advisable. Application by Mortgagee of any condemnation award or portion of it toward the last maturing installments of the Indebtedness shall not excuse Mortgagor from making the regularly scheduled payments nor extend the due date or reduce the amount of these payments. Application of any condemnation award by Mortgagee toward payment of the Indebtedness shall constitute an acceleration and a prepayment and shall subject Mortgagor to any applicable prepayment premium or formula. Mortgagee or any of Mortgagee's employees is irrevocably appointed attorney-in-fact and is duly authorized and empowered to receive, receipt for, discharge and satisfy any condemnation award and judgment, whether joint or several, on behalf of Mortgagor. Mortgagee shall not be liable for failure to collect any condemnation award, regardless of the cause of such failure.

7.     The Indebtedness shall become due and payable immediately, without notice, at the option of Mortgagee, if Mortgagor shall convey, assign or transfer the Premises by deed, land contract or other instrument, or if title to the Premises shall become vested in any other person or party in any manner whatsoever or if there is any disposition (through one or more transactions) of legal or beneficial title to a controlling interest of Mortgagor. In the event ownership of the Premises becomes vested in a person or persons other than Mortgagor (with or without the prior written approval of Mortgagee), Mortgagee may (but shall not be obligated to) deal with and may enter into any contract or agreement with the successor(s) in interest with reference to this Mortgage in the same manner as with Mortgagor, without in any manner discharging or otherwise affecting the lien of this Mortgage or Mortgagor's liability under this Mortgage or upon the Indebtedness.

8.     This Mortgage shall, as to any personal property covered by it, be deemed to grant a security interest in the personal property pursuant to the Uniform Commercial Code. Mortgagor agrees, upon request of Mortgagee from time to time, to promptly furnish a detailed list of personal property subject to this Mortgage and, upon request by Mortgagee, to immediately execute, deliver and/or file any mortgage, security agreement or financing statement to include specifically this list of personal property and to immediately take such other actions as deemed necessary or desirable by Mortgagee to evidence, perfect or continue the security interests granted in this Mortgage; and Mortgagee or any agent of Mortgagee is hereby authorized in its own name, and is also hereby irrevocably appointed (which appointment is coupled with an interest) the true and lawful attorney in fact for Mortgagor (with full power of substitution) in the name and place of Mortgagor, to execute and file such security agreements and financing statements and to take such other actions as deemed necessary or desirable by Mortgagee to evidence, perfect or continue the security interests granted in this Mortgage. Upon the occurrence of any Event of Default under this Mortgage, Mortgagee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code or otherwise provided by law or by this Mortgage including, without limit, the right to require Mortgagor to assemble the personal property and make it available to Mortgagee at a place to be designated by Mortgagee which is reasonably convenient to both parties, the right to take possession of the personal property with or without demand and with or without process of law and the right to sell and dispose of it and distribute the proceeds according to law. Mortgagor agrees that any requirement of reasonable notice shall be met if Mortgagee sends notice to Mortgagor at least ten (10) days prior to the date of sale, disposition or other event giving rise to the required notice. Mortgagor agrees that the proceeds of any disposition of the personal property may be applied by Mortgagee first to Mortgagee's reasonable expenses in connection with the disposition including, without limit, attorney fees, and then to payment of the Indebtedness. At any sale or other disposition of the personal property pursuant to this paragraph, Mortgagee disclaims all warranties which would otherwise be given under the Uniform Commercial Code, including, without limit, a disclaimer of any warranty relating to title, possession, quiet enjoyment or the like, and Mortgagee may communicate these disclaimers to a purchaser at such disposition. This disclaimer of warranties will not render the sale commercially unreasonable. Mortgagor agrees that Mortgagee shall be under no obligation to accept any noncash proceeds in connection with any sale or disposition of the personal property covered by this Mortgage, unless failure to do so would be commercially unreasonable. If Mortgagee agrees in its sole discretion to accept noncash proceeds (unless the failure to do so would be commercially unreasonable), Mortgagee may ascribe any commercially reasonable value to such proceeds. Without limiting the foregoing, Mortgagee may apply any discount factor in determining the present value of proceeds to be received in the future or may elect to apply proceeds to be received in the future only as and when such proceeds are actually received in cash by Mortgagee. Mortgagor represents that its exact name is its name as set forth in this Mortgage and that Mortgagor is located (as determined pursuant to Article 9 of the Uniform Commercial Code) in Michigan, unless otherwise expressly specified in this Mortgage. Mortgagor will give Mortgagee not less than 90 days' prior written notice of all contemplated changes in Mortgagor's name, location, chief executive office, or principal place of business, but the giving of this notice shall not cure any Event of Default caused by this change. "Uniform Commercial Code" means Act No. 174 of the Michigan Public Acts of 1962, as amended, revised or replaced from time to time, including without limit as amended by Act No. 348 of the Michigan Public Acts of 2000. Notwithstanding the foregoing, the parties intend that the terms used herein which are defined in the Uniform Commercial Code have, at all times, the broadest and most inclusive meanings possible. Accordingly, if the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more broadly or inclusively than the Uniform Commercial Code in effect on the date of this Agreement, then such term, as used herein, shall be given such broadened meaning. If the Uniform Commercial

Code shall in the future be amended or held by a court to define any term used herein more narrowly, or less inclusively, than the Uniform Commercial Code in effect on the date of this Agreement, such amendment or holding shall be disregarded in defining terms used in this Agreement.

9.      As additional security for the payment and performance of the Indebtedness, Mortgagor grants a security interest to Mortgagee in all deposit or other accounts with Mortgagee and Mortgagor assigns to Mortgagee all its right, title and interest in all written and oral leases and occupancy agreements, now or later existing, covering the Premises (but without an assumption by Mortgagee of liabilities of Mortgagor under any of these leases or occupancy agreements by virtue of this assignment), and Mortgagor assigns to Mortgagee the rents, issues and profits of the Premises. If an Event of Default occurs under this Mortgage, Mortgagee may receive and collect the rents, issues and profits personally or through a receiver so long as the Event of Default exists and during the pendency of any foreclosure proceedings and during any redemption period. Mortgagor agrees to consent to the appointment of a receiver if this is believed necessary or desirable by Mortgagee to enforce its rights under this Mortgage. Mortgagee shall at no time have any obligation to attempt to collect rent or other amounts from any tenant or occupier of the Premises.   Mortgagee shall at no time have any obligation to enforce any other obligations owed by tenants or occupiers of the Premises to Mortgagor. No action taken by Mortgagee under this Mortgage shall make Mortgagee a "mortgagee in possession." Mortgagor shall at no time collect advance rent under any lease or occupancy agreement pertaining to the Premises in excess of one month (other than as a security deposit) and Mortgagee shall not be bound in any manner by any rent prepayment in violation of this prohibition. The assignment of licenses and permits under this Mortgage shall not be construed as a consent by Mortgagee to any license or permit so assigned, or to impose upon Mortgagee any obligations with respect to them.  Mortgagor shall not cancel or amend any of the licenses and permits assigned (nor permit any of them to terminate if they are necessary or desirable for the operation of the Premises) without first obtaining the written approval of Mortgagee. This paragraph shall not be applicable to any license or permit that terminates if it is assigned without the consent of another party (other than Mortgagor), unless this consent has been obtained nor shall this paragraph be construed as a present assignment of any license or permit that Mortgagor is required by law to hold.  Mortgagor shall comply with and perform as required all obligations and restrictions imposed upon Mortgagor or the Premises under applicable deed restrictions, restrictive covenants, easements, leases, land contracts, condominium or planned unit development documents, or other agreements affecting the Premises, but this is not a consent by Mortgagee to take subject to any of these agreements unless specifically set forth on attached Schedule A, if any, and Mortgagee does not assume any obligations under these agreements. Mortgagor shall promptly provide Mortgagee with certificates of occupancy, licenses, rent rolls, income and expense statements and other documents and information pertaining to the Premises and its operations as Mortgagee, from time to time, may request.

10.      (a) Mortgagor represents and covenants that Mortgagor has not used Hazardous Materials (as later defined) on or affecting the Premises in any manner which violates Environmental Laws (as later defined), that there is no condition concerning the Premises which could require remediation pursuant to Environmental Laws, and that, to the best of Mortgagor's knowledge, no prior owner of the Premises or any current or prior occupant has used Hazardous Materials on or affecting the Premises in any manner which violates Environmental Laws. Mortgagor covenants and agrees that neither it nor any occupant shall use, introduce or maintain Hazardous Materials on the Premises unless done in strict compliance with all Environmental Laws; (b) Mortgagor shall conduct and complete all investigations, environmental audits, studies, sampling and testing, and all remedial, removal and other actions necessary to clean up and remove all Hazardous Materials on or affecting the Premises, whether caused by Mortgagor or a third party, in accordance with all Environmental Laws to the satisfaction of Mortgagee, and in accordance with the orders and directives of all federal, state and local governmental authorities, and Mortgagor shall notify Mortgagee in writing prior to taking, and continually after that of the status of, all such actions. Mortgagor shall, promptly upon Mortgagee's request, provide Mortgagee with copies of the results of all such actions and all related documents and information.  Any remedial, removal or other action by Mortgagor shall not be deemed a cure or waiver of any breach of this paragraph 10 due to the presence or use of Hazardous Materials on or affecting the Premises. Additionally, Mortgagor shall defend, indemnify and hold harmless Mortgagee, its employees, agents, shareholders, officers and directors, from and against any and all claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses (including, without limit, attorney fees) of whatever kind arising out of or related to (i) the presence, disposal, release or threatened release of any Hazardous Materials on, from or affecting the Premises or the soil, water, air, vegetation, buildings, personal property, persons or animals on the Premises, (ii) any personal injury (including, without limit, wrongful death) or property damage (real or personal) arising out of or related to these Hazardous Materials, (iii) any lawsuit brought or threatened, settlement reached or government order related to these Hazardous Materials, (iv) the cost of removal of Hazardous Materials from any portion of the Premises, (v) taking necessary precautions to protect against the release of Hazardous Materials on or affecting the Premises, (vi) complying with all Environmental Laws, and/or (vii) any violation of Environmental Laws or requirements of Mortgagee, which are in any way related to Hazardous Materials including, without limit, attorneys and consultants' fees (the attorneys and consultants to be selected by Mortgagee), investigation and laboratory fees and environmental studies required by Mortgagee (whether prior to foreclosure, or otherwise).  Upon the request of Mortgagee, Mortgagor and any guarantor shall execute a separate indemnity consistent with this paragraph; (c) Mortgagor has never received any notice ("Environmental Complaint") of any potential violation of Environmental Laws with respect to Mortgagor or the Premises (and, within five (5) days of receipt of any Environmental Complaint, Mortgagor shall give Mortgagee a copy of it), and to the best of Mortgagor's knowledge, there have been no actions commenced or threatened by any party with respect to Mortgagor or the Premises for noncompliance with any Environmental Laws; (d) In the event this Mortgage is foreclosed or Mortgagor tenders a deed in lieu of foreclosure, Mortgagor shall deliver the

OCROD PG 5 OF 10

Premises to Mortgagee, purchaser or grantee, as the case may be, free of Hazardous Materials so that the condition of the Premises shall not be a violation of any Environmental Laws; (e) Upon ten (10) days' notice to Mortgagor (except in an emergency or where not practical under applicable law, in which case notice is waived), and without limitation of Mortgagee's other rights under this Mortgage or elsewhere, Mortgagee has the right, but not the obligation, to enter on the Premises and to take those actions as it deems appropriate to investigate or test for, clean up, remove, resolve, minimize the impact of or advise governmental agencies of the possible existence of any Hazardous Materials upon Mortgagee's receipt of any notice from any source asserting the existence of any Hazardous Materials or an Environmental Complaint pertaining to the Premises which, if true, could result in an order, suit or other action against Mortgagor or any part of the Premises which, in the sole opinion of Mortgagee, could jeopardize its security under this Mortgage. Any such actions conducted by Mortgagee shall be solely for the benefit of and to protect the interests of Mortgagee and shall not be relied upon by Mortgagor or any third party for any purpose. By conducting any such actions, Mortgagee does not assume control over the environmental affairs or operations of Mortgagor nor assume any liability of Mortgagor or any third party; (f) The provisions of this paragraph 10 shall be in addition to all other obligations and liabilities Mortgagor may have to Mortgagee at common law or pursuant to any other agreement, and shall survive (i) the repayment of the Indebtedness, (ii) the satisfaction of all other obligations of Mortgagor under this Mortgage and under the other loan documents, (iii) the discharge of this Mortgage, and (iv) the foreclosure of this Mortgage or acceptance of a deed in lieu of foreclosure; and (g) For purposes of this Mortgage, (i) "Hazardous Materials" means each and all of the following: hazardous materials and/or substances as defined in any Environmental Law, asbestos, petroleum, petroleum by-products, natural gas, flammable explosives, radioactive materials, and toxic materials, and (ii) "Environmental Laws" mean any and all federal, state, local or other laws (whether under common law, by legislative action or otherwise), rules, policies, ordinances, directives, orders, statutes, or regulations an object of which is to regulate or improve health, safety, or the environment.

11.     The occurrence or existence of any of the following conditions or events shall constitute an "Event of Default" under this Mortgage:  (a) Any failure to pay the Indebtedness or any other indebtedness of Mortgagor or any guarantor of any of the Indebtedness ("Guarantor") when due, or such portion of it as may be due, by acceleration or otherwise, and any such failure to pay shall continue beyond any applicable grace or cure period, if any, expressly provided with respect thereto in the instrument or document evidencing or governing such Indebtedness; (b) Any failure or neglect to comply with, or breach of, or default under, any term or provision of this Mortgage; or any failure to comply with, or breach of or default under, any term or provision of any other agreement between Mortgagor or any Guarantor and Mortgagee, and any such failure, breach or default continues beyond any applicable grace or cure period, if any, expressly provided with respect thereto;  (c) Any warranty, representation, or other information made, given or furnished to Mortgagee by or on behalf of Mortgagor or any Guarantor shall be, or shall prove to have been, false or materially  misleading when made, given, or furnished; (d) Any loss, theft, substantial damage or destruction to or of any of the Premises, or the issuance or filing of any attachment, levy, garnishment or the commencement of any proceeding in connection with any of the Premises or of any other judicial process of, upon or in respect of Mortgagor, any Guarantor, or any of the Premises; (e) Sale or other disposition by Mortgagor or any Guarantor of any substantial portion of its assets or property; or voluntary suspension of the transaction of business by Mortgagor or any Guarantor; or death, dissolution, termination of existence, merger, consolidation, insolvency, business failure, or assignment for the benefit of creditors of or by Mortgagor or any Guarantor; or commencement of any proceedings under any state or federal bankruptcy or insolvency laws or laws for the relief of debtors by or against Mortgagor or any Guarantor; or the appointment of a receiver, trustee, court appointee, sequestrator or otherwise, for all or any part of the property of  Mortgagor or any Guarantor; (f) Default under any mortgage or security agreement against any of the Premises; (g) Any default or event of default shall occur under any instrument, agreement or other document evidencing, securing or otherwise relating to any of the Indebtedness; or (h) Mortgagee deems itself insecure, in good faith believing that the prospect of payment of the Indebtedness or performance of this Mortgage is impaired or shall fear deterioration, removal, or waste of the Premises.

12.     Acceleration of the Indebtedness as provided in this Mortgage shall trigger any applicable prepayment premium or formula. Without limiting when a prepayment premium may be due, it is agreed that, at any time after acceleration, a tender of payment of the amount necessary to satisfy the entire Indebtedness by or on behalf of Mortgagor or otherwise, must include any applicable prepayment premium or formula.

13.     Immediately upon the occurrence and at any time during the continuance or existence of any Event of Default, Mortgagee shall have the option to do any or all of the following:  (a) Declare the entire unpaid amount of the Indebtedness, including, without limit, accrued and unpaid interest on it and any applicable prepayment premium or formula, and all other charges payable by Mortgagor to Mortgagee, to be immediately due and payable and, at Mortgagee's option, (i) to bring suit for the same, or (ii) to take all steps and institute all other proceedings that Mortgagee deems necessary to enforce payment of the Indebtedness and performance under this Mortgage and to protect the lien of this Mortgage; (b) Commence foreclosure proceedings against the Premises through judicial proceedings or by advertisement, at the option of Mortgagee. The commencement by Mortgagee of foreclosure proceedings shall be deemed an exercise by Mortgagee of its option to accelerate the Indebtedness, unless such proceedings on their face specifically indicate otherwise. Mortgagor grants power to Mortgagee to sell the Premises or to cause the same to be sold at public sale, and to convey the same to the purchaser, in a single parcel or in several parcels at the option of Mortgagee; (c) Procure new or cause to be updated abstracts, tax histories, title insurance, or title reports; (d) Obtain a receiver to manage the Premises and collect the rents, profits and income from it; (e) Contest the amount or validity of any taxes applicable to the Premises by appropriate proceedings either in Mortgagee's name, Mortgagor's name or jointly with Mortgagor.

---

Mortgagor shall execute and deliver to Mortgagee, upon demand, whatever documents and information Mortgagee determines may be necessary or proper to so contest the taxes or to secure payment of any resulting refund. Mortgagor shall reimburse Mortgagee for all costs and expenses, including, without limit, attorney fees, incurred in connection with each tax contest proceeding. All refunds resulting from each tax contest proceeding shall belong to Mortgagee to be applied against the Indebtedness with the surplus, if any, to be paid to Mortgagor. Mortgagee and any of its employees is each irrevocably appointed attorney-in-fact for Mortgagor and is authorized to execute and deliver in the name of Mortgagor those documents deemed necessary or proper by Mortgagee to carry out any tax contest proceeding or receive any resulting refunds; and/or (f) In the event of any sale of the Premises by foreclosure, through judicial proceedings, by advertisement or otherwise, apply the proceeds of any such sale in the following order or such other order as Mortgagee may elect to: (i) all expenses incurred for the collection of the Indebtedness and the foreclosure of this Mortgage including, without limit, attorney fees; (ii) all sums expended or incurred by Mortgagee directly or indirectly in carrying out terms, covenants and agreements of or under this Mortgage or any related document, together with interest as provided in this Mortgage; (iii) all accrued and unpaid interest and late payment charges upon the Indebtedness; (iv) any applicable prepayment premium or formula; (v) the unpaid principal amount of the Indebtedness; and (vi) the surplus, if any, paid to Mortgagor unless a court of competent jurisdiction decrees otherwise.

**WARNING: THIS MORTGAGE CONTAINS A POWER OF SALE AND UPON DEFAULT MAY BE FORECLOSED BY ADVERTISEMENT. IN FORECLOSURE BY ADVER-TISEMENT AND THE RELATED SALE OF THE PREMISES, NO HEARING IS REQUIRED AND THE ONLY NOTICE REQUIRED IS TO PUBLISH NOTICE IN A LOCAL NEWSPAPER AND TO POST A COPY OF THE NOTICE ON THE PREMISES. MORTGAGOR WAIVES ALL RIGHTS UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES AND THE STATE OF MICHIGAN TO A HEARING PRIOR TO SALE IN CON-NECTION WITH FORECLOSURE BY ADVERTISEMENT AND ALL NOTICE REQUIREMENTS EXCEPT AS SET FORTH IN THE MICHIGAN STATUTE PROVIDING FOR FORECLOSURE BY ADVERTISEMENT.**

14.    No single or partial exercise, or delay in the exercise, of any right or power under this Mortgage, shall preclude other or further exercise of the rights and powers under this Mortgage. The unenforceability of any provision of this Mortgage shall not affect the enforceability of the remainder. This Mortgage constitutes the entire agreement of Mortgagor and Mortgagee with respect to the subject matter of this Mortgage. No amendment of this Mortgage shall be effective unless the same shall be in writing and signed by Mortgagor and an authorized officer of Mortgagee. If there is more than one Mortgagor, all undertakings, warranties and covenants made by Mortgagor and all rights and powers given to Mortgagee are made or given jointly and severally. This Mortgage shall be binding on Mortgagor and Mortgagee and on Mortgagor's and Mortgagee's heirs, legal representatives, successors and assigns including, without limit, any debtor in possession or trustee in bankruptcy for Mortgagor. This shall not be deemed a consent by Mortgagee to a conveyance by Mortgagor of all or part of the Premises or of any ownership interest in Mortgagor.  Mortgagee may sell, assign or grant participations in any of the Indebtedness and any related obligations, including, without limit, this Mortgage.  Mortgagee may provide information relating to this Mortgage or relating to Mortgagor to Mortgagee's parent, affiliates, subsidiaries, service providers, assignees and participants.  In the event of foreclosure of this Mortgage or the enforcement by Mortgagee of any other remedies under this Mortgage, Mortgagor waives any right otherwise available in respect to marshalling of assets which secure the Indebtedness or to require Mortgagee to pursue its remedies against any other assets or any other party.  Upon full and final payment of the Indebtedness and performance by Mortgagor of all its other obligations under this Mortgage, except as otherwise provided in paragraphs 10(f) and 20, the parties shall automatically each fully and finally release and discharge the other from any claim, liability or obligation in connection with this Mortgage and the Indebtedness. This Mortgage shall in all respects be governed by and construed in accordance with the laws of the State of Michigan.

15.    Promptly upon the request of Mortgagee, Mortgagor shall execute, acknowledge and deliver all further documents, and do all further acts as Mortgagee may require in its sole discretion to confirm and protect the lien of this Mortgage or otherwise to accomplish the purposes of this Mortgage.

16.    Nothing in this Mortgage shall be construed to preclude Mortgagee from pursuing any available remedy provided by law for the collection of the Indebtedness or enforcement of its rights upon an Event of Default. Nothing in this Mortgage shall reduce or release any rights or security interests of Mortgagee contained in any existing agreement between Mortgagor or any Guarantor and Mortgagee. No waiver of default or consent to any act by Mortgagor shall be effective unless in writing and signed by an authorized officer of Mortgagee. No waiver of any default or forbearance on the part of Mortgagee in enforcing any of its rights under this Mortgage shall operate as a waiver of any other default or of the same default on a future occasion or of any rights.

17.    At the sole option of Mortgagee, this Mortgage shall become subordinate, in whole or in part (but not with respect to priority as to insurance proceeds or any eminent domain award) to any or all leases and/or occupancy agreements of the Premises upon the execution by Mortgagee, and recording in the appropriate official county records where the premises are located, of a unilateral declaration to that effect.

18.    All notices and demands required or permitted to be given to Mortgagor shall be deemed given when delivered to Mortgagor or when placed in an envelope addressed to Mortgagor at the address above, or at such other address as Mortgagee may have on its records, and deposited, with postage, in a depository under the custody of the United States Postal Service or delivered to an overnight delivery courier.  The mailing may be certified, first class or overnight delivery mail.

19.    To the extent that any of the Indebtedness is payable upon demand, nothing contained in this Mortgage shall modify the terms and conditions of that Indebtedness nor prevent Mortgagee from making demand, without notice and with or without reason, for immediate payment of any or all of that Indebtedness at any time(s), whether or not an Event of Default has occurred.

20.    Notwithstanding any prior revocation, termination or discharge of this Mortgage, (except as to the rights of subsequent intervening bona fide purchasers or lienholders) the effectiveness of this Mortgage shall automatically continue or be reinstated, as the case may be, in the event that (a) any payment received or credit given by Mortgagee in respect of the Indebtedness is returned, disgorged or rescinded as a preference, impermissible setoff, fraudulent conveyance, diversion of trust funds, or otherwise under any applicable law, in which case this Mortgage shall be enforceable as if the returned, disgorged or rescinded payment or credit had not been received or given, whether or not Mortgagee relied upon this payment or credit or changed its position as a consequence of it; or (b) any liability is sought to be imposed against Mortgagee relating to any matter as to which Mortgagor agreed to indemnify Mortgagee under this Mortgage, including, without limit, as to the presence of Hazardous Materials on, in or about the Premises, whether this matter is known or unknown, now or later exists (excluding only matters which arise after any acquisition by Mortgagee of the Premises, by foreclosure, deed in lieu of foreclosure or otherwise, to the extent due to the wrongful act or omission of Mortgagee), in which case this Mortgage shall be enforceable to the extent of all liability, costs and expenses (including, without limit, attorney fees) incurred by Mortgagee as the direct or indirect result thereof. In the event of continuation or reinstatement of this Mortgage, Mortgagor agrees upon demand by Mortgagee to execute and deliver to Mortgagee those documents which Mortgagee determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of Mortgagor to do so shall not affect in any way the reinstatement or continuation. If Mortgagor does not execute and deliver to Mortgagee upon demand such documents, Mortgagee and each employee is irrevocably appointed (which appointment is coupled with an interest) the true and lawful attorney of Mortgagor (with full power of substitution) to execute and deliver such documents in the name and on behalf of Mortgagor.

21.    **MORTGAGOR AND MORTGAGEE ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS MORTGAGE OR THE INDEBTEDNESS.**

22.    Additional Provisions. None

**Remainder of Page Intentionally Left Blank.**

**IN WITNESS WHEREOF**, Mortgagor has signed and delivered this Mortgage the day and year first written above.

**RECORDING REQUIREMENTS: Type or print name of each Mortgagor and Notary beneath the respective signature line.**

Turbo Components, Inc., a Michigan Corporation

By: _____
Harold Balkema

Title: President

By: _____
Brad Fortenbacher

Title: Treasurer


STATE OF MICHIGAN          }

                                        } S.S.

COUNTY OF _Ottawa_____   }

The foregoing instrument was acknowledged before me on _August 17, 2012_
by _Harold Balkema_
a(n) _President_____   of _Turbo Components, Inc, a Michigan Corporation_

_____
Notary Public, _____ County, _____
My commission expires: _____

SUE LOWTHER
NOTARY PUBLIC OF MICHIGAN
COUNTY OF OTTAWA
My Commission Expires Aug. 30, 2013
Acting in the County of Ottawa

STATE OF MICHIGAN          }

                                        } S.S.

COUNTY OF _Ottawa_____   }

The foregoing instrument was acknowledged before me on _August 17, 2012_
by _Brad Fortenbacher_
a(n) _Treasurer_____   of _Turbo Components, Inc, a Michigan Corporation_

_____
Notary Public, _____ County, _____
My commission expires: _____

SUE LOWTHER
NOTARY PUBLIC OF MICHIGAN
COUNTY OF OTTAWA
My Commission Expires Aug. 30, 2013
Acting in the County of Ottawa

OCROD PG 9 OF 10

Prepared by:

Janice Davis
COMERICA BANK
39200 Six Mile Road
Livonia, MI 48152

When recorded return to:

COMERICA BANK

Mail Code: 7578
39200 Six Mile Rd.
Livonia, MI 48152

9
zTTm

8 5 8 8 4 8 1
TX:4261998
6/8/2015 10:44:00 AM

**2015-0020488**
**FILED/SEALED FOR RECORD IN**
**OTTAWA COUNTY, MI**
**JUSTIN F. ROEBUCK**
**COUNTY CLERK/REGISTER OF DEEDS**
**06/08/2015 AT 12:24 PM**
**MORTGAGE 38.00**

Comerica Bank

## CONTINUING COLLATERAL MORTGAGE
## (THIS IS A FUTURE ADVANCE MORTGAGE)

This Continuing Collateral Mortgage ("Mortgage") is made as of June 5, 2015 by Turbo Components, Inc., a Michigan Corporation (individually and collectively if more than one party "Mortgagor"), located at 14680 Apple Drive, Fruitport, Michigan 49415, to Comerica Bank ("Mortgagee"), located at 39200 Six Mile Road, Livonia, Michigan 48152, Attention: National Documentation Services, Mail Code 7578. As security for the purposes stated in this Mortgage, Mortgagor mortgages, warrants, and assigns to Mortgagee, its successors and assigns, the real property in the County of **Ottawa**, State of **Michigan**, legally described as·

**That part of the following description lying West of Old US-16 beginning at a point 249.25 feet North of the Southeast corner of the Northwest 1/4 of the Northeast 1/4 of Section 1, Town 8 North, Range 16 West, Spring Lake Township, Ottawa County, Michigan and running thence North on the East 1/8 line of said Section 747.75 feet; thence West to a point on the North and South 1/4 line of said Section, 988.0 feet North of the North 1/8 line; thence South on said North and South 1/4 line 741 feet; thence Easterly to the place of beginning, excepting the South 141 feet of the East 205 feet of the West 238 feet thereof.**

Parcel Identification No. **70-03-01-200-026**

Commonly Known As: **14680 Apple Drive, Fruitport, Michigan 49415**

together with· (a) all related easements, hereditaments, appurtenances, rights, licenses and privileges; (b) all buildings and improvements now or later situated under, upon or over any of the above described land; (c) all the rents, issues, profits, revenues, accounts and general intangibles arising from the above described land, or relating to any business conducted by Mortgagor on it, under present or future leases, licenses or otherwise, including, without limit, all rights conferred by Act No. 210 of the Michigan Public Acts of 1953, as amended, (d) all machinery, equipment, goods, fixtures, and articles of personal property of every kind and nature (other than Household Goods, as defined by 12 CFR 227.12, as amended from time to time, and other than consumer goods, as defined in the Uniform Commercial Code, unless such goods were purchased with the proceeds of any loan specifically referenced as being secured by this Mortgage), now or later located upon the above described land and useable in connection with any present or future operation on the land (individually and collectively the "equipment") including, without limit, all lighting, heating, cooling, ventilating, air-conditioning, incinerating, refrigerating, plumbing, sprinkling, communicating and electrical systems, and all general intangibles, including without limit software, acquired or used in connection therewith.  It is agreed that all equipment shall for the purposes of this Mortgage, unless Mortgagee shall otherwise elect, be deemed conclusively to be real estate and mortgaged under this Mortgage; (e) all "as-extracted collateral", and (f) all awards or payments, and interest on them, made with respect to the Premises as a result of (i) any eminent domain proceeding, (ii) any street grade alteration, (iii) any loss of or damage to any building or other improvement, (iv) any other injury to or decrease in the value of the Premises, (v) any refund due on account of the payment of real estate taxes, assessments or other charges levied against the Premises or (vi) any refund of utility deposits or right to any tenant deposit (all of the above individually and collectively the "Premises").  Unless otherwise indicated, a reference to the "Premises" means all and/or any part of the Premises.

This Mortgage is made to secure when due, whether by stated maturity, demand, acceleration or otherwise, all existing and future Indebtedness (as hereinafter defined) of **TNB, L.L.C., a Michigan Limited Liability Company** (individually and collectively if more than one party "Borrower"), and/or Mortgagor to Mortgagee, including, without limit, payment of **Two Hundred Sixty Three Thousand and 00/100 Dollars ($263,000.00)** according to certain evidence(s) of indebtedness. This reference to a dollar amount does not limit the dollar amount secured by this Mortgage.  "Indebtedness" shall mean any and all indebtedness, obligations or liabilities of the Borrower and/or Mortgagor to Mortgagee, howsoever arising, evidenced or incurred, whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, and whether known or unknown, and whether originally payable to Mortgagee or to a third party and subsequently acquired by Mortgagee, including, without limitation, (a) any and all direct indebtedness of the Borrower and/or Mortgagor to Mortgagee, including indebtedness evidenced by any and all promissory notes, (b) any and all obligations or liabilities of the Borrower and/or Mortgagor to Mortgagee arising under any guaranty where the Borrower and/or Mortgagor has guaranteed the payment of indebtedness owing to Mortgagee from a third party; (c) any and all obligations or liabilities of the Borrower and/or Mortgagor to Mortgagee arising from applications or agreements for the issuance of letters of credit, (d) late charges, loan fees or charges and overdraft indebtedness, (e) any agreement to indemnify Mortgagee for environmental liability or to clean up hazardous waste; (f) any and all indebtedness, obligations or

CONT_COLL_MTG
69496-61-0-M

liabilities for which the Borrower and/or Mortgagor would otherwise be liable to Mortgagee were it not for the invalidity, irregularity or unenforceability of them by reason of any bankruptcy, insolvency or other law or order of any kind, or for any other reason; (g) any and all amendments, modifications, renewals and/or extensions of any of the above, including, without limit, amendments, modifications, renewals and/or extensions which are evidenced by new or additional instruments, documents or agreements; (h) all costs incurred by Mortgagee in establishing, determining, continuing, or defending the validity or priority of its lien or security interest, or to protect the value of the Premises, or for any appraisal, environmental audit, title examination or title insurance policy relating to the Premises, or in pursuing its rights and remedies under this Mortgage or under any other agreement between Mortgagee and the Borrower and/or Mortgagor or in connection with any proceeding involving Mortgagee as a result of any financial accommodation to the Borrower and/or Mortgagor, all costs incurred by Mortgagee in connection with any suit or claim involving or against Mortgagee in any way related to the Premises, the Indebtedness or this Mortgage; and (i) all costs of collecting Indebtedness, including, without limit, attorneys' fees and costs. Any reference in this Mortgage to attorneys' fees shall be deemed a reference to reasonable fees, charges, costs and expenses of counsel and paralegals, whether inside or outside counsel is used, and whether or not a suit or action is instituted, and to court costs if a suit or action is instituted, and whether attorneys' fees or court costs are incurred at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding or otherwise. All costs and expenses shall be payable immediately by the Mortgagor when incurred by Mortgagee, immediately upon demand, and until paid shall bear interest at the highest per annum rate applicable to any of the Indebtedness, but not in excess of the maximum rate permitted by law. Notwithstanding the foregoing, this Mortgage shall not secure that part of the Indebtedness, if any, which constitutes a consumer loan, other than a consumer loan specifically referenced as being secured by this Mortgage (and all extensions, renewals, modifications or replacements thereof).

Mortgagor, on a continuing basis, warrants, covenants and agrees to and with Mortgagee, which covenants, warranties and agreements, to the extent permitted by law, shall be deemed to run with the land, as follows:

1.      Mortgagor will pay to Mortgagee all Indebtedness according to the terms of the relevant instruments evidencing it, and Mortgagor agrees that this Mortgage is a continuing mortgage securing the payment of the Indebtedness.

2      Mortgagor has good and indefeasible title to the entire Premises in fee simple and with full power to sell, mortgage and convey it, the Premises are free of all easements, restrictions, liens, leases and encumbrances whether now existing or later created, except those matters listed on attached Schedule A (if any) to which this Mortgage is expressly subject, and Mortgagor will warrant and defend the Premises against all other claims. Mortgagee shall have the right, at its option and at such times as it, in its sole discretion deems necessary, to take whatever action it may deem necessary to defend or uphold the lien of this Mortgage or otherwise enforce any of its rights under this Mortgage or any obligation secured by this Mortgage including, without limit, the right to institute appropriate legal proceedings for these purposes. With respect to the right, title, or lien of any person or entity which is superior to the lien of this Mortgage, Mortgagee has the right, but not the obligation, to acquire and/or pay off the holder of such right, title, or lien and add the amount so paid to the Indebtedness.

3.      Mortgagor shall not mortgage or pledge the Premises as security for any other indebtedness or obligations. Mortgagor shall pay when due, and before any interest, collection fees or penalties accrue or default occurs, all payments required under any mortgages on the Premises, and all taxes, assessments, and other charges and impositions levied, assessed or existing with respect to (i) the Premises or (ii) the execution, delivery or recordation of this Mortgage or any note or other instrument evidencing or securing repayment of the Indebtedness or the interest of Mortgagee in the Premises, and will deliver to Mortgagee without demand official receipts showing these payments. If Mortgagor fails to pay these mortgage payments, taxes, assessments, other charges or impositions when due, or if Mortgagor fails to pay all interest, collection fees and penalties accrued on them, Mortgagee, at its sole option, may (but is not obligated to) pay them and the monies paid shall be added to the Indebtedness. Mortgagor shall pay (before the same become liens or encumbrances against the Premises) any and all obligations or liabilities for repairs or improvements to the Premises or for any other goods, services, or utilities furnished to the Premises. At the sole option of Mortgagee, Mortgagor shall pay to Mortgagee on the first day of each month a pro rata portion of all taxes, assessments, liens, mortgages, and other charges levied, assessed or existing on the Premises in an amount sufficient to pay them when due, plus payments (based on single item or aggregate analysis, as determined by Mortgagee under applicable law) sufficient to maintain an additional balance of not more than one-sixth of that amount, all as estimated by Mortgagee. In the event that sufficient funds have been deposited with Mortgagee to cover the amount of these taxes, assessments, liens, mortgages, and other charges when they become due and payable, Mortgagee shall pay them. In the event that sufficient funds have not been deposited to cover the amount of these taxes, assessments, liens, mortgages and other charges at least fifteen (15) days prior to the time when they become due and payable, Mortgagor shall immediately upon request by Mortgagee pay the amount of the deficiency to Mortgagee. Mortgagee shall not be required to keep in a separate account or to pay Mortgagor any interest or earnings whatever on the funds held by Mortgagee for the payment of taxes, assessments, liens, mortgages, or other charges pursuant to this paragraph or for the payment of insurance premiums under paragraph (4) below, or on any other funds deposited with Mortgagee in connection with this Mortgage. If an Event of Default occurs under this Mortgage, any funds then remaining on deposit with Mortgagee may be applied against the Indebtedness immediately upon or at any time after the Event of Default occurs, and without notice to Mortgagor. No lienholder junior to this Mortgage may exercise any rights with respect to the Premises, and all rents and other proceeds from the Premises shall be held in trust by the junior lienholder as the property of Mortgagee, until satisfaction in full of the Indebtedness Nothing

in this paragraph shall be considered a consent by Mortgagee to any lien, mortgage or encumbrance on the Premises unless set forth on attached Schedule A, if any.

4.      Mortgagor shall keep the buildings and all other improvements now or later existing on the Premises constantly insured for the benefit of Mortgagee against fire and other hazards and risks, including, without limit, vandalism and malicious mischief, as Mortgagee may require and shall further provide flood insurance (if the Premises are situated in a special flood hazard area as determined by the Director of the Federal Emergency Management Agency or other governing agency), loss of rents insurance, public liability and product liability insurance and any other insurance as Mortgagee may require from time to time, all in amounts and in forms and with companies as are satisfactory to Mortgagee. Mortgagor shall deliver to Mortgagee the policies evidencing the required insurance with premiums fully paid for one year in advance and with standard mortgagee clauses satisfactory to Mortgagee. Renewals of the required insurance (together with evidence of premium prepayment for one year in advance) shall be delivered to Mortgagee at least thirty (30) days before the expiration of any existing policies. All policies and renewals shall provide that they may not be canceled or amended without giving Mortgagee thirty (30) days' prior written notice of cancellation or amendment. All policies and renewals shall be held by, and are pledged to, Mortgagee, along with all insurance premium rebates, as additional security for the Indebtedness. Should Mortgagor fail to insure or fail to pay the premiums on any required insurance or fail to deliver the policies or renewals of them as provided above, Mortgagee may (but is not obligated to) have the insurance issued or renewed (and pay the premiums on it for the account of Mortgagor) in amounts and with companies and at premiums as Mortgagee deems appropriate. If Mortgagee elects to have insurance issued or renewed to insure Mortgagee's interest, Mortgagee shall have no obligation to also insure Mortgagor's interest or to notify Mortgagor of Mortgagee's actions. Any sums paid by Mortgagee for insurance as provided above shall be added to the Indebtedness. In the event of loss or damage, the proceeds of all required insurance shall be paid to Mortgagee alone. No loss or damage shall itself reduce the Indebtedness. Mortgagee and any of Mortgagee's employees is each irrevocably appointed attorney-in-fact for Mortgagor and is authorized to adjust and compromise each loss without the consent of Mortgagor, to collect, receive and receipt for the insurance proceeds in the name of Mortgagee and Mortgagor and to endorse Mortgagor's name upon any check in payment of the loss. The proceeds shall be applied first toward reimbursement of all costs and expenses of Mortgagee in collecting the proceeds (including, without limit, attorneys' fees), and then toward payment of the Indebtedness or any portion of it, whether or not then due or payable and in whatever order of maturity as Mortgagee may elect, or Mortgagee, at its option, may apply any or all the insurance proceeds to the repair or rebuilding of the Premises. Application of proceeds by Mortgagee toward later maturing installments of the Indebtedness shall not excuse Mortgagor from making the regularly scheduled installment payments nor shall such application extend the due date or reduce the amount of any of these payments. Application of proceeds by Mortgagee toward payment of the Indebtedness shall constitute an acceleration and prepayment and shall subject Mortgagor to any applicable prepayment premium or formula. In the event of a foreclosure of this Mortgage, or the giving of a deed in lieu of foreclosure, the purchaser or grantee of the Premises shall succeed to all of the rights of Mortgagor under said insurance policies. At the sole option of Mortgagee, Mortgagor shall pay to Mortgagee on the first day of each month a pro rata portion of the annual premiums (as estimated by Mortgagee) for the required insurance in an amount sufficient to pay them when due, plus payments (based on single item or aggregate analysis, as determined by Mortgagee under applicable law) sufficient to maintain an additional balance of not more than one-sixth of that amount. In the event that sufficient funds have been deposited with Mortgagee to cover the amount of the insurance premiums for required insurance when the premiums become due and payable, Mortgagee shall pay the premiums. In the event that sufficient funds have not been deposited with Mortgagee to pay the insurance premiums at least fifteen (15) days prior to the time when they become due and payable, Mortgagor shall immediately upon request pay the amount of this deficiency to Mortgagee. Mortgagor shall promptly repair, replace or rebuild each part of the Premises which may be damaged or destroyed by fire or other casualty or which may be affected by any eminent domain proceedings, notwithstanding application by Mortgagee of the insurance proceeds or eminent domain award to payment of the Indebtedness.

5.      Mortgagor shall abstain from commission of waste upon the Premises, keep the Premises in good repair, and promptly comply with all laws, regulations and requirements of all governmental bodies affecting the Premises. If Mortgagee determines that the Premises requires inspection, testing, appraisal, repair, care, alteration or attention of any kind, Mortgagee or its representatives may (but is not obligated to) enter upon the Premises, and inspect, test, appraise, repair, alter or maintain the Premises as Mortgagee may deem necessary, and Mortgagor shall reimburse Mortgagee upon demand for all resulting costs and expenses incurred by Mortgagee. Any inspection, audit, appraisal or examination by Mortgagee or its representatives of the Premises or of information or documents pertaining to the Premises is for the sole purpose of protecting Mortgagee's interests under this Mortgage and is not for the benefit or protection of Mortgagor or any third party. Mortgagee has no obligation to provide Mortgagor or any third party with information concerning, or results of, any inspection, audit, appraisal or examination by Mortgagee or its representatives. If Mortgagee, in its sole discretion, discloses information to Mortgagor this disclosure is for the sole protection of Mortgagee, does not constitute an agreement to further disclosure and does not create a warranty by Mortgagee as to the accuracy, sufficiency or any other aspect of the disclosure. Mortgagee may spend money as Mortgagee deems essential to protect the value of the Premises. Mortgagor shall not make or permit any other party to make any material alterations, additions or improvements of any type to the Premises (individually and collectively the "Improvements"), regardless of whether the Improvements would increase the value of the Premises, without Mortgagee's prior written consent. This consent may be withheld by Mortgagee in its sole discretion. If Mortgagee consents to the making of any Improvements and the Improvements are not completed with due diligence in accordance with the plans and specifications approved in writing by Mortgagee, or if construction of the Improvements should cease before completion for a

---

CONT_COLL_MTG                                    - 3 -
69496-61-0-M

period of thirty (30) days, then and in either event it shall be an Event of Default under this Mortgage and Mortgagee shall have all the rights and remedies provided in this Mortgage, including, without limitation, the right (but not the obligation) to enter or cause entry to be made upon the Premises and complete the Improvements and its costs shall be added to the Indebtedness. If any action is threatened or commenced which affects Mortgagee's interest in the Premises, including, without limit, building, environmental or zoning proceedings, Mortgagee may take such action as it deems necessary to protect its interest and its costs shall be added to the Indebtedness.

6.      In the event the Premises is taken under power of eminent domain, or by condemnation, the entire proceeds of the award shall be paid directly to Mortgagee and applied toward reimbursement of all Mortgagee's costs and expenses incurred in connection with collecting the award (including, without limit, attorney fees), and the balance applied upon the Indebtedness whether or not then due or payable in whatever manner Mortgagee deems advisable. Application by Mortgagee of any condemnation award or portion of it toward the last maturing installments of the Indebtedness shall not excuse Mortgagor from making the regularly scheduled payments nor extend the due date or reduce the amount of these payments. Application of any condemnation award by Mortgagee toward payment of the Indebtedness shall constitute an acceleration and a prepayment and shall subject Mortgagor to any applicable prepayment premium or formula. Mortgagee or any of Mortgagee's employees is irrevocably appointed attorney-in-fact and is duly authorized and empowered to receive, receipt for, discharge and satisfy any condemnation award and judgment, whether joint or several, on behalf of Mortgagor. Mortgagee shall not be liable for failure to collect any condemnation award, regardless of the cause of such failure.

7      The Indebtedness shall become due and payable immediately, without notice, at the option of Mortgagee, if Mortgagor shall convey, assign or transfer the Premises by deed, land contract or other instrument, or if title to the Premises shall become vested in any other person or party in any manner whatsoever or if there is any disposition (through one or more transactions) of legal or beneficial title to a controlling interest of Mortgagor. In the event ownership of the Premises becomes vested in a person or persons other than Mortgagor (with or without the prior written approval of Mortgagee), Mortgagee may (but shall not be obligated to) deal with and may enter into any contract or agreement with the successor(s) in interest with reference to this Mortgage in the same manner as with Mortgagor, without in any manner discharging or otherwise affecting the lien of this Mortgage or Mortgagor's liability under this Mortgage or upon the Indebtedness.

8.      This Mortgage shall, as to any personal property covered by it, be deemed to grant a security interest in the personal property pursuant to the Uniform Commercial Code. Mortgagor agrees, upon request of Mortgagee from time to time, to promptly furnish a detailed list of personal property subject to this Mortgage and, upon request by Mortgagee, to immediately execute, deliver and/or file any mortgage, security agreement or financing statement to include specifically this list of personal property and to immediately take such other actions as deemed necessary or desirable by Mortgagee to evidence, perfect or continue the security interests granted in this Mortgage; and Mortgagee or any agent of Mortgagee is hereby authorized in its own name, and is also hereby irrevocably appointed (which appointment is coupled with an interest) the true and lawful attorney in fact for Mortgagor (with full power of substitution) in the name and place of Mortgagor, to execute and file such security agreements and financing statements and to take such other actions as deemed necessary or desirable by Mortgagee to evidence, perfect or continue the security interests granted in this Mortgage. Upon the occurrence of any Event of Default under this Mortgage, Mortgagee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code or otherwise provided by law or by this Mortgage including, without limit, the right to require Mortgagor to assemble the personal property and make it available to Mortgagee at a place to be designated by Mortgagee which is reasonably convenient to both parties, the right to take possession of the personal property with or without demand and with or without process of law and the right to sell and dispose of it and distribute the proceeds according to law. Mortgagor agrees that any requirement of reasonable notice shall be met if Mortgagee sends notice to Mortgagor at least ten (10) days prior to the date of sale, disposition or other event giving rise to the required notice. Mortgagor agrees that the proceeds of any disposition of the personal property may be applied by Mortgagee first to Mortgagee's reasonable expenses in connection with the disposition including, without limit, attorney fees, and then to payment of the Indebtedness. At any sale or other disposition of the personal property pursuant to this paragraph, Mortgagee disclaims all warranties which would otherwise be given under the Uniform Commercial Code, including, without limit, a disclaimer of any warranty relating to title, possession, quiet enjoyment or the like, and Mortgagee may communicate these disclaimers to a purchaser at such disposition. This disclaimer of warranties will not render the sale commercially unreasonable. Mortgagor agrees that Mortgagee shall be under no obligation to accept any noncash proceeds in connection with any sale or disposition of the personal property covered by this Mortgage, unless failure to do so would be commercially unreasonable. If Mortgagee agrees in its sole discretion to accept noncash proceeds (unless the failure to do so would be commercially unreasonable), Mortgagee may ascribe any commercially reasonable value to such proceeds. Without limiting the foregoing, Mortgagee may apply any discount factor in determining the present value of proceeds to be received in the future or may elect to apply proceeds to be received in the future only as and when such proceeds are actually received in cash by Mortgagee. Mortgagor represents that its exact name is its name as set forth in this Mortgage and that Mortgagor is located (as determined pursuant to Article 9 of the Uniform Commercial Code) in Michigan, unless otherwise expressly specified in this Mortgage. Mortgagor will give Mortgagee not less than 90 days' prior written notice of all contemplated changes in Mortgagor's name, location, chief executive office, or principal place of business, but the giving of this notice shall not cure any Event of Default caused by this change   "Uniform Commercial Code" means Act No. 174 of the Michigan Public Acts of 1962, as amended, revised or replaced from time to time,  including without limit as amended by Act No. 348 of the Michigan Public Acts of 2000.  Notwithstanding the foregoing, the parties intend that the terms used herein which are defined in the Uniform Commercial Code have, at all times, the broadest and most inclusive meanings

possible. Accordingly, if the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more broadly or inclusively than the Uniform Commercial Code in effect on the date of this Agreement, then such term, as used herein, shall be given such broadened meaning. If the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more narrowly, or less inclusively, than the Uniform Commercial Code in effect on the date of this Agreement, such amendment or holding shall be disregarded in defining terms used in this Agreement.

9.      As additional security for the payment and performance of the Indebtedness, Mortgagor grants a security interest to Mortgagee in all deposit or other accounts with Mortgagee and Mortgagor assigns to Mortgagee all its right, title and interest in all written and oral leases and occupancy agreements, now or later existing, covering the Premises (but without an assumption by Mortgagee of liabilities of Mortgagor under any of these leases or occupancy agreements by virtue of this assignment), and Mortgagor assigns to Mortgagee the rents, issues and profits of the Premises. If an Event of Default occurs under this Mortgage, Mortgagee may receive and collect the rents, issues and profits personally or through a receiver so long as the Event of Default exists and during the pendency of any foreclosure proceedings and during any redemption period. Mortgagor agrees to consent to the appointment of a receiver if this is believed necessary or desirable by Mortgagee to enforce its rights under this Mortgage. Mortgagee shall at no time have any obligation to attempt to collect rent or other amounts from any tenant or occupier of the Premises.   Mortgagee shall at no time have any obligation to enforce any other obligations owed by tenants or occupiers of the Premises to Mortgagor. No action taken by Mortgagee under this Mortgage shall make Mortgagee a "mortgagee in possession." Mortgagor shall at no time collect advance rent under any lease or occupancy agreement pertaining to the Premises in excess of one month (other than as a security deposit) and Mortgagee shall not be bound in any respect by any rent prepayment in violation of this prohibition. The assignment of licenses and permits under this Mortgage shall not be construed as a consent by Mortgagee to any license or permit so assigned, or to impose upon Mortgagee any obligations with respect to them. Mortgagor shall not cancel or amend any of the licenses and permits assigned (nor permit any of them to terminate if they are necessary or desirable for the operation of the Premises) without first obtaining the written approval of Mortgagee. This paragraph shall not be applicable to any license or permit that terminates if it is assigned without the consent of another party (other than Mortgagor), unless this consent has been obtained nor shall this paragraph be construed as a present assignment of any license or permit that Mortgagor is required by law to hold.   Mortgagor shall comply with and perform as required all obligations and restrictions imposed upon Mortgagor or the Premises under applicable deed restrictions, restrictive covenants, easements, leases, land contracts, condominium or planned unit development documents, or other agreements affecting the Premises, but this is not a consent by Mortgagee to take subject to any of these agreements unless specifically set forth on attached Schedule A, if any, and Mortgagee does not assume any obligations under these agreements. Mortgagor shall promptly provide Mortgagee with certificates of occupancy, licenses, rent rolls, income and expense statements and other documents and information pertaining to the Premises and its operations as Mortgagee, from time to time, may request.

10      (a) Mortgagor represents and covenants that Mortgagor has not used Hazardous Materials (as later defined) on or affecting the Premises in any manner which violates Environmental Laws (as later defined), that there is no condition concerning the Premises which could require remediation pursuant to Environmental Laws, and that, to the best of Mortgagor's knowledge, no prior owner of the Premises or any current or prior occupant has used Hazardous Materials on or affecting the Premises in any manner which violates Environmental Laws. Mortgagor covenants and agrees that neither it nor any occupant shall use, introduce or maintain Hazardous Materials on the Premises unless done in strict compliance with all Environmental Laws; (b) Mortgagor shall conduct and complete all investigations, environmental audits, studies, sampling and testing, and all remedial, removal and other actions necessary to clean up and remove all Hazardous Materials on or affecting the Premises, whether caused by Mortgagor or a third party, in accordance with all Environmental Laws to the satisfaction of Mortgagee, and in accordance with the orders and directives of all federal, state and local governmental authorities, and Mortgagor shall notify Mortgagee in writing prior to taking, and continually after that of the status of, all such actions. Mortgagor shall, promptly upon Mortgagee's request, provide Mortgagee with copies of the results of all such actions and all related documents and information. Any remedial, removal or other action by Mortgagor shall not be deemed a cure or waiver of any breach of this paragraph 10 due to the presence or use of Hazardous Materials on or affecting the Premises. Additionally, Mortgagor shall defend, indemnify and hold harmless Mortgagee, its employees, agents, shareholders, officers and directors, from and against any and all claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses (including, without limit, attorney fees) of whatever kind arising out of or related to (i) the presence, disposal, release or threatened release of any Hazardous Materials on, from or affecting the Premises or the soil, water, air, vegetation, buildings, personal property, persons or animals on the Premises, (ii) any personal injury (including, without limit, wrongful death) or property damage (real or personal) arising out of or related to these Hazardous Materials, (iii) any lawsuit brought or threatened, settlement reached or government order related to these Hazardous Materials, (iv) the cost of removal of Hazardous Materials from any portion of the Premises, (v) taking necessary precautions to protect against the release of Hazardous Materials on or affecting the Premises, (vi) complying with all Environmental Laws, and/or (vii) any violation of Environmental Laws or requirements of Mortgagee, which are in any way related to Hazardous Materials including, without limit, attorneys and consultants' fees (the attorneys and consultants to be selected by Mortgagee), investigation and laboratory fees and environmental studies required by Mortgagee (whether prior to foreclosure, or otherwise)  Upon the request of Mortgagee, Mortgagor and any guarantor shall execute a separate indemnity consistent with this paragraph; (c) Mortgagor has never received any notice ("Environmental Complaint") of any potential violation of Environmental Laws with respect to Mortgagor or the Premises (and, within five (5) days of receipt of any Environmental Complaint, Mortgagor shall give Mortgagee a

copy of it), and to the best of Mortgagor's knowledge, there have been no actions commenced or threatened by any party with respect to Mortgagor or the Premises for noncompliance with any Environmental Laws; (d) In the event this Mortgage is foreclosed or Mortgagor tenders a deed in lieu of foreclosure, Mortgagor shall deliver the Premises to Mortgagee, purchaser or grantee, as the case may be, free of Hazardous Materials so that the condition of the Premises shall not be a violation of any Environmental Laws; (e) Upon ten (10) days' notice to Mortgagor (except in an emergency or where not practical under applicable law, in which case notice is waived), and without limitation of Mortgagee's other rights under this Mortgage or elsewhere, Mortgagee has the right, but not the obligation, to enter on the Premises and to take those actions as it deems appropriate to investigate or test for, clean up, remove, resolve, minimize the impact of or advise governmental agencies of the possible existence of any Hazardous Materials upon Mortgagee's receipt of any notice from any source asserting the existence of any Hazardous Materials or an Environmental Complaint pertaining to the Premises which, if true, could result in an order, suit or other action against Mortgagor or any part of the Premises which, in the sole opinion of Mortgagee, could jeopardize its security under this Mortgage. Any such actions conducted by Mortgagee shall be solely for the benefit of and to protect the interests of Mortgagee and shall not be relied upon by Mortgagor or any third party for any purpose. By conducting any such actions, Mortgagee does not assume control over the environmental affairs or operations of Mortgagor nor assume any liability of Mortgagor or any third party, (f) The provisions of this paragraph 10 shall be in addition to all other obligations and liabilities Mortgagor may have to Mortgagee at common law or pursuant to any other agreement, and shall survive (i) the repayment of the Indebtedness, (ii) the satisfaction of all other obligations of Mortgagor under this Mortgage and under the other loan documents, (iii) the discharge of this Mortgage, and (iv) the foreclosure of this Mortgage or acceptance of a deed in lieu of foreclosure, and (g) For purposes of this Mortgage, (i) "Hazardous Materials" means each and all of the following: hazardous materials and/or substances as defined in any Environmental Law, asbestos, petroleum, petroleum by-products, natural gas, flammable explosives, radioactive materials, and toxic materials, and (ii) "Environmental Laws" mean any and all federal, state, local or other laws (whether under common law, by legislative action or otherwise), rules, policies, ordinances, directives, orders, statutes, or regulations an object of which is to regulate or improve health, safety, or the environment.

11.      The occurrence or existence of any of the following conditions or events shall constitute an "Event of Default" under this Mortgage:  (a) Any failure to pay the Indebtedness or any other indebtedness of Borrower, Mortgagor or any guarantor of any of the Indebtedness ("Guarantor") when due, or such portion of it as may be due, by acceleration or otherwise, and any such failure to pay shall continue beyond any applicable grace or cure period, if any, expressly provided with respect thereto in the instrument or document evidencing or governing such Indebtedness; (b) Any failure or neglect to comply with, or breach of, or default under, any term or provision of this Mortgage; or any failure to comply with, or breach of default under, any term or provision of any other agreement between Borrower, Mortgagor or any Guarantor and Mortgagee, and any such failure, breach or default continues beyond any applicable grace or cure period, if any, expressly provided with respect thereto; (c) Any warranty, representation, or other information made, given or furnished to Mortgagee by or on behalf of Borrower, Mortgagor or any Guarantor shall be, or shall prove to have been, false or materially  misleading when made, given, or furnished, (d) Any loss, theft, substantial damage or destruction to or of any of the Premises, or the issuance or filing of any attachment, levy, garnishment or the commencement of any proceeding in connection with any of the Premises or of any other judicial process of, upon or in respect of Borrower, Mortgagor, any Guarantor, or any of the Premises, (e) Sale or other disposition by Borrower, Mortgagor or any Guarantor of any substantial portion of its assets or property; or voluntary suspension of the transaction of business by Borrower, Mortgagor or any Guarantor; or death, dissolution, termination of existence, merger, consolidation, insolvency, business failure, or assignment for the benefit of creditors of or by Borrower, Mortgagor or any Guarantor, or commencement of any proceedings under any state or federal bankruptcy or insolvency laws or laws for the relief of debtors by or against Borrower, Mortgagor or any Guarantor, or the appointment of a receiver, trustee, court appointee, sequestrator or otherwise, for all or any part of the property of Borrower,  Mortgagor or any Guarantor, (f) Default under any mortgage or security agreement against any of the Premises, (g) Any default or event of default shall occur under any instrument, agreement or other document evidencing, securing or otherwise relating to any of the Indebtedness; or (h) Mortgagee deems itself insecure, in good faith believing that the prospect of payment of the Indebtedness or performance of this Mortgage is impaired or shall fear deterioration, removal, or waste of the Premises.

12      Acceleration of the Indebtedness as provided in this Mortgage shall trigger any applicable prepayment premium or formula. Without limiting when a prepayment premium may be due, it is agreed that, at any time after acceleration, a tender of payment of the amount necessary to satisfy the entire Indebtedness by or on behalf of Mortgagor or otherwise, must include any applicable prepayment premium or formula.

13      Immediately upon the occurrence and at any time during the continuance or existence of any Event of Default, Mortgagee shall have the option to do any or all of the following: (a) Declare the entire unpaid amount of the Indebtedness, including, without limit, accrued and unpaid interest on it and any applicable prepayment premium or formula, and all other charges payable by Mortgagor to Mortgagee, to be immediately due and payable and, at Mortgagee's option, (i) to bring suit for the same, or (ii) to take all steps and institute all other proceedings that Mortgagee deems necessary to enforce payment of the Indebtedness and performance under this Mortgage and to protect the lien of this Mortgage; (b) Commence foreclosure proceedings against the Premises through judicial proceedings or by advertisement, at the option of Mortgagee. The commencement by Mortgagee of foreclosure proceedings shall be deemed an exercise by Mortgagee of its option to accelerate the Indebtedness, unless such proceedings on their face specifically indicate otherwise. Mortgagor grants power to Mortgagee to sell the Premises or to cause the same to be sold at public sale, and to convey the same to the

purchaser, in a single parcel or in several parcels at the option of Mortgagee; (c) Procure new or cause to be updated abstracts, tax histories, title insurance, or title reports, (d) Obtain a receiver to manage the Premises and collect the rents, profits and income from it; (e) Contest the amount or validity of any taxes applicable to the Premises by appropriate proceedings either in Mortgagee's name, Mortgagor's name or jointly with Mortgagor. Mortgagor shall execute and deliver to Mortgagee, upon demand, whatever documents and information Mortgagee determines may be necessary or proper to so contest the taxes or to secure payment of any resulting refund. Mortgagor shall reimburse Mortgagee for all costs and expenses, including, without limit, attorney fees, incurred in connection with each tax contest proceeding. All refunds resulting from each tax contest proceeding shall belong to Mortgagee to be applied against the Indebtedness with the surplus, if any, to be paid to Mortgagor. Mortgagee and any of its employees is each irrevocably appointed attorney-in-fact for Mortgagor and is authorized to execute and deliver in the name of Mortgagor those documents deemed necessary or proper by Mortgagee to carry out any tax contest proceeding or receive any resulting refunds, and/or (f) In the event of any sale of the Premises by foreclosure, through judicial proceedings, by advertisement or otherwise, apply the proceeds of any such sale in the following order or such other order as Mortgagee may elect to. (i) all expenses incurred for the collection of the Indebtedness and the foreclosure of this Mortgage including, without limit, attorney fees; (ii) all sums expended or incurred by Mortgagee directly or indirectly in carrying out terms, covenants and agreements of or under this Mortgage or any related document, together with interest as provided in this Mortgage, (iii) all accrued and unpaid interest and late payment charges upon the Indebtedness, (iv) any applicable prepayment premium or formula, (v) the unpaid principal amount of the Indebtedness; and (vi) the surplus, if any, paid to Mortgagor unless a court of competent jurisdiction decrees otherwise.

**WARNING: THIS MORTGAGE CONTAINS A POWER OF SALE AND UPON DEFAULT MAY BE FORECLOSED BY ADVERTISEMENT. IN FORECLOSURE BY ADVER-TISEMENT AND THE RELATED SALE OF THE PREMISES, NO HEARING IS REQUIRED AND THE ONLY NOTICE REQUIRED IS TO PUBLISH NOTICE IN A LOCAL NEWSPAPER AND TO POST A COPY OF THE NOTICE ON THE PREMISES. MORTGAGOR WAIVES ALL RIGHTS UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES AND THE STATE OF MICHIGAN TO A HEARING PRIOR TO SALE IN CON-NECTION WITH FORECLOSURE BY ADVERTISEMENT AND ALL NOTICE REQUIREMENTS EXCEPT AS SET FORTH IN THE MICHIGAN STATUTE PROVIDING FOR FORECLOSURE BY ADVERTISEMENT.**

14.     No single or partial exercise, or delay in the exercise, of any right or power under this Mortgage, shall preclude other or further exercise of the rights and powers under this Mortgage The unenforceability of any provision of this Mortgage shall not affect the enforceability of the remainder. This Mortgage constitutes the entire agreement of Mortgagor and Mortgagee with respect to the subject matter of this Mortgage. No amendment of this Mortgage shall be effective unless the same shall be in writing and signed by Mortgagor and an authorized officer of Mortgagee. If there is more than one Mortgagor, all undertakings, warranties and covenants made by Mortgagor and all rights and powers given to Mortgagee are made or given jointly and severally. This Mortgage shall be binding on Mortgagor and Mortgagee and on Mortgagor's and Mortgagee's heirs, legal representatives, successors and assigns including, without limit, any debtor in possession or trustee in bankruptcy for Mortgagor. This shall not be deemed a consent by Mortgagee to a conveyance by Mortgagor of all or part of the Premises or of any ownership interest in Mortgagor.   Mortgagee may sell, assign or grant participations in any of the Indebtedness and any related obligations, including, without limit, this Mortgage.   Mortgagee may provide information relating to this Mortgage or relating to Mortgagor to Mortgagee's parent, affiliates, subsidiaries, service providers, assignees and participants.   In the event of foreclosure of this Mortgage or the enforcement by Mortgagee of any other remedies under this Mortgage, Mortgagor waives any right otherwise available in respect to marshalling of assets which secure the Indebtedness or to require Mortgagee to pursue its remedies against any other assets or any other party.   Upon full and final payment of the Indebtedness and performance by Mortgagor of all its other obligations under this Mortgage, except as otherwise provided in paragraphs 10(f) and 20, the parties shall automatically each fully and finally release and discharge the other from any claim, liability or obligation in connection with this Mortgage and the Indebtedness. This Mortgage shall in all respects be governed by and construed in accordance with the laws of the State of Michigan.

15.     Promptly upon the request of Mortgagee, Mortgagor shall execute, acknowledge and deliver all further documents, and do all further acts as Mortgagee may require in its sole discretion to confirm and protect the lien of this Mortgage or otherwise to accomplish the purposes of this Mortgage.

16.     Nothing in this Mortgage shall be construed to preclude Mortgagee from pursuing any available remedy provided by law for the collection of the Indebtedness or enforcement of its rights upon an Event of Default Nothing in this Mortgage shall reduce or release any rights or security interests of Mortgagee contained in any existing agreement between Borrower, Mortgagor or any Guarantor and Mortgagee.   No waiver of default or consent to any act by Mortgagor shall be effective unless in writing and signed by an authorized officer of Mortgagee. No waiver of any default or forbearance on the part of Mortgagee in enforcing any of its rights under this Mortgage shall operate as a waiver of any other default or of the same default on a future occasion or of any rights

17.     At the sole option of Mortgagee, this Mortgage shall become subordinate, in whole or in part (but not with respect to priority as to insurance proceeds or any eminent domain award) to any or all leases and/or occupancy agreements of the Premises upon the execution by Mortgagee, and recording in the appropriate official county records where the premises are located, of a unilateral declaration to that effect.

18.     All notices and demands required or permitted to be given to Mortgagor shall be deemed given when delivered to Mortgagor or when placed in an envelope addressed to Mortgagor at the address above, or at such other address as Mortgagee may have on its records, and deposited, with postage, in a depository under the custody of the United States Postal Service or delivered to an overnight delivery courier   The mailing may be certified, first class or overnight delivery mail.

19.     To the extent that any of the Indebtedness is payable upon demand, nothing contained in this Mortgage shall modify the terms and conditions of that Indebtedness nor prevent Mortgagee from making demand, without notice and with or without reason, for immediate payment of any or all of that Indebtedness at any time(s), whether or not an Event of Default has occurred.

20.     Notwithstanding any prior revocation, termination or discharge of this Mortgage, (except as to the rights of subsequent intervening bona fide purchasers or lienholders) the effectiveness of this Mortgage shall automatically continue or be reinstated, as the case may be, in the event that (a) any payment received or credit given by Mortgagee in respect of the Indebtedness is returned, disgorged or rescinded as a preference, impermissible setoff, fraudulent conveyance, diversion of trust funds, or otherwise under any applicable law, in which case this Mortgage shall be enforceable as if the returned, disgorged or rescinded payment or credit had not been received or given, whether or not Mortgagee relied upon this payment or credit or changed its position as a consequence of it; or (b) any liability is sought to be imposed against Mortgagee relating to any matter as to which Mortgagor agreed to indemnify Mortgagee under this Mortgage, including, without limit, as to the presence of Hazardous Materials on, in or about the Premises, whether this matter is known or unknown, now or later exists (excluding only matters which arise after any acquisition by Mortgagee of the Premises, by foreclosure, deed in lieu of foreclosure or otherwise, to the extent due to the wrongful act or omission of Mortgagee), in which case this Mortgage shall be enforceable to the extent of all liability, costs and expenses (including, without limit, attorney fees) incurred by Mortgagee as the direct or indirect result thereof. In the event of continuation or reinstatement of this Mortgage, Mortgagor agrees upon demand by Mortgagee to execute and deliver to Mortgagee those documents which Mortgagee determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of Mortgagor to do so shall not affect in any way the reinstatement or continuation. If Mortgagor does not execute and deliver to Mortgagee upon demand such documents, Mortgagee and each employee is irrevocably appointed (which appointment is coupled with an interest) the true and lawful attorney of Mortgagor (with full power of substitution) to execute and deliver such documents in the name and on behalf of Mortgagor.

21.     **MORTGAGOR AND MORTGAGEE ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS MORTGAGE OR THE INDEBTEDNESS.**

22.     Additional Provisions. **None**

**IN WITNESS WHEREOF**, Mortgagor has signed and delivered this Mortgage the day and year first written above.

**RECORDING REQUIREMENTS: Type or print name of each Mortgagor and Notary beneath the respective signature line.**

Turbo Components, Inc., a Michigan Corporation

By: _____
    Bradley Forpul becher

Title. President

By: _____

Title _____

STATE OF MICHIGAN                    }

                                     } S.S.

COUNTY OF _Muskegon_ }

The foregoing instrument was acknowledged before me on _June 5, 2015_
by _Bradley Fortenbacher_
a(n) _President_ of _Babo Components, Inc., a Michigan Corporation_

Notary Public, _____ County, _____

My commission expires. _____

TERESA LAVIGNE
Notary Public, State of Michigan
County of Muskegon
My Commission Expires: June 22, 2018
Acting in the County of Muskegon

STATE OF MICHIGAN                    }

                                     } S.S.

COUNTY OF _____ }

The foregoing instrument was acknowledged before me on_____
by_____,
a(n)_____ of_____.

                    _____

Notary Public, _____ County, _____
My commission expires· _____

Prepared by.

Regina Jenkins
COMERICA BANK
39200 Six Mile Road
Livonia, MI 48152

When recorded return to:

COMERICA BANK

_____

Mail Code· 7578
39200 Six Mile Rd.
Livonia, MI 48152

# EXHIBIT E

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

Michigan Department of State - Uniform Commercial Code

Filing Number: 20200724000329-3

Filing Date and Time: 07/24/2020 12:02 PM

Total Number of Pages: 1

*(This document was filed electronically)*

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| **Denise Ann Pietras** |
| B. E-MAIL CONTACT AT FILER (optional) |
| **dap@h2law.com** |
| C. SEND ACKNOWLEDGEMENT TO: (Name and Address) |
| **Denise Ann Pietras** |
| **450 W 4th St** |
| **Royal Oak, MI 48067 USA** |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| **TURBO COMPONENTS, INC.** | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **14680 APPLE DRIVE** | **Fruitport** | **MI** | **49415** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| **GROW MICHIGAN, LLC** | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **TWO LONE PINE ROAD** | **Bloomfield Hills** | **MI** | **48304** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

All of the following real and personal property owned by Debtor, whether now owned or existing, or hereafter arising or acquired or received by Debtor, wherever located: (a) all Accounts; all Inventory; all Equipment and Fixtures; all General Intangibles, Payment intangibles, and Intellectual Property Collateral; all Investment Property and Subsidiary Interests; all Deposit Accounts and any and all monies credited by or due from any financial institution or any other depository; all Goods and other personal property, including all merchandise returned or rejected by Account Debtors, relating to or securing any of the Accounts; all rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; all additional amounts due to Debtor from any Account Debtors relating to the Accounts; other property, including warranty claims, relating to any Goods; all contract rights, rights of payment earned under a contract right, Instruments (including, without limit, promissory notes), Chattel Paper (including, without limit, Electronic Chattel Paper), Documents, warehouse receipts, letters of credit, and money; all Commercial Tort Claims (whether now existing or hereafter arising); all Letter-of-Credit Rights (whether or not such letter of credit is evidenced by a writing); all Supporting obligations; all real and personal property of third parties in which Debtor has been granted a lien or security interest as security for the payment or enforcement of Accounts; and any other goods or personal property, if any, in which Debtor may hereafter in writing grant a security interest to Lender hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Lender and Debtor, or any of them; and (b) Debtor's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by Debtor or in which it has an interest), computer programs, electronic media, tapes, disks and documents relating to subsection (a) of this definition of Collateral; and (c) all proceeds and products of subsections (a) and (b) of this definition of Collateral in whatever form, including: cash, Deposit Accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, Chattel Paper, security agreements, Documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds. All capitalized words shall have their meaning as set forth in that certain Security Agreement dated October 17, 2014, entered into by and among the Debtor and the Secured Party, as Lender.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
| --- | --- |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**#107685-1**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

THE PAYMENT OF THE INDEBTEDNESS EVIDENCED BY THIS NOTE
IS SUBORDINATED TO THE EXTENT SET FORTH IN THE
SUBORDINATION AND INTERCREDITOR AGREEMENT DATED
OCTOBER 28, 2014, BETWEEN CRESTMARK BANK, A MICHIGAN
BANKING CORPORATION, LOEB TERM SOLUTIONS, AN ILLINOIS
LIMITED LIABILITY COMPANY, GROW MICHIGAN, LLC, AND
OTHERS, AND REFERENCE IS MADE TO SUCH AGREEMENT FOR A
FULL STATEMENT OF THE TERMS AND CONDITIONS OF SUCH
SUBORDINATION. THE HOLDER OF THIS NOTE, BY ITS
ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY
THE PROVISIONS OF THE SUBORDINATION AND INTERCREDITOR
AGREEMENT.

## PROMISSORY NOTE

$100,000.00                                                          Jackson, Michigan
Maturity Date: February 1, 2017                            Dated: February 1, 2016

FOR VALUE RECEIVED, TURBO COMPONENTS, INC., a Michigan
corporation ("Borrower"), with its principal office at 14680 Apple Drive, Fruitport, Michigan
49415, promise to pay to the order of GROW MICHIGAN, LLC, a Michigan limited
liability company ("Lender"), at 100 S. Jackson Street, Suite 206, Jackson, MI 49201, or at such
other place as Lender may designate in writing, the principal sum of ONE HUNDRED
THOUSAND AND 00/100 DOLLARS ($100,000.00), plus interest as hereinafter provided,
all in lawful money of the United States of America, in accordance with the terms hereof, the
terms of that certain Business Loan Agreement by and between the parties dated October 28,
2014 (the "Loan Agreement"), and all other related loan agreements executed by Borrower
in favor of Lender in connection with this credit facility. The terms of the Loan Agreement
and such other related loan agreements are incorporated by reference and made part of this
Promissory Note (this "Note").

The unpaid principal balance of this Note shall bear interest, computed upon the basis of
a year of 360 days for the actual number of days elapsed in a month, at the variable rate per
annum equal to the rate of interest designated by The Wall Street Journal (or its successor)
("WSJ") as the Prime Rate (as hereinafter defined), adjusted monthly when said Prime Rate is
changed, plus eight hundred one thousand two hundred seventy-five (1275) basis points
(12.75%). For purposes of this Note, the term "Prime Rate" shall mean the rate of interest most
recently announced by WSJ as its Prime Rate. The Prime Rate may not be the most favorable or
lowest rate charged by Lender to its debtors.

Except as otherwise provided herein for early or accelerated payment, interest only shall
be payable monthly on the first day of each month commencing on the first day of the month
following the date hereof, and continuing until the Maturity Date.

Except as otherwise provided herein for early or accelerated payment, any unpaid
principal balance of this Note, together with any accrued and unpaid interest, shall be due and
payable in full on or before the Maturity Date.

Provided that all interest payments on this Note shall then be current, Borrower may prepay this Note in whole at any time or in part (but no individual payment shall be less than five percent (5%) of the original principal amount of this Note) from time to time.

Concurrent with and at the same time as any payment of this Note in whole or in part prior to the Maturity Date, including scheduled principal payments hereunder, voluntary prepayments, and/or as a result of this Note becoming immediately due and payable due to an Event of Default (as such term is defined in the Loan Agreement) in accordance with the terms of this Note and/or the Loan Agreement, in addition to the amount so paid, Borrower shall pay a premium equal to two hundred (200) basis points on (the equivalent of two percent (2%) of) the principal amount being paid.

Borrower acknowledges and agrees that the payment premium specified above is the product of arm's length negotiations between the parties and the amount thereof constitutes reasonable compensation for loss by Lender of the opportunity to recover loan origination expenses and profits over the balance of the term of this Note, and is not a penalty.

All payments received hereunder shall, at the option of Lender, first be applied against accrued and unpaid interest and the balance against principal. Borrower expressly assumes all risks of loss or delay in the delivery of any payments made by mail, and no course of conduct or dealing shall affect Borrower's assumption of these risks.

Upon the occurrence of any Event of Default under the Loan Agreement, Lender, at its option, and without notice to Borrower, may declare the entire unpaid principal balance of this Note, together with all accrued and unpaid interest, to be immediately due and payable.

Upon the occurrence and during the continuance of an Event of Default, the outstanding principal amount hereof shall continue to bear interest at the variable rate per annum equal to the rate of interest designated by WSJ as the Prime Rate, adjusted monthly when said Prime Rate is changed, plus twelve and three-quarters percent (12.75%). Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and Borrower's failure to pay the entire amount then due shall be and continue to be an Event of Default. Upon the occurrence of any Event of Default, neither the failure of Lender promptly to exercise its right to declare the outstanding principal and accrued unpaid interest hereunder to be immediately due and payable, nor the failure of Lender to demand strict performance of any other obligation of Borrower or any other person or entity who or which may be liable hereunder, shall constitute a waiver of any such rights, nor a waiver of such rights in connection with any future default on the part of Borrower or any other person or entity who or which may be liable hereunder.

Notwithstanding anything contained herein to the contrary, or anything contained in the Loan Agreement to the contrary, at any time after sixty (60) days following the occurrence and during the continuation of an Event of Default, Lender may convert this Note into common stock of Borrower by providing Borrower with notice that Lender wishes to convert this Note (the "Conversion Notice"); provided, however, that no such conversion shall occur without the written approval of Crestmark Bank (as such term is defined in the Loan Agreement). Upon the date on which the Conversion Notice is received by the Borrower (following proper delivery of such Conversion Notice by Lender in accordance with the Loan Agreement), or such later date as set

2

forth therein (the "Conversion Date"), this Note shall be converted into that amount of common stock of Borrower (the "Conversion Interests") as shall be equal to fifty-one percent (51%) of all issued and outstanding common stock of Borrower as of the Conversion Date on a fully-diluted basis. Lender shall be deemed to be the holder of the Conversion Interests as of the Conversion Date. No provision of this paragraph shall limit any of Borrower's obligations or Lender's rights under this Note or the Loan Agreement. As soon as practicable after Lender surrenders this Note to Borrower for conversion into Conversion Interests, Borrower shall issue and deliver to Lender a certificate representing the Conversion Interests.

Borrower and all endorsees, sureties and guarantors hereof hereby jointly and severally waive presentment for payment, demand, notice of non-payment, notice of protest or protest of this Note, and Lender's diligence in collection or bringing suit, and do hereby consent to any and all extensions of time, renewals, waivers or modifications as may be granted by Lender with respect to payment or any other provisions of this Note. The liability of Borrower under this Note shall be absolute and unconditional, without regard to the liability of any other party. Borrower is liable to Lender for all reasonable costs and expenses of any kind incurred in the collection of this Note, including, without limitation, reasonable attorneys' fees and court costs. These costs and expenses include, without limitation, any costs or expenses incurred by Lender in any bankruptcy, reorganization, insolvency or similar proceeding.

Notwithstanding anything herein to the contrary, in no event shall Borrower be required to pay a rate of interest in excess of the Maximum Rate (as defined below). The term "Maximum Rate" shall mean the maximum non-usurious rate of interest that Lender is allowed to contract for, charge, take, reserve or receive under the applicable laws of any applicable state or of the United States of America (whichever from time to time permits the highest rate for the use, forbearance or detention of money) after taking into account, to the extent required by applicable law, any and all relevant payments or charges hereunder, or under any other document or instrument executed and delivered in connection therewith and the indebtedness evidenced hereby.

In the event Lender ever receives, as interest, any amount in excess of the Maximum Rate, such amount as would be excessive interest shall be deemed a partial prepayment of principal, and, if the principal hereof is paid in full, any remaining excess shall be returned to Borrower. In determining whether or not the interest paid or payable, under any specified contingency, exceeds the Maximum Rate, Borrower and Lender shall, to the maximum extent permitted by law, (a) characterize any non-principal payment as an expense, fee, or premium rather than as interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread the total amount of interest through the entire contemplated term of such indebtedness until payment in full of the principal (including the period of any extension or renewal thereof) so that the interest on account of such indebtedness shall not exceed the Maximum Rate.

The rights of Lender and its assigns hereunder shall not be impaired by Lender's sale, hypothecation or rehypothecation of this Note or by any indulgence. The purchaser, assignee, transferee or pledgee of this Note shall forthwith become vested with and entitled to exercise all the powers and rights given by this Note to Lender as if such purchaser, assignee, transferee or pledgee were originally named as payee in this Note.

3

IN WITNESS WHEREOF, this Promissory Note has been duly executed by authorized officers of Borrower.

BORROWER:

TURBO COMPONENTS, INC.,
a Michigan corporation

By: _____

Mark A. Sweany

Its:    Vice President

Signature Page to Promissory Note

This Note is secured by that certain Security Agreement by and between the parties' dated October 28, 2014, and by any other liens or security interests provided for in any other related loan agreements executed by Borrower in favor of Lender in connection with this credit facility.

The failure of Lender to exercise any of this rights, remedies, powers or privileges hereunder in any instance will not constitute a waiver thereof, or of any other right or remedy, and no single or partial exercise of any right or remedy shall preclude any other or further exercise thereof or of any other right or remedy.

This Note shall be binding upon Borrower and its successors and assigns, and the benefits hereof shall inure to Lender and its successors and assigns. This Note has been executed in the State of Michigan, and all rights and obligations hereunder shall be governed by the laws of the State of Michigan without regard to principles of conflicts of laws. This Note and any related loan agreements embody the entire agreement between Borrower and Lender regarding the terms of the loan evidenced by this Note and supersede all oral statements and prior writings relating to such loan.

THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. THE PARTIES HERETO, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVE ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

4

IN WITNESS WHEREOF, this Promissory Note has been duly executed by authorized officers of Borrower.

BORROWER:

TURBO COMPONENTS, INC.,
a Michigan corporation

By: _____

Mark A. Sweany

Its:  Vice President

Signature Page to Promissory Note

THE PAYMENT OF THE INDEBTEDNESS EVIDENCED BY THIS NOTE IS SUBORDINATED TO THE EXTENT SET FORTH IN THE SUBORDINATION AND INTERCREDITOR AGREEMENT DATED ON OR ABOUT THE SAME DATE AS THIS NOTE, BETWEEN CRESTMARK BANK, A MICHIGAN BANKING CORPORATION, LOEB TERM SOLUTIONS, A [＿＿＿＿＿＿＿], GROW MICHIGAN, LLC, AND OTHERS, AND REFERENCE IS MADE TO SUCH AGREEMENT FOR A FULL STATEMENT OF THE TERMS AND CONDITIONS OF SUCH SUBORDINATION. THE HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AND INTERCREDITOR AGREEMENT.

## PROMISSORY NOTE

$600,000.00                                                        Jackson, Michigan
Maturity Date: October [7, 2019                          Dated: October [7, 2014

FOR VALUE RECEIVED, TURBO COMPONENTS, INC., a Michigan corporation ("Borrower"), with its principal office at 14680 Apple Drive, Fruitport, Michigan 49415, promise to pay to the order of GROW MICHIGAN, LLC, a Michigan limited liability company ("Lender"), at 180 West Michigan Avenue, Suite 800, Jackson, Michigan 49201, or at such other place as Lender may designate in writing, the principal sum of SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($600,000.00), plus interest as hereinafter provided, all in lawful money of the United States of America, in accordance with the terms hereof, the terms of that certain Business Loan Agreement by and between the parties of even date herewith (the "Loan Agreement"), and all other related loan agreements executed by Borrower in favor of Lender in connection with this credit facility. The terms of the Loan Agreement and such other related loan agreements are incorporated by reference and made part of this Promissory Note (this "Note").

The unpaid principal balance of this Note shall bear interest, computed upon the basis of a year of 360 days for the actual number of days elapsed in a month, at the variable rate per annum equal to the rate of interest designated by The Wall Street Journal (or its successor) ("WSJ") as the Prime Rate (as hereinafter defined), adjusted monthly when said Prime Rate is changed, plus eight hundred seventy-five (875) basis points (8.75%). For purposes of this Note, the term "Prime Rate" shall mean the rate of interest most recently announced by WSJ as its Prime Rate. The Prime Rate may not be the most favorable or lowest rate charged by Lender to its debtors.

Except as otherwise provided herein for early or accelerated payment, interest shall be payable monthly on the first day of each month commencing on the first day of the month following the date hereof, and continuing until April 31, 2015, in six (6) equal monthly installments, each of [＿＿＿＿＿＿].

Except as otherwise provided herein for early or accelerated payment, principal and interest shall be payable monthly on the first day of each month commencing on May 1, 2015, and

270857&v1

continuing until the earlier of payment in full and the Maturity Date (as hereinafter defined), in fifty-four (54) equal monthly installments (based on an eight-four (84) month amortization schedule), each of [_____].

Except as otherwise provided herein for early or accelerated payment, any unpaid principal balance of this Note, together with any accrued and unpaid interest, shall be due and payable in full on or before the date which is sixty (60) months from the date hereof (the "Maturity Date").

Provided that all interest payments on this Note shall then be current, Borrower may prepay this Note in whole at any time or in part (but no individual payment shall be less than five percent (5%) of the original principal amount of this Note) from time to time.

Concurrent with and at the same time as any payment of this Note in whole or in part prior to the Maturity Date, including scheduled principal payments hereunder, voluntary prepayments, and/or as a result of this Note becoming immediately due and payable due to an Event of Default (as such term is defined in the Loan Agreement) in accordance with the terms of this Note and/or the Loan Agreement, in addition to the amount so paid, Borrower shall pay a premium equal to two hundred (200) basis points on (the equivalent of two percent (2%) of) the principal amount being paid.

Borrower acknowledges and agrees that the payment premium specified above is the product of arm's length negotiations between the parties and the amount thereof constitutes reasonable compensation for loss by Lender of the opportunity to recover loan origination expenses and profits over the balance of the term of this Note, and is not a penalty.

All payments received hereunder shall, at the option of Lender, first be applied against accrued and unpaid interest and the balance against principal. Borrower expressly assumes all risks of loss or delay in the delivery of any payments made by mail, and no course of conduct or dealing shall affect Borrower's assumption of these risks.

Upon the occurrence of any Event of Default under the Loan Agreement, Lender, at its option, and without notice to Borrower, may declare the entire unpaid principal balance of this Note, together with all accrued and unpaid interest, to be immediately due and payable.

Upon the occurrence and during the continuance of an Event of Default, the outstanding principal amount hereof shall continue to bear interest at the variable rate per annum equal to the rate of interest designated by WSJ as the Prime Rate, adjusted monthly when said Prime Rate is changed, plus nine and three-quarters percent (9.75%). Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and Borrower's failure to pay the entire amount then due shall be and continue to be an Event of Default. Upon the occurrence of any Event of Default, neither the failure of Lender promptly to exercise its right to declare the outstanding principal and accrued unpaid interest hereunder to be immediately due and payable, nor the failure of Lender to demand strict performance of any other obligation of Borrower or any other person or entity who or which may be liable hereunder, shall constitute a waiver of any such rights, nor a waiver of such rights in connection with any future default on the part of Borrower or any other person or entity who or which may be liable hereunder.

2

Notwithstanding anything contained herein to the contrary, or anything contained in the Loan Agreement to the contrary, at any time after sixty (60) days following the occurrence and during the continuation of an Event of Default, Lender may convert this Note into common stock of Borrower by providing Borrower with notice that Lender wishes to convert this Note (the "Conversion Notice"); provided, however, that no such conversion shall occur without the written approval of Crestmark Bank (as such term is defined in the Loan Agreement). Upon the date on which the Conversion Notice is received by the Borrower (following proper delivery of such Conversion Notice by Lender in accordance with the Loan Agreement), or such later date as set forth therein (the "Conversion Date"), this Note shall be converted into that amount of common stock of Borrower (the "Conversion Interests") as shall be equal to [____] percent [(__%)] of all issued and outstanding common stock of Borrower as of the Conversion Date on a fully-diluted basis. Lender shall be deemed to be the holder of the Conversion Interests as of the Conversion Date. No provision of this paragraph shall limit any of Borrower's obligations or Lender's rights under this Note or the Loan Agreement. As soon as practicable after Lender surrenders this Note to Borrower for conversion into Conversion Interests, Borrower shall issue and deliver to Lender a certificate representing the Conversion Interests.

Borrower and all endorsees, sureties and guarantors hereof hereby jointly and severally waive presentment for payment, demand, notice of non-payment, notice of protest or protest of this Note, and Lender's diligence in collection or bringing suit, and do hereby consent to any and all extensions of time, renewals, waivers or modifications as may be granted by Lender with respect to payment or any other provisions of this Note. The liability of Borrower under this Note shall be absolute and unconditional, without regard to the liability of any other party. Borrower is liable to Lender for all reasonable costs and expenses of any kind incurred in the collection of this Note, including, without limitation, reasonable attorneys' fees and court costs. These costs and expenses include, without limitation, any costs or expenses incurred by Lender in any bankruptcy, reorganization, insolvency or similar proceeding.

Notwithstanding anything herein to the contrary, in no event shall Borrower be required to pay a rate of interest in excess of the Maximum Rate (as defined below). The term "Maximum Rate" shall mean the maximum non-usurious rate of interest that Lender is allowed to contract for, charge, take, reserve or receive under the applicable laws of any applicable state or of the United States of America (whichever from time to time permits the highest rate for the use, forbearance or detention of money) after taking into account, to the extent required by applicable law, any and all relevant payments or charges hereunder, or under any other document or instrument executed and delivered in connection therewith and the indebtedness evidenced hereby.

In the event Lender ever receives, as interest, any amount in excess of the Maximum Rate, such amount as would be excessive interest shall be deemed a partial prepayment of principal, and, if the principal hereof is paid in full, any remaining excess shall be returned to Borrower. In determining whether or not the interest paid or payable, under any specified contingency, exceeds the Maximum Rate, Borrower and Lender shall, to the maximum extent permitted by law, (a) characterize any non-principal payment as an expense, fee, or premium rather than as interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread the total amount of interest through the entire contemplated term of such indebtedness until payment in full of the principal (including the period of any extension or renewal thereof) so that the interest on account of such

3

indebtedness shall not exceed the Maximum Rate.

The rights of Lender and its assigns hereunder shall not be impaired by Lender's sale, hypothecation or rehypothecation of this Note or by any indulgence. The purchaser, assignee, transferee or pledgee of this Note shall forthwith become vested with and entitled to exercise all the powers and rights given by this Note to Lender as if such purchaser, assignee, transferee or pledgee were originally named as payee in this Note.

This Note is secured by that certain Security Agreement by and between the parties of even date herewith, that certain Mortgage by and between the parties of even date herewith, and by any other liens or security interests provided for in any other related loan agreements executed by Borrower in favor of Lender in connection with this credit facility.

The failure of Lender to exercise any of this rights, remedies, powers or privileges hereunder in any instance will not constitute a waiver thereof, or of any other right or remedy, and no single or partial exercise of any right or remedy shall preclude any other or further exercise thereof or of any other right or remedy.

This Note shall be binding upon Borrower and its successors and assigns, and the benefits hereof shall inure to Lender and its successors and assigns. This Note has been executed in the State of Michigan, and all rights and obligations hereunder shall be governed by the laws of the State of Michigan without regard to principles of conflicts of laws. This Note and any related loan agreements embody the entire agreement between Borrower and Lender regarding the terms of the loan evidenced by this Note and supersede all oral statements and prior writings relating to such loan.

THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. THE PARTIES HERETO, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVE ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, this Promissory Note has been duly executed by authorized officers of Borrower.

BORROWER:

TURBO COMPONENTS, INC.,
a Michigan corporation

By:    _____

        Mark A. Sweany

Its:   Vice President

Signature Page to Promissory Note

# EXHIBIT F

**PROMISSORY NOTE**
**(Revolving Line of Credit)**

$328,530.72                                                                                                Fruitport, MI

Maturity Date: December 1, 2023                                                        Dated: January 10, 2023

**FOR VALUE RECEIVED,** on or before the Maturity Date stated above, the undersigned ("Borrower") promises to pay to the order of BorgWarner Turbo Systems LLC ("Lender"), at its offices located at 3850 Hamlin Road, Auburn Hills, MI 48326 or at such other place as Lender may designate in writing, the principal sum of THREE HUNDRED TWENTY-EIGHT THOUSAND FIVE HUNDRED THIRTY AND 72/100 DOLLARS ($328,530.72), or so much as has been advanced and not repaid pursuant to this Note, plus interest as hereinafter provided, in lawful money of the United States. Subject to the terms and conditions of this Note, the unpaid principal balance outstanding from time to time under this Note shall bear interest from the date each Advance is made until paid in full at an interest rate of eight percent (8%) simple interest per annum (the "Interest Rate"). Interest will be calculated on a basis of a 360-day year and charged for the actual number of days elapsed.

Borrower shall pay accrued interest on the principal balance outstanding hereunder, on the first Business Day of each month, commencing June 1, 2023. The unpaid principal balance and all accrued interest thereon shall be due and payable in full on the Maturity Date (or earlier upon acceleration). This is a Note under which advances, repayments, and readvances may be made from time to time, subject to the terms and conditions of this Note. For the avoidance of doubt, this Note covers all future advances made to Borrower by Lender, even in excess of the principal sum identified above.

**LENDER SHALL BE UNDER NO OBLIGATION TO MAKE ANY ADVANCES TO BORROWER PURSUANT TO THIS NOTE, NOTWITHSTANDING ANYTHING EXPRESSED OR IMPLIED IN THIS NOTE OR ANY OTHER LOAN DOCUMENT, AND LENDER, AT ANY TIME(S), WITHOUT NOTICE, AND IN ITS SOLE DISCRETION, MAY REFUSE TO MAKE ADVANCES TO BORROWER WITHOUT INCURRING ANY LIABILITY DUE TO THIS REFUSAL AND WITHOUT AFFECTING BORROWER'S LIABILITY UNDER THIS NOTE FOR ALL AMOUNTS ADVANCED.**

If any payment of principal or interest hereunder is not paid within ten (10) days from the date same is due, then, at the option of Lender, in addition to all other sums due hereunder, Borrower shall pay a late charge in an amount equal to the greater of $30.00 and five percent (5%) of the amount of such payment, but acceptance of payment of any such charge shall not constitute a waiver of any Event of Default hereunder.

The sums advanced hereunder shall be charged to a loan account in Borrower's name on Lender's books (the "Loan Account"), and Lender shall credit to such account the amount of each repayment hereunder. Lender shall render Borrower, from time to time, a statement of account setting forth Borrower's loan balance in said Loan Account which shall be presumed to be correct and accepted by and binding upon Borrower, unless Lender receives a written statement of exceptions within ten (10) days after such statement has been rendered to Borrower. Such statement of account shall be prima facie evidence of the loan and amounts owing to Lender by Borrower hereunder.

Any payment made by mail will be deemed tendered and received only upon actual receipt (time being of the essence), at the address of Lender designated for such payment whether or not Lender has authorized payment by mail or any other manner. Borrower hereby expressly assumes all risk of loss or liability resulting from non-delivery or delay in delivery of any payment transmitted by mail or in any other manner.

No delay or failure of Lender in exercising any right, remedy, power or privilege hereunder shall affect such right, remedy, power or privilege, nor shall any single or partial exercise thereof preclude the exercise of any other right, remedy, power or privilege. No delay or failure of Lender at any time to demand strict adherence to the terms of this Note shall be deemed to constitute a course of conduct inconsistent with Lender's right at any time, before or after any Event of Default (defined below), to demand strict adherence to the terms of this Note.

There shall be no prepayment penalty if all or any part of any principal of the Note which is bearing interest at such time based upon the Interest Rate is paid in whole or in part before the original due date of that principal.

Nothing herein contained, nor any transaction relating thereto, or hereto, shall be construed or so operate as to require Borrower to pay, or be charged, interest at a greater rate than the maximum allowed by the applicable law relating to this Note. Should any interest or other charges, charged, paid or payable by Borrower in connection with this Note, or any other document delivered in connection herewith, result in the charging, compensation, payment or earning of interest in excess of the maximum allowed by the applicable law as aforesaid, then any and all such excess shall be and the same is hereby waived by the holder, and any and all such excess paid shall be automatically credited against and in reduction of the principal due under this Note.

If (a) Borrower or any guarantor under a guaranty of all or part of the indebtedness of Borrower to Lender ("guarantor") (i) fail(s) to pay this Note, or fail(s) to pay any of the other indebtedness of Borrower to Lender when due, by maturity, acceleration or otherwise, or fail(s) to pay any indebtedness of Borrower to Lender owing on a demand basis upon demand; or (ii) fail(s) to comply with any of the terms or provisions of any agreement between Borrower or any guarantor and Lender, and any such failure continues beyond any applicable grace or cure period, if any, expressly provided with respect thereto; or (iii) become(s) insolvent or the subject of a voluntary or involuntary proceeding in bankruptcy, or a reorganization, arrangement or creditor composition proceeding, (if a business entity) cease(s) doing business as a going concern, (if a natural person) die(s) or become(s) incompetent, (if a partnership) dissolve(s) or any general partner of it dies, becomes incompetent or becomes the subject of a bankruptcy proceeding or (if a corporation or a limited liability company) is the subject of a dissolution, merger or consolidation; or (b) if any warranty or representation made by Borrower or any guarantor in connection with this Note or any of the indebtedness of Borrower to Lender shall be discovered to be untrue or incomplete; or (c) if there is any termination, notice of termination, or breach of any guaranty, pledge, collateral assignment or subordination agreement relating to all or any part of the indebtedness of Borrower to Lender; or (d) if there is any failure by Borrower or any guarantor to pay when due any of its indebtedness (other than to Lender) or in the observance or performance of any term, covenant or condition in any document evidencing, securing or relating to such indebtedness; or (e) if Lender deems itself insecure, in good faith believing that the prospect of payment or performance of this Note or any of the indebtedness of Borrower to Lender is impaired or shall fear deterioration, removal or waste of any of the collateral securing all or any part of such indebtedness; or (f) if there is filed or issued a levy or writ of attachment or garnishment or other like judicial process, upon Borrower or any guarantor or any of the collateral securing all or any part of the indebtedness of Borrower to Lender, including without limit, any accounts of Borrower or any guarantor with Lender, then Borrower shall be in default under this Note (an "Event of Default").

Upon the occurrence of an Event of Default: (a) the entire unpaid principal balance and all accrued interest shall at the sole option of Lender be immediately due and payable, without presentment, demand, protest or any further notice or any other formalities of any kind, all of which are hereby expressly and irrevocably waived, together with (to the extent permitted under applicable law) the costs, attorneys' fees, and outside consultants' fees reasonably incurred by Lender in collecting or enforcing payment, (b) the outstanding principal amount hereof shall bear interest at the Default Rate, (c) Lender may proceed to protect and enforce all or any of its rights, remedies, powers and privileges under this Note by action at law, suit in equity or other appropriate proceedings, and (d) any commitment or obligation, if any, on the part of Lender to make loans or otherwise extend credit to or in favor of Borrower shall immediately terminate. Upon the occurrence and at any time during the continuance or existence of an Event of Default under subsection (a)(iii) of the preceding paragraph, then the Obligations and all indebtedness then outstanding thereunder shall automatically become immediately due and payable without any notice by Lender to Borrower and any commitment or obligation, if any, on the part of Lender to make loans or otherwise extend credit to or in favor of Borrower shall immediately terminate. Further, upon the occurrence or at any time during the continuance or existence of any default hereunder, Lender may collect, deal with and dispose of all or any part of any security in any manner permitted or authorized by the Michigan Uniform Commercial Code or other applicable law (including public or private sale), and after deducting expenses (including, without limitation, reasonable attorneys' fees and expenses), Lender may apply the proceeds thereof in part or full payment of any of the Obligations, whether due or not, in any manner or order Lender elects.

Borrower hereby grants to Lender a security interest in Lender's own indebtedness or liability to Borrower, if any, however evidenced, including a security interest in all of Borrower's bank deposits, instruments, negotiable

2

documents and chattel paper which at any time are in the possession or control of Lender, as further security for repayment of the Obligations; and Borrower hereby grants to Lender all rights and privileges afforded a secured party under the Michigan Uniform Commercial Code or other applicable law.

All payments other than scheduled payments paid hereunder shall, at the option of Lender, first be applied against any and all fees, costs and expenses (including expenses of collection), then against accrued interest, and the balance against principal. Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default.

Borrower hereby waives presentment for payment, demand, notice of non-payment, notice of protest and protest of this Note, diligence in collection or bringing suit.

Borrower's obligations hereunder are cross-collateralized and cross-defaulted with all other indebtedness owing to Lender by Borrower.

No delay or omission of Lender to exercise any right under this Note impairs that right nor can it be construed to waive any Event of Default or acquiesce in any Event of Default, and the making of an advance notwithstanding the existence of an Event of Default or the inability of Borrower to satisfy the conditions precedent to such advance does not constitute a waiver or acquiescence. Any single or partial exercise of any right does not preclude any other or further exercise of it or the exercise of any other right, and no waiver, amendment or other variation of the terms of this Note is valid unless in writing signed by Borrower and Lender, and then only to the extent that such writing specifies. All remedies contained in this Note or afforded by law are cumulative and all are available to Lender until this Note has been paid in full.

Borrower must reimburse Lender for any costs, internal charges and out-of-pocket expenses (including attorneys' fees and time charges of attorneys for Lender, who may be employees of Lender) paid or incurred by Lender in connection with the preparation, review, execution, delivery, amendment, modification, administration, collection and enforcement of this Note. Borrower further indemnifies Lender, its directors, officers and employees against all losses, claims, damages, penalties, judgments, liabilities and expenses (including without limitation all expenses of litigation or preparation for litigation whether or not Lender is a party) which any of them pay or incur arising out of or relating to this Note or the direct or indirect application or proposed application of the proceeds of this Note.

This Note, if executed by more than one (1) Person, shall be the joint and several obligation of all of such Persons, and shall be binding upon each Borrower and its heirs, personal representatives, successors and assigns, whether expressed or not. The liability of each Borrower shall be absolute and unconditional, without regard to the liability of any other party hereto.

The terms of this Note bind and benefit Borrower and Lender and their respective successors and assigns, except that Borrower shall not assign its rights or obligations under this Note. Lender may, at any time, sell to one or more Persons participating interests in this Note. Lender may, without the consent of Borrower, assign to one or more Persons all or any part of its rights and obligations under this Note, and Borrower releases Lender for the amount so assigned.

This Note is to be construed in accordance with the internal laws (but not the law of conflicts) of the State of Michigan. Borrower irrevocably submits to the non-exclusive jurisdiction of any United States federal or state court sitting in the State of Michigan in any action or proceeding arising out of or relating to this Note, and Borrower irrevocably agrees that all such claims may be heard and determined in any such court and irrevocably waives any present and future objection it may have as to the venue of any action or proceeding brought in that court, or that that court is an inconvenient forum. Nothing herein shall limit the right of Lender to bring any action or proceeding against Borrower in the courts of any other jurisdiction.

Lender hereby notifies Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act"), and Lender's policies and practices, Lender is

3

required to obtain, verify and record certain information and documentation that identifies Borrower, which information includes the name and address of Borrower and such other information that will allow Lender to identify Borrower in accordance with the Act.

Borrower acknowledges and agrees that (a) copies of this Note and the other Loan Documents, including without limitation photocopies, facsimiles and electronically scanned copies, shall be deemed originals and shall be enforceable without the necessity of producing originals, (b) Borrower shall not contest the existence, validity or enforceability of this Note or any of the other Loan Documents on account of the failure of Lender to produce an original of this Note or the other Loan Documents, and (c) Lender may, without notice to or the consent of Borrower, dispose of or destroy the originals of this Note and the other Loan Documents without affecting Lender's rights under this Note and the other Loan Documents.

## DEFINITIONS

As used in this Note, the following terms shall have the given meaning:

"Business Day" shall mean any day other than Saturday or Sunday on which (i) commercial banking institutions are open for business in Michigan and (ii) dealings in US dollar deposits are transacted in the London interbank market.

"Default Rate" shall mean an annual rate of interest equal to the lesser of (i) three percent (3.0%) per annum in excess of the Interest Rate or (ii) the highest rate of interest permitted by applicable law to be charged for unpaid monetary obligations.

"Governmental Authority" shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including, without limitation, any supranational bodies such as the European Union or the European Central Bank).

"Interest Period" shall mean one (1) month, provided that: (i) that the first Interest Period for any advance made on any day other than on the first Business Day of any month shall be the period commencing on the date such advance is made and ending on the first Business Day of the next succeeding month and (ii) if any Interest Period would otherwise expire on a day which is not a Business Day, the Interest Period shall be extended to the next succeeding Business Day (provided, however, that if such next succeeding Business Day occurs in the following calendar month, then the Interest Period shall expire on the immediately preceding Business Day).

"Loan Documents" shall mean, collectively, this Note, any guaranties, mortgage, security agreement, any swap agreements, other interest rate protection agreements, derivative agreements, and any other document, instrument or agreement evidencing or securing this Note, together with any and all modifications and amendments to any of the foregoing.

"Obligations" shall mean, collectively, Borrower's obligations for the payment of all sums advanced or to be advanced hereunder, together with interest on the outstanding principal balance of such sums and with any and all other sums payable by Borrower to Lender pursuant to this Note or any other Loan Documents, along with Borrower's obligation for the payment of any letters of credit issued by Lender and payment and performance of all of the warranties, representations, covenants and agreements to be paid, fulfilled, observed and performed by Borrower under each Loan Document to which Borrower is a party.

"Person" shall mean any corporation, natural person, firm, limited liability company, joint venture, partnership, trust, unincorporated organization, enterprise, government or any department or agency of any government.

4

**LENDER AND BORROWER KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT EITHER OF THEM TO HAVE TO A TRIAL BY JURY IN ANY PROCEEDING (WHETHER SOUNDING IN CONTRACT OR TORT) WHICH IS IN ANY WAY CONNECTED WITH THIS NOTE, ANY RELATED AGREEMENT, OR THE RELATIONSHIP ESTABLISHED UNDER IT.**

[remainder of page intentionally left blank]

BORROWER:

**TURBO COMPONENTS, INC.**

Address:

14680 Apple Drive

By:

Fruitport, MI 49415

Its: President

NOTARIZATION OF BORROWER'S SIGNATURE REQUIRED IF NOT SIGNED IN PRESENCE OF LENDER'S REPRESENTATIVE.

STATE OF MICHIGAN

COUNTY OF KENT

The foregoing instrument was acknowledged before me on January 13, 2023 by Bradley Fortenbacher, the President, of Turbo Components, Inc., on behalf of said entity.

Nicole Zuidema
Notary Public, Kent County, Michigan
My commission expires: January 29, 2028

NICOLE ZUIDEMA
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF KENT
My Commission Expires   January 29, 2028
Acting in the County of

[Signature Page to Promissory Note]

ERECORDING
**2023-0004714**
**FILED & SEALED FOR RECORD IN**
**OTTAWA COUNTY, MI**
**JUSTIN F. ROEBUCK**
**COUNTY CLERK/REGISTER OF DEEDS**
**03/01/2023  AT 11:24 AM**
**30.00**

# MORTGAGE

**THIS MORTGAGE** is given on the 10th day of January, 2023, by TURBO COMPONENTS, INC., a Michigan corporation, of 14680 Apple Drive, Fruitport, Michigan 49415 ("**Mortgagor**"), to BORGWARNER TURBO SYSTEMS LLC, a Delaware limited liability company, of 3850 Hamlin Road, Auburn Hills, Michigan 48326 ("**Lender**").

FOR VALUE RECEIVED, Mortgagor mortgages and warrants to Lender land located in the Township of Spring Lake, County of Ottawa, State of Michigan, described as follows:

That part of the following description lying West of Old US-16 beginning at a point 249.25 feet North of the Southeast corner of the Northwest 1/4 of the Northeast 1/4 of Section 1, Town 8 North, Range 16 West and running thence North on the East 1/8 line of said Section 747.75 feet, thence West to a point on the North and South 1/4 line of said Section, 988.0 feet North of the North 1/8 line; thence South on said North and South 1/4 line 741 feet, thence Easterly to the place of beginning, excepting the South 141 feet of the East 205 feet of the West 238 feet thereof.

PP#70-03-01-200-026 Commonly known as: 14680 Apple Drive, Spring Lake, Michigan 49456

and (1) all buildings, structures and other improvements now or in the future located on the land and all easements, hereditaments and appurtenances now or in the future belonging to the land, (2) all fixtures now or in the future attached to or used in connection with the land, (3) all equipment (including, without limitation, all machinery, engines, boilers, elevators and plumbing, heating, air conditioning and ventilating equipment) now or in the future located on the land, all of which equipment shall be considered to be fixtures and a part of the realty, (4) all rents, income and profits arising from the land or from the buildings, structures, other improvements, fixtures and equipment now or in the future located on the land and (5) all rights to make divisions of the land that are exempt from the platting requirements of the Michigan Land Division Act, as it shall be amended, subject to a mortgages dated August 17, 2012, recorded September 12, 2012, in the office of the Ottawa County, Michigan, Register of Deeds, in Instrument No. 2012-0038213, in favor of Comerica Bank, as mortgagee and dated June 5, 2015, recorded June 8, 2015, in the office of the Ottawa County, Michigan, Register of Deeds, in Instrument No. 2015-0020488, in favor of Comerica Bank (collectively "**Prior Mortgage**").  In this Mortgage, the above-described land, buildings, structures, improvements, easements, hereditaments, appurtenances, fixtures and equipment are collectively called "**the premises.**"

-1-

**THIS MORTGAGE SECURES PAYMENT AND PERFORMANCE OF ALL INDEBTEDNESS AND OBLIGATIONS NOW AND IN THE FUTURE OWING TO LENDER BY MORTGAGOR, including all obligations of Mortgagor under this Mortgage,** The indebtedness and obligations now owing to Lender by Mortgagor include, **BUT ARE NOT NECESSARILY LIMITED TO**, the indebtedness and obligations evidenced by any promissory notes, guarantees and documents listed below.

| Note, Guaranty or Document | Date | Principal Amount (If Any) |
|---|---|---|
| **Promissory Note** | **01/10/2023** | **$464,915.11** |

This Mortgage secures all present and future indebtedness and obligations owing to Lender by Mortgagor, regardless of whether any such indebtedness or obligation is (i) not listed above, (ii) not presently intended or contemplated by Lender or Mortgagor, (iii) indirect, contingent or secondary, (iv) unrelated to the premises or to any financing of the premises by Lender, (v) of a kind or class that is different from any indebtedness or obligation now owing to Lender by Mortgagor, or (vi) evidenced by a note or other document that does not refer to this Mortgage.

The indebtedness and obligations secured by this Mortgage are collectively referred to in this Mortgage as the "**Indebtedness**."

Mortgagor further warrants, represents and agrees as follows:

1.      **Payment of Indebtedness**.  Mortgagor agrees to pay or perform all of the Indebtedness now or in the future owing by Mortgagor, including all interest on it, in accordance with the terms of the instruments, documents or agreements evidencing it ("**Instruments**").

2.      **Warranties**.  Mortgagor warrants and represents to Lender as follows:

Mortgagor is a corporation, duly incorporated and validly existing in good standing in the State of Michigan or other jurisdiction indicated in the first

-2-

paragraph of this Mortgage; Mortgagor has full power and authority to carry on its business as presently conducted and to enter into and perform its obligations under this Mortgage; the execution, delivery and performance of this Mortgage by Mortgagor have been duly authorized by all necessary action of its members and managers and will not violate Mortgagor's articles of organization or operating agreement and will not require the approval of its members.

3. **Assignment of Leases and Contracts**. Mortgagor assigns and mortgages to Lender, and grants to Lender a security interest in, as additional security for the Indebtedness, all of Mortgagor's right, title and interest in and to all existing and future oral or written leases of all or any part of the premises or of any interest in them, together with all rents and profits arising from, and all other proceeds of, those leases.

4. **Prior Mortgage**. Mortgagor shall pay each and every installment of principal and interest of the indebtedness secured by the Prior Mortgage, as and when due and payable, and shall pay and perform all other obligations under or secured by the Prior Mortgage.

5. **Taxes and Insurance**. Mortgagor shall pay, or cause to be paid, before they become delinquent, all taxes, assessments and other similar charges levied upon or with respect to the premises and shall promptly deliver to Lender satisfactory evidence of payment of them. Mortgagor shall cause all buildings, improvements and other insurable parts of the premises to be insured against loss or damage by fire, by hazards included within extended coverage and by other risks that Lender from time to time requires, in amounts and with insurers that are acceptable to Lender, and Mortgagor shall cause all premiums on the insurance to be paid when due. Lender shall not, however, require hazard insurance covering any building or buildings that are part of the premises to be in an amount greater than the replacement cost of the building or buildings. Each policy shall provide that the insurer shall give Lender at least 10 days' prior written notice of any cancellation of or any material change in the insurance. Lender is authorized to settle, adjust or compromise any claims for loss or damage under any insurance policy. Mortgagor shall immediately endorse and deliver to Lender all proceeds of any policy. purchase the required insurance following Lender's notification to Mortgagor that Mortgagor was required to do so.

6. **Maintenance and Repair**. Mortgagor shall maintain the premises in good condition and repair; shall not commit or suffer any waste of the premises; shall not remove, demolish or substantially alter any building or fixture on the premises without the prior written consent of Lender; shall cause to be complied with all laws, ordinances, regulations and requirements of any governmental authority applicable to the premises or to activities on the premises; shall promptly repair, restore, replace or rebuild any part of

-3-

the premises that is damaged or destroyed by any casualty; and shall promptly pay when due all charges for utilities and other services to the premises.

7.     **Lender's Right to Perform; Receiver.**  If Mortgagor shall default in the performance of any obligation of Mortgagor under this Mortgage (including, without limitation, its obligations to keep the premises in good condition and repair, to pay taxes and assessments and to obtain and maintain insurance), then Lender shall have the right, but shall have no obligation, to perform, or cause to be performed, the obligation, and Mortgagor shall reimburse Lender on demand for all sums expended by Lender in doing so.

8.     **Condemnation.**  If all or any part of the premises is taken, whether temporarily or permanently, under power of eminent domain or by condemnation, the entire proceeds of the award or other payment for the taking shall be paid directly to Lender.

9.     **Environmental and Access Law Warranties and Agreements.** Mortgagor warrants and represents to Lender, and agrees, as follows:

(a)     Mortgagor, the premises and all activities of Mortgagor and all other persons on the premises are and shall continue to be in compliance with all environmental laws and all access laws.  No part of the premises is or shall in the future be used as a "public accommodation," as defined in the federal Americans With Disabilities Act, as amended.  The premises are not and shall not become a site or source of environmental contamination.  Except as expressly disclosed by Mortgagor to Lender in writing, (1) no asbestos or polychlorinated biphenyls are present on or contained in the premises, and (2) the premises do not contain, and have never contained, an underground storage tank.

(b)     In this Mortgage, (1) **"environmental law"** means at any time any applicable federal, state, local or foreign law (including common law), ordinance, rule, regulation, permit, order or other legally binding requirement that then (A) regulates the quality of air, water, soil or other environmental media, (B) regulates the generation, management, transportation, treatment, storage, recycling or disposal of any wastes, (C) protects public health, occupational safety and health, natural resources or the environment, or (D) establishes liability for the investigation, removal or remediation of, or harm caused by, environmental contamination; (2) **"hazardous substance"** means at any time any substance or waste that is then subject to or regulated by any environmental law, (3) **"environmental contamination"** means the presence of a hazardous substance in or on, or the release, discharge or emission of a hazardous substance from, the premises in excess of any limit or criterion established or issued under any environmental law, and (4) **"access law"** means at any time any applicable law, ordinance, rule,

-4-

regulation or order that then regulates the accessibility of property to disabled persons, including, but not limited to, the federal Americans With Disabilities Act, as amended.

10. **Events of Default and Acceleration**. Upon the occurrence of any of the following events of default, all or any part of the Indebtedness shall, at the option of Lender, become immediately due and payable without notice or demand:

(a) If default occurs in the payment or performance of any of the Indebtedness, when and as it shall be due and payable.

(b) If default occurs in the performance of any obligation to Lender under this Mortgage, whether or not Lender shall have performed the obligation on Mortgagor's behalf, and whether or not Mortgagor shall have reimbursed Lender for any payments or expenses it incurred curing the default.

(c) If Mortgagor, without the written consent of Lender, shall sell, convey or transfer the premises or any interest in the premises or any rents or profits from the premises, or if any part of the premises or any interest in them shall be transferred by operation of law.

(d) If a voluntary or involuntary case in bankruptcy or receivership shall be started by or against Mortgagor.

11. **Remedies**. Lender shall have all rights and remedies given by this Mortgage or otherwise permitted by law. In addition, Lender shall have the right and is authorized:

(a) To foreclose this Mortgage by action under applicable law.

(b) To sell, release and convey the premises at public sale, and to sign and deliver to the purchasers at the sale good and sufficient deeds of conveyance, paying any surplus funds, after payment of the Indebtedness in full and the expenses of the sale, including attorney fees as provided by law, to Mortgagor, all in accordance with Chapter 32 of the Michigan Revised Judicature Act, as it may be amended from time to time, and any similar statutory provisions that may in the future be enacted in addition to Chapter 32 or in substitution for it. The premises may, at the option of Lender, be sold in one parcel.

(c) To pay, on behalf of Mortgagor, all or any part of the indebtedness and obligations then secured by the Prior Mortgage, whether or not then due and payable and whether or not Mortgagor shall then be in default under the Prior Mortgage, but Lender shall not be obligated to do so. Any payment by Lender

-5-

shall become part of the Indebtedness, payable by Mortgagor to Lender upon demand.

All rights and remedies of Lender under this Mortgage, whether or not exercisable only on default, shall be cumulative and may be exercised from time to time, and no delay by Lender in the exercise of any right or remedy shall be a waiver of it, and no single or partial exercise of any right or remedy shall prevent other or further exercise of it or the exercise of any other right or remedy, except to the extent otherwise provided by law.

12. **Indemnification.** Mortgagor shall indemnify and hold harmless Lender with respect to any and all claims, demands, causes of action, liabilities, damages, losses, judgments and expenses (including attorney fees) that shall be asserted against or incurred by Lender by reason of (1) any representation or warranty by Mortgagor in this Mortgage being inaccurate in any respect, (2) any failure of Mortgagor to perform any of Mortgagor's obligations under this Mortgage, or (3) any past, present or future condition or use of the premises (whether known or unknown), other than an excluded condition or use, including, but not limited to, liabilities arising under any "environmental law," as defined in *Paragraph* 9 of this Mortgage. An "**excluded condition or use**" is one that both (A) does not exist or occur, to any extent, at any time before Mortgagor has permanently given up possession and control of the premises by reason of a foreclosure of this Mortgage or Lender's acceptance of a conveyance of the premises to Lender in lieu of foreclosure and (B) was not caused or permitted to exist, in whole or part, by any act or omission of Mortgagor. Indemnification by Mortgagor under this paragraph shall not limit any other right or remedy (including Lender's right to accelerate payment of the Indebtedness) that is available to Lender by reason of the circumstance in respect of which indemnity is made. Mortgagor's obligations under this paragraph shall survive foreclosure of this Mortgage and any conveyance of the premises in lieu of foreclosure.

13. **Expenses.** Mortgagor shall pay to Lender on demand all expenses, including attorney fees and legal expenses, paid or incurred by Lender in collecting or attempting to collect the Indebtedness or in protecting and enforcing the rights of and obligations to Lender under any provision of this Mortgage, including, without limitation, taking any action in any bankruptcy, insolvency or reorganization proceeding concerning Mortgagor or foreclosing this Mortgage by advertisement or by action.

-6-

**LENDER AND MORTGAGOR EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES ITS, HIS OR HER RIGHT TO A TRIAL BY JURY IN ANY ACTION, INCLUDING ANY CLAIM, COUNTERCLAIM, CROSS-CLAIM OR THIRD-PARTY CLAIM ("CLAIM"), THAT IS BASED UPON, ARISES OUT OF OR RELATES TO THIS MORTGAGE OR THE INDEBTEDNESS, INCLUDING, WITHOUT LIMITATION, ANY CLAIM THAT IS BASED UPON, ARISES OUT OF OR RELATES TO ANY ACTION OR INACTION OF LENDER IN CONNECTION WITH ANY ACCELERATION OF THE INDEBTEDNESS OR ANY FORECLOSURE OR OTHER ENFORCEMENT OF THIS MORTGAGE.**

Mortgagor has signed this Mortgage as of the date stated on the first page of this Mortgage.

TURBO COMPONENTS, INC.

By _____

Brad Fortenbacher
Its President

**STATE OF MICHIGAN** )
: ss.
**COUNTY OF** _Muskegon_ )

This Mortgage was acknowledged before me on _Feb 8th_, 2023, by Brad Fortenbacher, not individually, but as a President of Turbo Components, Inc., a Michigan corporation, for the corporation.

_Tammi L. DeMott_

Notary Public, _Muskegon_ County, Michigan
My commission expires: _10·10·2026_
Acting in the County of : _Muskegon_

> TAMMI L DEMOTT
> Notary Public - State of Michigan
> County of Muskegon
> My Commission Expires Oct 10, 2026
> Acting in the County of _Muskegon_

THIS INSTRUMENT PREPARED BY AND RETURN TO:
Dennis W. Loughlin
**WARNER NORCROSS & JUDD LLP**
2715 Woodward Avenue, Suite 300
Detroit, Michigan 48201
Telephone: (313) 546-6186
27749922

-8-